CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 16-3456

EDDIE R. BRADLEY,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF UNIVERSITY PARK, ILLINOIS,
an Illinois Home Rule municipality, and
VIVIAN COVINGTON, Mayor, in her individual
and official capacities,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15–CV–8489 — **Charles R. Norgle**, *Judge.*

————————————

ARGUED SEPTEMBER 15, 2017 — DECIDED JULY 16, 2019

————————————

Before MANION, ROVNER and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In 2015, the Village of University Park's mayor and board fired police chief Eddie Ray Bradley without any notice of good cause or any form of hearing—i.e., the procedural protections owed to Bradley under the United States Constitution. Bradley sued the village and mayor in

federal court under 42 U.S.C. § 1983 for violating his Four-teenth Amendment rights by depriving him of a property in-terest in his job without due process of law. He also asserted several state-law claims. The district court dismissed Brad-ley's federal due process claim on the pleadings. We reverse.

The parties agree that Bradley had a protected property interest in his continued employment. They agree that the mayor and the village board are the policymakers for their municipality on the subject. And everyone agrees that al-though there was ample opportunity for a hearing, Bradley received no pretermination notice or hearing. Those points of agreement suffice to prove a due process claim under § 1983 against the individual officials and the village itself, where the village acted through high-ranking officials with policymak-ing authority. See, e.g., *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 542 (1985); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485 (1986); *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694 (1978).[1]

The defendants seek to avoid this straightforward conclu-sion. They urge us to follow a line of cases that excuses liabil-ity for the absence of predeprivation due process if the depri-vation is the result of a "random, unauthorized act by a state employee, rather than an established state procedure," and "if a meaningful postdeprivation remedy for the loss is availa-ble." *Hudson v. Palmer*, 468 U.S. 517, 532-33 (1985), citing *Par-ratt v. Taylor*, 451 U.S. 527, 541 (1981), and *Logan v. Zimmerman*

---

[1] This case does not present any issues concerning genuine emergen-cies. *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981) (explaining the "emergency situation exception to the normal rule that due process requires a hearing prior to deprivation of a property right"); *Tavarez v. O'Malley*, 826 F.2d 671, 674, 677 (7th Cir. 1987).

No. 16-3456                                                              3

*Brush Co.*, 455 U.S. 422 (1982); see also *Easter House v. Felder*, 910 F.2d 1387 (7th Cir. 1990) (en banc). Defendants reason that because the village's top officials decided as a matter of village policy to deny an employee due process in a way that also violated state law, their policy decision should be treated as a "random and unauthorized act … beyond the control of the State," *Parratt*, 451 U.S. at 541, leaving Bradley to pursue remedies only under state law. In other words, defendants argue that by intentionally violating plaintiff's federal due process rights in a way that also violated state law, they insulated their actions from federal liability.

This argument is foreclosed for several reasons. First, the Supreme Court has never suggested that the pragmatic but narrow rule of *Parratt* applies to employee due process claims where predeprivation notice and an opportunity to be heard could be provided in a practical way. Public employers' decisions to violate both state and federal procedural requirements have never been treated as grounds to excuse federal due process liability. In addition, in this case, the decision to fire Bradley was made by the top municipal officials. This court has held squarely that "a complaint asserting municipal liability under *Monell* by definition states a claim to which *Parratt* is inapposite." *Wilson v. Town of Clayton*, 839 F.2d 375, 380 (7th Cir. 1988). That holding is consistent with other circuits and accords with common sense. A municipality cannot be held liable under a respondeat superior theory of liability. It can be held liable for a constitutional violation only if the violation resulted from a formal policy, an informal custom, or a decision "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 691, 694 & n.58. In cases alleging due process violations by municipal policymakers, there is no need to inquire

separately into whether an employee's actions were "random and unauthorized."

In addition, defendants' expansive interpretation of *Parratt*, *Hudson* and *Easter House* is at odds with the Supreme Court's explication of *Parratt* and *Hudson* in *Zinermon v. Burch*, 494 U.S. 113, 124 (1990), which explained that the Court had "rejected the view that § 1983 … does not reach abuses of state authority that are forbidden by the State's statutes or Constitution or are torts under the State's common law," and that "overlapping remedies are generally irrelevant to the question of the existence of a cause of action under § 1983."

Excusing top municipal officials from federal liability when they violate constitutional due process rights, so long as they also violate state laws and the state provides some post-deprivation recourse, would (1) undermine public employees' due process rights and remedies under *Loudermill* and its progeny; (2) conflict with *Monroe v. Pape*, 365 U.S. 167 (1961), and its progeny, which hold that a state or local official may be sued under § 1983 for actions taken "under color of state law" even though the official's actions also violate state or local law and a remedy exists under state law; and (3) conflict with *Patsy v. Board of Regents*, 457 U.S. 496, 500–01 (1982), which held that § 1983 plaintiffs need not exhaust state-law remedies before asserting their federal rights. There is no indication in *Parratt*, *Hudson*, *Zinermon*, or our en banc decision in *Easter House* of an intention to undermine or overrule so much bedrock § 1983 law or to intrude on *Monell* doctrine in cases against municipalities. Those decisions should not be read to provide a defense to Bradley's due process claim.

Where predeprivation procedures are both required and practicable, municipal policymakers expose the municipality

No. 16-3456                                                      5

and themselves to liability under § 1983 if they deliberately disregard an individual's constitutional due process rights. This is true even when state law also offers postdeprivation remedies. We therefore reverse the judgment of the district court and remand for further proceedings.

I.  *Factual Background and Procedural History*

In 2013, plaintiff Bradley became the police chief of the Village of University Park, Illinois. Soon after a municipal election in 2015, however, the mayor and village board placed Bradley on administrative leave. Thirteen days later, they fired him summarily, without giving him any notice of good cause or any opportunity to be heard.

The letter terminating Bradley did not try to justify his firing based on any sort of good cause. It suggested that he was being ousted by operation of state law because his employment contract extended his tenure beyond the term of the village officeholders who had appointed him, citing 65 Ill. Comp. Stat. 5/3.1-30-5(c) & 5/8-1-7(b), and *Millikin v. Edgar County*, 142 Ill. 528 (1892). This meant, according to the village board, that Bradley's appointment as police chief terminated as of May 15, 2015 without needing a board vote, a statement of reasons, or a hearing. Bradley responded with a letter demanding an opportunity to be heard. He received no answer.

These actions did not comply with the termination provisions of Bradley's employment contract, the requirements of state law, or—critical to this case—the Fourteenth Amendment. To effect Bradley's removal, Illinois state law required the village to follow a process set forth in 65 Ill. Comp. Stat. 5/10-2.1-17. See also University Park, Ill., *Codified Ordinances* part 2, title 8, § 271-02(g) (adopting in its entirety 65 Ill. Comp.

Stat. 5/10-2.1-17). This process requires a statement of "the reasons for such removal or discharge," which must be voted on by the village's corporate authorities before the discharge may take effect. *Id.* The process also includes "a fair and impartial hearing of the charges" in front of the village's board of fire and police commissioners. *Id.* These procedures would, if followed, satisfy the basic federal constitutional requirement that the village offer its tenured employees notice and an opportunity to be heard before firing them, a right that "does not depend on a demonstration of certain success." *Loudermill*, 470 U.S. at 542–46; *id.* at 544, citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978); see also *Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (explaining that minimum constitutional requirements of "pretermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story").

The mayor and the village board had the authority and discretion to fire Bradley. State law delegated this authority to their offices. See 65 Ill. Comp. Stat. 5/10-2.1-17 (vesting power to remove police chief in "the appointing authority"); University Park, Ill., *Codified Ordinances* part 2, title 4, § 210-01 (mayor sits on village board); *id.* at title 6, § 220-02 & -05 (village board, which includes the mayor, appoints a municipal manager, and together the board, mayor, and manager appoint and remove police chief).

Bradley sued under § 1983 for deprivation of property without due process of law, naming as defendants the village itself and the mayor in her official and individual capacities. (We need not distinguish between the village and the mayor in this opinion.) He also sought relief under several state-law

theories. The village filed an answer admitting that Bradley was fired without any process and asserting several affirmative defenses, including qualified immunity for the mayor in her individual capacity. The village has conceded that Bradley held a protected property interest in his job.[2]

The district court directed the parties to address the qualified immunity defense and to address our decision in *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 532–33 (7th Cir. 2008), which affirmed dismissal of a federal due process claim by a local fire inspector. Unlike the present case, Michalowicz *had* received hearings both before and after his firing, but he alleged that his hearings did not comply with the detailed procedures required under the state statute. Nonetheless, the district court here rendered judgment on the pleadings and dismissed Bradley's due process claim with prejudice. Dkt. 35 at 3.

The district court reasoned that Bradley simply "attacks the actions, and inactions, of Defendants in the process of firing him" and not the "process available to him under Illinois law" for vindicating his rights. *Id.* This meant, in the judgment of the district court, that "Plaintiff's accusations are that Defendants' actions were 'random and unauthorized' by law," *id.* at 2, quoting *Michalowicz*, 528 F.3d at 535, so that constitutional due process requirements are met as long as a state law

---

[2] This fact distinguishes Bradley's case from the same village's firing of its village manager, also in May 2015. See *Linear v. Village of University Park*, 887 F.3d 842, 843–44 (7th Cir. 2018) (finding that plaintiff failed to state due process claim because he did not have property interest in his tenure as village manager). The village has expressly waived on appeal any arguments it might have made to the contrary. See Appellees' Br. at 14, 23–24.

No. 16-3456

remedy "provides for a post-termination hearing." *Id.* The district court found that Bradley's remedy in state court under state administrative law would be adequate and his "choice" not to take advantage of the state administrative process available to him was "fatal to his claim in federal court." *Id.* at 3. The court then dismissed Bradley's remaining state-law claims without prejudice.

## II. *Bradley's Federal Due Process Claim*

### A. *Due Process Basics*

Because the district court dismissed Bradley's complaint on the pleadings under Federal Rule of Civil Procedure 12(c) for failure to state a claim, we review the district court's legal conclusions *de novo*, construing the factual allegations in the complaint in the light most favorable to Bradley. E.g., *Bishop v. Air Line Pilots Ass'n*, 900 F.3d 388, 396–97 (7th Cir. 2018).

The basic legal questions presented by due process cases like this are familiar: "(1) is there a property or liberty interest protected by due process; and (2) if so, what process is due, and when must that process be made available?" *Simpson v. Brown County*, 860 F.3d 1001, 1006 (7th Cir. 2017); see generally *Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976).

For public employees, a "protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract." *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004), quoting *Johnson v. City of Fort Wayne*, 91 F.3d 922, 943 (7th Cir. 1996). We need not dwell on this element. As noted, the village concedes that Bradley had a property interest in his job protected by procedural due process. His protections were not just procedural but substantive. Cf. *Manley v. Law*, 889 F.3d 885, 893 (7th Cir.

No. 16-3456                                                    9

2018) (purely procedural rules of state or local law do not support claim to federal due process rights), citing *Swarthout v. Cooke*, 562 U.S. 216, 221–22 (2011).

When a public employee has a property interest in his or her job, the constitutional requirements for predeprivation procedures are well-established: notice of the proposed deprivation, a statement of reasons, and an opportunity to be heard in response. *Board of Regents v. Roth*, 408 U.S. 564, 569–70 (1972); *Perry v. Sindermann*, 408 U.S. 593, 602–03 (1972). As for "the specific dictates of due process" in any individual case, we are required to consider "three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Being fired from a job does not require a predeprivation hearing that approximates a full trial. Cf. *Goldberg v. Kelly*, 397 U.S. 254, 266–71 (1970) (termination of welfare benefits was such a substantial deprivation that plaintiff was entitled to a predeprivation "evidentiary hearing"). But a job is nonetheless a substantial enough property interest that, absent extenuating circumstances such as an emergency, the basics of predeprivation due process must be provided.

Thus, in the normal course of terminating a public employee who has a property interest in his or her job, "the root requirement of the Due Process Clause" is the provision of adequate notice and "some kind of a hearing" to a public employee "*before* he is deprived of any significant property

interest." *Loudermill*, 470 U.S. at 542, 546 (internal quotations omitted); accord, e.g., *Gilbert*, 520 U.S. at 929; *Zinermon*, 494 U.S. at 132 ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking.").

To be clear, Bradley is not complaining about the adequacy of his notice or the procedural details of a hearing. All parties agree: he received no process at all. In contrast, plaintiffs in public employee due process cases often argue that their rights to due process were violated when state or local officials failed to comply with additional procedural details set forth in state statutes or local ordinances. State and local governments are free to provide more robust protections and detailed procedures for firing and disciplining public employees than is constitutionally required. Many have done so. Those detailed procedural codes are easier to administer than having to devise ad hoc procedures in each case.

As we have written for decades, however, those additional procedural details in state and local law should not be confused with the minimal federal constitutional requirements of predeprivation notice and an opportunity to be heard. See, e.g., *Schultz v. Baumgart*, 738 F.2d 231, 236 (7th Cir. 1984) (explaining that "it is not the task of this [federal] court to enforce in every procedural detail the elaborate requirements of [state law]"); accord, e.g., *Linear*, 887 F.3d at 844 ("We regularly disparage arguments … that procedures required by state law create property interests and hence lead to a federal

requirement that state procedures be used."), citing *Snowden v. Hughes*, 321 U.S. 1, 11–13 (1944).[3]

Furthermore, "[j]ust as a violation of state law does not a constitutional claim make, so the [state law] violation does not protect officials from the federal consequences of their otherwise-unconstitutional conduct," as Supreme Court precedent has "establish[ed] the indifference of constitutional norms to the content of state law." *Archie*, 847 F.2d at 1217 n.6, citing *Home Telephone & Telegraph Co. v. City of Los Angeles*, 227 U.S. 278 (1913), and *Snowden*, 321 U.S. 1.

This point has been clear since *Monroe v. Pape*, 365 U.S. 167, 183 (1961), which was overruled in part not relevant here by *Monell*, 436 U.S. at 664–89. *Monroe* held that the defendant police officers were acting "under color of" state authority and could be held liable under § 1983 for violations of the United States "Constitution *and laws of Illinois*," despite the existence

---

[3] Our cases reiterating this principle are legion. See, e.g., *Martin v. Shawano-Gresham School Dist.*, 295 F.3d 701, 706 (7th Cir. 2002) ("the failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process"); *Wallace v. Tilley*, 41 F.3d 296, 301 (7th Cir. 1994) (holding that "denial of state procedures in and of itself does not create inadequate process under the federal constitution" because constitutional requirements are satisfied with sufficient predeprivation notice and an opportunity for a hearing—even if plaintiff did not have an attorney present at the hearing, and such hearing was not conducted by an impartial decision-maker); *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("As we tirelessly but unavailingly remind counsel in this court, a violation of state law … is not a denial of due process, even if the state confers a procedural right. … The standard of due process is federal."); *Archie v. City of Racine*, 847 F.2d 1211, 1216–17 (7th Cir. 1988) (en banc) ("Once state law defines the substance [of the property right], constitutional law establishes the minimum procedures. … [But] violation of state law is not itself the violation of the Constitution.").

of "a simple remedy" under Illinois law and the fact that "the courts of Illinois are available to give petitioners that full redress."365 U.S. at 172 (emphasis added). This was so because § 1983 was designed to provide a remedy "against those who representing a State in some capacity were *unable* or *unwilling* to enforce a state law." *Id.* at 176. *Monroe* explained: "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court." *Id.* at 183.

In sum, the simultaneous violation of both federal and state law does not provide defendants with a defense to liability, nor does the existence of a state remedy bar aggrieved plaintiffs from pursuing federal claims.

B.  *Monell Basics*

The legal issues are undisputed until this point: Bradley had a protected property interest, which he lost without any due process. And since *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694 (1978), a municipal corporation may be held liable under § 1983 in such circumstances. As we recently explained, "[t]he critical question under *Monell*, reaffirmed in *Los Angeles County v. Humphries*, 562 U.S. 29 (2010), is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). Determining what caused the violation is crucial because *Monell* held that "municipalities are not liable for the torts of their

No. 16-3456                                                    13

employees under the strict-liability doctrine of respondeat su-
perior, as private employers are." *Vodak v. City of Chicago*, 639
F.3d 738, 747 (7th Cir. 2011). Local governments are liable for
damages under § 1983 only for violations of federal rights that
occur "pursuant to official municipal policy of some nature."
*Monell*, 436 U.S. at 691.

The "official policy" requirement for *Monell* claims is "in-
tended to distinguish acts of the *municipality* from acts of *em-
ployees* of the municipality" and to limit liability to "action for
which the municipality is actually responsible." *Pembaur v.
City of Cincinnati*, 475 U.S. 469, 479–80 (1986). A plaintiff might
prove this essential element by showing that (1) "the action
that is alleged to be unconstitutional implements or executes
a policy statement, ordinance, regulation, or decision offi-
cially adopted and promulgated by that body's officers," *Mo-
nell*, 436 U.S. at 690; or (2) the "constitutional deprivations
[were] visited pursuant to governmental 'custom' even
though such a custom has not received formal approval
through the body's official decisionmaking channels," *id.* at
690–91; or (3) the deprivation was "made by its lawmakers or
by those whose edicts or acts may fairly be said to represent
official policy," *id.* at 694. See also *Los Angeles County v. Hum-
phries*, 562 U.S. at 36; *Board of County Com'rs of Bryan County v.
Brown*, 520 U.S. 397, 403–04 (1997).

The *Monell* requirement can be satisfied by "a single deci-
sion attributable to a municipality." *Bryan County*, 520 U.S. at
405. "[I]t is plain that municipal liability may be imposed for
a single decision by municipal policymakers" to adopt "a
course of action tailored to a particular situation … whether
that action is to be taken only once or to be taken repeatedly."
*Pembaur*, 475 U.S. at 480–81, 485 (municipality was liable

under § 1983 when county prosecutor acting as county's final decisionmaker directed subordinates to engage in actions that violated plaintiff's rights); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 252, 268 (1981) (municipal liability for compensatory—but not punitive—damages was appropriate under § 1983 when city council canceled performer's concert license without due process).

Contrary to defendants' position here, such an unconstitutional act of municipal decisionmakers can result in municipal liability even if their act also violated state law. For example, in *Owen v. City of Independence*, 445 U.S. 622 (1980), the Supreme Court made clear that both a city and its manager could be held liable under § 1983 for firing the city police chief without due process, even if the defendants' actions also violated state law. *Id*. at 627 n.4 & 633 (holding qualified immunity does not apply to damage claims against municipal government itself).

If a plaintiff cannot prove, however, that a policy is attributable to the municipality itself—i.e., that the deprivation was due to "[e]ither the content of an official policy, a decision by a final decisionmaker, or evidence of custom"—then there is no municipal liability. *Glisson*, 849 F.3d at 379. Any inquiry into whether the actions of a municipal employee may be attributed to the municipality can be answered by applying the *Monell* test for liability.

In Bradley's case, this component is also undisputed. The mayor and the board concede that they had sole discretion and authority to fire Bradley. "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bryan*

No. 16-3456                                                    15

*County*, 520 U.S. at 405. Under *Monell*, the actions of the mayor
and village board in firing Bradley are, by virtue of the de-
fendants' authority as policymakers, automatically consid-
ered actions of the municipality itself under § 1983. Their de-
cision to deprive Bradley of due process is the municipal pol-
icy that forms the basis for defendants' liability.

III. *Defendants' Counter-argument*

A busy reader might be forgiven for thinking that this
opinion should end here. The municipal defendants seem to
have conceded that the municipality's policymakers uncon-
stitutionally deprived Bradley of a recognized property inter-
est without any due process. Yet defendants instead contend
that their official action—taken by the village's highest-rank-
ing officials with final policymaking authority—should be
considered "random and unauthorized" and thus excused
under *Parratt*. We reject this defense.

To explain why, we first describe *Parratt* and its progeny
(*Hudson, Logan, Zinermon*, and our circuit's application of the
*Parratt* exception in *Easter House*). We then explain why de-
fendants' proposal to extend the *Parratt* exception to munici-
pal § 1983 liability is contrary to our own and other circuits'
precedent—and for good reasons. It makes no sense to speak
of such official policymaking as "random and unauthorized"
in terms of *Parratt*. That's why the Supreme Court has never
suggested that *Parratt* can be extended to defend against an
otherwise valid *Monell* claim. The defendants' proposed ex-
ception is not necessary given *Monell*'s test for liability. And
accepting defendants' argument would conflict directly with
*Monroe, Monell, Pembaur, Owen*, and *Bryan County*. We would
have to reach the improbable conclusion that a municipality

is *not* liable for its highest officials' decision to deprive a person of his federal constitutional rights.

Finally, even if the *Parratt* exception were relevant here, neither Supreme Court precedent nor our decision in *Easter House* supports defendants' theory that, so long as municipal policymakers violate both the federal Constitution and state law, and some state remedy exists, the municipality is excused from § 1983 liability. In the past we have disparaged similar attempts to evade municipal liability, dismissing as "extravagant" a claim that the "acts of [a] Mayor … are merely acts of an errant employee." *Vodak*, 639 F.3d at 747. Defendants' proposal would also undermine (1) the constitutional protection for public employees in *Roth*, *Sindermann*, and *Loudermill*, while creating a direct conflict with (2) the *Monroe v. Pape* line of cases recognizing that state or local officials may be liable under § 1983 for actions taken "under color of state law," even if the official's actions also violate state or local law, as well as (3) *Patsy v. Board of Regents*' holding that § 1983 plaintiffs need not exhaust state-law remedies before asserting their federal rights. We see no reason to avoid Supreme Court precedent or to read our precedent in such a disruptive manner.

A. *Parratt and State Employees' "Random and Unauthorized" Actions*

1. *Supreme Court Precedent*

"*Parratt* is a rare exception to due process norms." *Brunson v. Murray*, 843 F.3d 698, 715 n.9 (7th Cir. 2016). A close look at the facts and holdings of *Parratt* and its progeny demonstrates the narrow, pragmatic reasoning underlying this exception to § 1983 due process liability.

In *Parratt*, a state prisoner ordered the famous "hobby materials valued at $23.50." 451 U.S. at 529. Due to the actions of state prison guards, the hobby materials were lost before they reached the prisoner. He sued under 42 U.S.C. § 1983 to recover their value as damages for depriving him of property without due process of law. In that situation, it would have been impossible for the state to provide a predeprivation hearing. The initial deprivation—the property loss—was as a practical matter "beyond the control of the State." *Id.* at 541. *Parratt* is thus based on the following narrow grounds: If a predeprivation hearing "is not only impracticable, but impossible," and yet "some meaningful opportunity subsequent to the initial taking" is available to provide redress, then that is all the due process the state can be expected to provide, and the aggrieved person's constitutional rights have not been violated. *Id.* at 541–43.

In later cases, the Supreme Court elaborated on *Parratt*'s limits. The Court emphasized that "absent 'the necessity of quick action by the State or the impracticality of providing any predeprivation process,' a postdeprivation hearing [ ] would be constitutionally inadequate," which "is particularly true where … the State's only post-termination process comes in the form of an independent tort action." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982), quoting *Parratt*, 451 U.S. at 539. If the state lacks the opportunity to provide any predeprivation process (e.g., due to an emergency or the actions of a rogue employee), the state can still meet its constitutional due process obligations by providing adequate postdeprivation procedures because the "state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." *Hudson*, 468 U.S. at 533 (extending *Parratt* to intentional but random and unauthorized

deprivations of prisoners' property). In essence, "[t]he controlling inquiry is solely whether the state is in a position to provide for predeprivation process;" if "the property deprivation is effected pursuant to an established state procedure," *Parratt* is irrelevant. *Id.* at 534.

*Parratt* generated disagreement among circuit courts of appeals, and the Supreme Court stepped in to clarify the scope and rationale of *Parratt* (and *Hudson*) in the context of Florida's civil commitment process for people with serious mental illness in *Zinermon v. Burch*, 494 U.S. 113, 116 & n.2 (1990). The *Zinermon* plaintiff alleged that he had been committed to a state mental hospital as a voluntary admittee even though his condition should have prompted assessment under the state's more elaborate procedures for involuntary commitment. *Id.* at 115, 122–23.

The plaintiff made clear that he was "not attacking the facial validity of Florida's voluntary admission procedures any more than he is attacking the facial validity of Florida's involuntary admission procedures." 494 U.S. at 117 n.3. In fact, he conceded "that, if Florida's statutes were strictly complied with, no deprivation of liberty without due process would occur." *Id.* Furthermore, the plaintiff did "not dispute that he had remedies under Florida law for unlawful confinement," including damage remedies under state mental health statutes and recourse to the state's common-law tort of false imprisonment. *Id.* at 130 n.15.

The defendants, who were state hospital officials, argued that *Parratt* and *Hudson* should excuse them from § 1983 liability. The plaintiff was alleging at most "only a random, unauthorized violation of the Florida statutes governing admission of mental patients," they argued, and he thus should be

limited to "the postdeprivation remedies provided by Florida's statutory and common law." *Id.* at 115, 130.

The Supreme Court rejected that argument. The Court first acknowledged that the state *could* have imposed additional safeguards at a predictable juncture in the hospital admission process—i.e., upon admission. 494 U.S. at 135. But the Court also noted the evidence that the hospital staff had disregarded existing procedures in determining whether plaintiff was competent to be admitted voluntarily, noting the psychiatrist's admission notes on petitioner's confused mental state. *Id.* at 134, 118 (after plaintiff was found wandering on a highway "bruised and bloodied," hospital staff gave him *voluntary* admission forms to sign while he "was hallucinating, confused, and psychotic and believed he was 'in heaven'"). The staff "knew or should have known that he was incapable of informed consent," and the way in which he was admitted "certainly did not ensure compliance with the statutory standard for voluntary admission." *Id.* at 134; see also *id.* at 135 ("The [hospital] staff are the *only* persons in a position to take notice of any misuse of the voluntary admission process and to ensure that the proper procedure is followed."). Thus, the additional guidance the Court apparently envisioned Florida providing was: do not direct incompetent patients to sign the voluntary admission forms for competent patients. That would have come close to "a rule forbidding a prison guard to maliciously destroy a prisoner's property," which would have seemed futile. *Id.* at 137.

*Zinermon* took care to distinguish *Parratt* and *Hudson*:

> [P]etitioners cannot characterize their conduct
> as 'unauthorized' in the sense the term is used
> in *Parratt* and *Hudson*. The State delegated to

No. 16-3456

> them the power and authority to effect the very
> deprivation complained of here, Burch's con-
> finement in a mental hospital, *and also delegated*
> *to them the concomitant duty to initiate the proce-*
> *dural safeguards set up by state law to guard against*
> *unlawful confinement*. In *Parratt* and *Hudson*, the
> state employees had no similar broad authority
> to deprive prisoners of their personal property,
> and no similar duty to initiate (for persons una-
> ble to protect their own interests) the procedural
> safeguards required before deprivations occur.
> The deprivation here is 'unauthorized' only in
> the sense that it was not an act sanctioned by
> state law, but, instead, was a 'depriv[ation] of
> constitutional rights ... by an official's abuse of
> his position.' *Monroe* [*v. Pape*, 365 U.S. 167, 172
> (1961)].

494 U.S. at 138 (emphasis added). The Court's citation to *Mon-*
*roe v. Pape* confirmed that a defendant's admissions that he
had violated state law and that state law provides a postdep-
rivation remedy, as defendants admit here, are not by them-
selves a defense to the federal constitutional claim. And the
quoted passage from *Zinermon* maps exactly onto the facts of
this case: Illinois law "delegated to [defendants] the power
and authority to effect the very deprivation complained of
here, [Burch's confinement or Bradley's termination], and also
delegated to them the concomitant duty to initiate the proce-
dural safeguards set up by state law to guard against unlaw-
ful [confinement or termination]." *Id*. at 138.

   This point was hammered home further by the Court's ex-
plicit rejection of the village's position here. The Court

reiterated that *Parratt* and *Hudson* "do not stand for the prop-osition that in every case where a deprivation is caused by an 'unauthorized … departure from established practices,' state officials can escape § 1983 liability simply because the State provides tort remedies." 494 U.S. at 138 n.20. Such a "reading of *Parratt* and *Hudson* detaches those cases from their proper role as special applications of the settled principles expressed in *Monroe* [*v. Pape*] and *Mathews* [*v. Eldridge*]." *Id.*

*Zinermon* insisted that *Parratt* and *Hudson* remained teth-ered to a long line of § 1983 jurisprudence, emphasizing that those cases merely "represent a special case of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." 494 U.S. at 128. In fact, the Court continued, "*Parratt* is not an exception to the *Mathews* balancing test, but rather an appli-cation of that test to the unusual case in which one of the var-iables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of depriva-tion at issue." *Id.* at 129. This consideration swamped the other *Mathews* factors in *Parratt* itself because "no matter how significant the private interest at stake and the risk of its erro-neous deprivation, see *Mathews*, 424 U.S. at 335, the State can-not be required constitutionally to do the impossible by providing predeprivation process." *Id.* Thus, *Zinermon* made clear that *Parratt* and *Hudson* had not broadly repudiated ex-isting § 1983 law.

2. *Seventh Circuit Application of Parratt in Easter House*

Shortly after *Zinermon* was decided, we considered these questions in a case the Supreme Court had remanded for fur-ther consideration in light of *Zinermon. Easter House v. Felder,*

910 F.2d 1387 (7th Cir. 1990) (en banc). It would be difficult to overstate how unusual the facts were in *Easter House*, or how much they differed from mainstream public employee due process cases like Bradley's. Plaintiff Easter House was a private adoption agency that had been betrayed by a former director named Smith. Stung by some management decisions, Smith abruptly quit Easter House to start a competing adoption agency that she also named Easter House (for clarity's sake, both we and the *Easter House* opinion refer to the imitator agency as "Easter House II"). *Id.* at 1391 & n.4, 1393 & n.7. She stole Easter House's open and closed case files on adoptive families and children. She also induced Easter House's only other trained social worker to join Easter House II, attempted to divert Easter House's mail and telephone calls to her new address, and deceived a family in the middle of the adoption process to deal with and pay her rather than Easter House. *Id.* at 1391, 1393 & nn.7–9.

The constitutional claims stem from the fact that Smith also roped into her scheme some state licensing officials in the Illinois Department of Children and Family Services (DCFS). She told them that Easter House was careless in handling confidential adoption records and would solicit affluent former clients to increase the number of placements. She also "made vague allegations that Easter House was connected to foreign adoption agencies" and expected to "make a million" from those connections. 910 F.2d at 1391 & n.3. Although Easter House never lost its license and continued operating throughout this debacle, DCFS officials acted contrary to state licensing procedures and: (a) delayed Easter House's license renewal, (b) sent Easter House a letter with some inaccurate licensing information that was corrected shortly thereafter, (c) incorrectly told three people that Easter House's license had

lapsed, and (d) did not offer Easter House assistance in the license renewal process "as required by the DCFS's regulations and enforcement manual." *Id.* at 1391–92.

At trial, a jury found that the defendant state officials had conspired with Smith to deprive Easter House of its state-issued license and had spread false information about it. 910 F.2d at 1390–94. The jury awarded damages on Easter House's federal claim that the defendants temporarily deprived it of property—its interest in the prompt renewal of its license—without due process of law. We were "not wholly convinced" this property interest was "of constitutional magnitude," given the fact that Easter House was able to operate without interruption, but we elected to "assume" this "difficult question" was answered in the affirmative. *Id.* at 1395–96.

We reversed the judgment in favor of Easter House, finding that the due process claim was barred by *Parratt*. To the extent the state defendants conspired with Smith (and we found that much of the evidence seemed to indicate their "lack of active participation," 910 F.2d at 1393 n.7), we held that the state employees' actions to undermine the state's licensing scheme to assist a competitor were "random and unauthorized" and that the state's due process obligations could be met by existing state-law tort remedies after the fact. *Id.* at 1404–05.

The en banc majority grappled with the tension between the *Parratt-Hudson* exception and *Zinermon*. Our circuit precedent had previously acknowledged that *Parratt* could be read more narrowly to focus on the fact that "the officials authorized to grant such a hearing are unaware of the deprivation before it occurs," or could be read more broadly to "place[] beyond the reach of section 1983 any loss that 'is not a result

of some established state procedure' … [because] the state cannot predict when a loss will occur." *Matthiessen v. Board of Education*, 857 F.2d 404, 407 n.3 (7th Cir. 1988) (holding that *Parratt* did not apply to municipal liability analysis under *Monell*), quoting *Tavarez v. O'Malley*, 826 F.2d 671, 677 (7th Cir. 1987), and *Wilson v. Town of Clayton*, 839 F.2d 375, 380 (7th Cir. 1988). We recognized in *Easter House* that the Supreme Court's rejection of the *Parratt* defense in *Zinermon* "hints that a 'narrow' application of the *Parratt* rule may be the appropriate course," and we tried to ascertain what that meant for Easter House. 910 F.2d at 1400, citing *Matthiessen*, 857 F.2d 404, *Wilson*, 839 F.2d 375, and *Tavarez*, 826 F.2d 671.

*Easter House* saw the primary distinctions between *Parratt* and *Zinermon* as: (1) the *Zinermon* state hospital defendants had both the authority and duty to initiate predeprivation safeguards, while the *Parratt* state prison defendants had neither; and (2) although predeprivation process was impossible in *Parratt*, in *Zinermon* the state could have required additional procedures to determine if the existing predeprivation hospital admission procedure should be used. 910 F.2d at 1400–02. To apply this teaching in *Easter House*, we noted that, unlike the *Zinermon* defendants, the "DCFS officials did not have the duty to initiate [formal hearing] predeprivation safeguards," but "[r]ather, the responsibility to initiate the procedural safeguards rested with the party aggrieved by the preliminary DCFS decision—in this case Easter House." *Id.* at 1402. In addition, the appropriate lens for deciding state responsibility under § 1983 was whether "the state knew or should have known" about the defendants' disregard of state law and procedure. *Id.* at 1401. Given that "Easter House point[ed] to nothing which would indicate that the state knew or should have known" that DCFS officials might engage in a

conspiracy to give Easter House some incorrect advice and delay the renewal of their license in contravention of state procedure, § 1983 liability was inappropriate. *Id.* at 1401.

Also, the *Easter House* opinion did not even cite *Monell*, and we rejected Easter House's attempt to impose a *Monell*-like framework for determining state liability, declining to adopt Easter House's proposed test that "the single act of a sufficiently high-ranking policy-maker may equate with or be deemed established state procedure." 910 F.2d at 1402. To the contrary, "we [did] not believe that *Zinermon* create[d] a *per se* 'employee status' exception to *Parratt*." *Id.* at 1400. To be sure, "whether a state official ranks 'high' or 'low' in the state hier-archy" would be "relevant as indicia of the discretion which that official exercises." *Id.*; see also *id.* at 1402 ("Without a doubt, the employee's position in the governmental hierarchy is relevant to this inquiry."). But in determining whether a state official is liable for a constitutional violation, *Easter House* directs us to look to whether (1) "a state's policy and procedures in a given area are delegated to a specified policy-maker, be it a single person, a committee, or the state legisla-ture," in which case that entity's "pronouncement in a given case reflects the state's position," even if informally made; or (2) if the state's policy could be said to have "change[d] if the policymaker repeatedly deviates from established policy and procedure until his practice and custom has replaced the for-mal policy and procedures." *Id.* at 1403. This liability analysis is at odds with the liability analysis required by *Monell* in cases against municipalities. But we can easily read *Easter House* as not creating a conflict with *Monell* because *Easter House* dealt with state officials, not local governments. We

simply did not address in *Easter House* any question of municipal liability under *Monell*.[4]

Applying this analysis to Easter House's claim, we noted that it was the state that "promulgated policy and procedure by formal means," rendering "the employment status of the state employee violating that procedure … much less important in determining whether a deviation from the policy may be characterized as random and unauthorized under *Parratt*." 910 F.2d at 1403. Thus, "[e]ven if we assume that the [DCFS defendants] qualify as 'policymakers' themselves—which we doubt given their position in the governmental hierarchy—their 'policy', which at absolute best may be characterized as informal, cannot be said automatically to preempt or displace otherwise adequate existing state policy and procedure." *Id.*

In the end, Judge Easterbrook's concurrence in *Easter House* accurately described our efforts to reconcile the tension between *Parratt* and *Zinermon* and showed how narrow the majority opinion had to be to thread its way between "a line of precedent already resembling the path of a drunken sailor." 910 F.2d at 1408–10. The majority read *Parratt* and *Hudson* as cautioning against "the use of § 1983 as just another opportunity for parties to shop between state and federal

---

[4] *Easter House* held that the high rank of a state official does not provide a *per se* bar to application of *Parratt*. It would be unwarranted, however, to read *Easter House* as also announcing a *per se* rule that the existence of a state law at odds with a high state official's actions *mandates* application of *Parratt*. Such a reading is not grounded in the facts present in *Easter House*, and it would conflict with broader Supreme Court jurisprudence, as discussed below.

forums." *Id.* at 1404. And we concluded the discussion of *Parratt* and *Zinermon* this way:

> Section 1983 must be preserved to remedy only those deprivations which actually occur without adequate due process of law, such as those which result from a *state's* conscious decision to ignore the protections guaranteed by the Constitution. It should not be employed to remedy deprivations which occur at the hands of a state employee who is acting in direct contravention of the state's established policies and procedures which have been designed to guarantee the very protections which the *employee* now has chosen to ignore. Such a limitation upon § 1983 maintains the delicate balance between the state and federal judicial systems, leaving the former to remedy individual torts and the latter to address property deprivations which occur without adequate due process protection.

*Id.* at 1404–05.

Moving forward from *Easter House*, it is important to acknowledge what *Easter House* did not do. It did not address *Monroe v. Pape*'s holding that a state official acts under color of state law for purposes of § 1983 even if he violates state law. It also did not address *Loudermill* or *Roth* or the due process rights of public employees who have property interests in their jobs. The *Easter House* majority did not even mention *Monell* or the major differences under § 1983 between state and local governments. In addition, as explained further below, we and other circuits have squarely rejected efforts to apply *Parratt* to *Monell* claims. *Easter House* did not criticize, let alone

No. 16-3456

overrule, the line of our cases rejecting *Parratt* defenses to due process claims against municipal policymakers, such as *Matthiessen*, *Wilson*, and *Tavarez*.[5]

### B. *The Gap Between Monell and Parratt*

The village contends that Bradley's firing without notice or opportunity to be heard presents a "single act of employee misconduct" that cannot "automatically become[] the state's new position" and lead to liability because the State of Illinois has not authorized the action. See *Easter House*, 910 F.2d at 1402; Appellees' Br. at 22, citing *Clifton v. Schafer*, 969 F.2d 278, 281–82 (7th Cir. 1992). This argument focused on *state* policy might have more force (apart from its conflict with canonical § 1983 precedent such as *Monroe v. Pape*) if the State of Illinois were somehow a defendant here, or perhaps if a village department had been acting as the State's agent in administering a state benefits program (the issue in *Clifton*). But for the last four decades, different rules of liability under § 1983 apply to municipalities making and carrying out their own policies.

The Supreme Court has never suggested that *Parratt* could apply to a *Monell* claim. The test for liability under *Monell* is already designed to identify conduct that is attributable to the municipality itself—which includes actions taken by an official with policymaking authority. There is no need to impose a separate inquiry as to whether a municipal policymaker's

---

[5] Since *Easter House* did not address *Monell* or claims against municipal governments or employees, our dissenting colleague's emphasis here on the perspective of the *State of Illinois*, in a case against a local government and its policymakers, misses the limits of *Easter House*. See post at 52 & 56–57. In addition, the *Easter House* majority did not reject *Matthiessen*, *Wilson*, and *Tavarez*, despite the opportunity to do so.

conduct is "random and unauthorized." *Parratt*, *Hudson*, and *Zinermon* were all decided after *Monell*, and they either did not cite *Monell* at all or merely noted that it overruled the portion of *Monroe v. Pape* rejecting any form of municipal liability under § 1983. *Parratt* and its progeny also did not cite any of the Supreme Court cases holding that a single act of a municipality or one of its high-ranking or policy-making officials can be sufficient for § 1983 liability under *Monell*, including *Owen v. City of Independence*, 445 U.S. 622, 627 & n.4 (1979) (§ 1983 liability appropriate for municipality that fired police chief without due process, despite fact that it was also violating state law), *City of Newport v. Fact Concerts*, 453 U.S. 247 (1981) (decided weeks apart from *Parratt*), or *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) (decided four years before *Zinermon*).

Conversely, the Supreme Court's *Monell* line of jurisprudence, including *Bryan County* and *Pembaur,* has never even suggested importing the *Parratt* framework, despite facts often showing concurrent violations of state law and available state remedies. Because it does not make sense to treat a municipal policymaker's actions as "random and unauthorized," and absent any indication from the Supreme Court that *Parratt* and its progeny were intended to upend the *Monell* framework, we have flatly rejected efforts to apply *Parratt* defenses to *Monell* claims. In *Wilson v. Town of Clayton*, the plaintiff alleged, among other claims, that the governing town board deprived him of property without due process of law by acting to shut down his business through a campaign of harassment. 839 F.2d at 377–78. The district court had dismissed the claim by applying a broad reading of *Parratt* and left the plaintiff to his tort remedies under state law. We reversed, making clear

that actions of municipal policymakers simply cannot be treated as "random and unauthorized" under *Parratt*:

> Because a municipality may only be liable for "acts which the municipality has officially sanctioned or ordered," *Pembaur v. City of Cincinnati*, 475 U.S. 469[, 480] (1986), its liability can never be premised on the result of a random and unauthorized act. The district court's dismissal of [the plaintiff]'s claim against the Town on the basis of *Parratt* misses the point of *Parratt*. "In *Parratt*, the Court emphasized that it was dealing with 'a tortious loss of … property as a result of a random and unauthorized act by a state employee … not a result of some established state procedure.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–36 (1982) (quoting *Parratt*, 451 U.S. at 541). When it is the Town itself that is being sued, and the suit is allowed under *Monell* because the action was executed in accordance with "official policy," the tortious loss of property can never be the result of a random and unauthorized act. *Therefore, a complaint asserting municipal liability under Monell by definition states a claim to which Parratt is inapposite.*

*Id.* at 380 (emphasis added).

Other circuits have agreed with this line of our cases. For example, in *Woodard v. Andrus*, 419 F.3d 348, 351–53 (5th Cir. 2005), the district court dismissed a claim against a municipal court's County Clerk who had charged fees in excess of those permitted by state law, reasoning that under *Parratt* the clerk's actions were "random and unauthorized" and plaintiff had

recourse to adequate state remedies. The Fifth Circuit reversed, holding that the defendant was the municipality's ultimate repository of county power for assessing court fees, so that *Monell* permitted municipal liability for the "official policy" embodied by the clerk's actions. *Id.* at 352–53. In short, "the *Parratt/Hudson* doctrine is inapposite" because "actions in accordance with an 'official policy' under *Monell* can hardly be labeled 'random and unauthorized.'" *Id.* at 353, quoting *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir. 1996) (affirming liability for plaintiff and rejecting *Parratt* defense to due process claim: "Where a municipal officer operates *pursuant to a local custom or procedure*, the *Parratt/Hudson* doctrine is inapposite").

Similarly, in *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), the Second Circuit held that if an "alleged loss results from adherence to an established state or municipal policy," which for municipal liability can include the act of "even 'a single decision' by an official with final policymaking authority," quoting *Pembaur*, 475 U.S. at 480, then "the availability of post-deprivation remedies does not defeat a Section 1983 claim." *Pangburn* cited *Sullivan v. Town of Salem*, 805 F.2d 81, 86 (2d Cir. 1986), which reversed a *Parratt* dismissal of a *Monell* due process claim: "If the conduct of the building official either established or was pursuant to town policy, *Parratt* and its progeny, which apply only to random, unauthorized conduct, are simply inapposite to this case." Accord, *Sanders v. Kennedy*, 794 F.2d 478, 482 (9th Cir. 1986) (reversing *Parratt* dismissal where plaintiffs alleged *Monell* due process claim based on local government's official policy, practice, or custom, and the "availability of a state tort remedy" was irrelevant); *McKee v. Heggy*, 703 F.2d 479, 482–83 & n. 6 (10th Cir. 1983) (reversing dismissal of *Monell* due process claim where

local officials auctioned plaintiff's car without complying with state forfeiture laws and possibly pursuant to city police custom, and explaining "an act by state officials need not comport with state law to be a deprivation of due process, *Home Telephone*, [227 U.S. 278], or to be actionable under § 1983, *Monroe*[, 365 U.S. 167]" and "the availability of a state post deprivation remedy does not provide [plaintiff] with due process"); see also *Gonzalez v. City of Castle Rock*, 366 F.3d 1093, 1113–14 (10th Cir. 2004) (en banc) ("when the issue is a deprivation resulting from a municipal policy … neither the city nor individual officers can seek refuge under *Parratt*"), rev'd on other grounds, 545 U.S 748 (2005).

So too here. The actions of the defendants as municipal policymakers simply cannot be deemed "random and unauthorized" within the meaning of *Parratt*. Their actions against Bradley *were* village policy. *Monell* provides the applicable legal standard, and it is satisfied here.[6]

---

[6] The defendants also cite cases in which we held that a plaintiff must challenge the adequacy of the required state procedures in order to hold the government entity liable for its employees' due process violations. These cases did not involve complaints about a municipality's formal policy or an employee with policymaking authority, so there could have been no municipal liability under *Monell*. See *Gable v. City of Chicago*, 296 F.3d 531, 535, 537, 539–40 (7th Cir. 2002) (city employees damaged and stole from impounded vehicles in violation of city policy; plaintiffs "concede that their injuries did not result from the application of an express policy or from any particular act of an individual with policymaking authority," and there was no evidence the employees' actions could be considered "City customs"); *Doherty v. City of Chicago*, 75 F.3d, 318, 321, 323–24 (7th Cir. 1996) (bingo hall operator alleged she was overcharged for bingo license and was improperly denied a permit due to political bias and neighborhood opposition; although *Monell* is not cited, there was no allegation that the city employees who charged the licensing fee and issued permits

Defendants here are not the first to argue that *Parratt* should excuse a municipality for acts of the municipality's policymakers. Although we have consistently reached outcomes that are in line with *Monell* (or rejected liability for non-constitutional violations when employees do not adhere to state-specific procedures), we have at times included the "random and unauthorized" language from *Parratt* to buttress those decisions. Such doctrinal confusion, however, should not be taken as authority to read our circuit precedent as creating a conflict with *Monell* and, as discussed further below, other Supreme Court § 1983 precedents.

---

had any policymaking authority or were acting pursuant to city custom). In addition, *Hamlin v. Vaudenberg*, 95 F.3d 580, 582–85 (7th Cir. 1996), is inapposite on all scores: (1) there was a state, not municipal, defendant; (2) the plaintiff inmate's sole allegation was that state prison officials did not comply with state procedures—which is not a constitutional due process claim, see above at 11–12 & n.3; and (3) the defendants were entirely "without discretionary power." On a different footing, *Germano v. Winnebago County*, 403 F.3d 926, 929 (7th Cir. 2005), affirmed dismissal of a class action challenging a county board's class-wide legislation regarding health insurance for retired sheriff deputies that was inconsistent with state insurance provisions. We did so without citing *Monell* or our cases rejecting application of *Parratt* to *Monell* claims, and we directed plaintiffs to their state remedies. We reasoned that the state "could not have predicted or prevented" the county's action, and thus the county's actions were unauthorized. In any event, the result in *Germano* was certainly correct. When legislatures enact such class-wide legislation that arguably impairs individuals' property rights, the legislative process provides the procedures that are due, though individuals harmed by legislation may still have takings claims in some cases. See generally *Atkins v. Parker*, 472 U.S. 115, 129–30 (1985) (legislation changed eligibility for federal food stamps); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432–33 (1982) (collecting cases where "the legislative determination provides all the process that is due").

Most recently, in *Breuder v. Board of Trustees of Community Coll. Dist. No. 502*, 888 F.3d 266, 271 (7th Cir. 2018), we rejected the village's position here in a case where another senior public employee was fired. In *Breuder*, a community college board fired the college president using essentially the same maneuver the village board used to fire Bradley. The college board claimed that the president's contract was invalid under Illinois law because it extended beyond the terms of some board members. *Id.* at 268. Because the board viewed the contract as invalid, it took the position that the president had no right to any hearing.

We rejected that argument. Under clearly established federal law, "a hearing is required whenever the officeholder has a 'legitimate claim of entitlement,' to keep the job." 888 F.3d at 270, quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). (Recall that the village does not dispute that point regarding Bradley.) We then explained why a refusal to listen to the community college president regarding his contract violated due process:

> Breuder, who had a written contract for a term of years, assuredly had a legitimate *claim* of entitlement to have the Board honor its promise. The claim may have failed in the end, but that did not eliminate the claim's existence.
>
> .... Imagine the Board saying: "You have committed misconduct; therefore your tenure has ended; since you no longer have tenure, we need not offer you a hearing at which we have to demonstrate that misconduct occurred." The Supreme Court clearly established in *Roth* and its many successors that this maneuver won't

> work. A hearing is required to establish whether misconduct occurred. Just so here. The Board believes that Breuder's contract was invalid, making him an at-will employee … or that the contract could be cancelled for misconduct. But *whether* the contract was valid was subject to legitimate debate, and a hearing would have allowed Breuder to articulate his position and insist that the contract be enforced. Both the duration of Breuder's tenure and the existence of misconduct … were debatable subjects. The members who refused even to listen to him violated his clearly established rights.

*Id.* at 270.

*Breuder* squarely rejected a reading of *Parratt* identical to the village's argument here. We pointed out that even if the board had "contended that the process due for a summary termination is the opportunity to sue in state court"—the village's position here, it would lose: "When the decision is made by a body's governing board, it would be hard to contend that the action is random and unauthorized for the purpose of *Parratt v. Taylor*, 451 U.S. 527 (1981), and its successors." 888 F.3d at 271.

We have at times characterized this ground for "distinguishing" *Parratt* as giving *Parratt* a "narrow" construction (which is true, to the extent we have construed it to avoid conflict with *Monell*). In *Matthiessen v. Board of Education*, 857 F.2d 404 (7th Cir. 1988), for example, a school board fired a teacher who was assumed to be entitled to the extensive procedural protections under state law for tenured teachers. We rejected the board's argument that *Parratt* showed that its failure to use

the procedures required by state law showed that its actions
were "random and unauthorized":

> "Random and unauthorized" has been inter-
> preted both narrowly and broadly. "Read nar-
> rowly it merely identifies the situation where a
> pre-deprivation remedy is infeasible because
> the officials authorized to grant such a hearing
> are unaware of the deprivation before it occurs."
> [*Tavarez*, 826 F.2d] at 677. This may be because
> "the person committing the unconstitutional act
> may be employed at such a low level of state or
> local government that the official authorized to
> grant a pre-deprivation hearing would be una-
> ware of the person's actions." *Wilson v. Civil
> Town of Clayton*, 839 F.2d 375, 380 (7th Cir.1988).
> "Read more broadly, ... *Parratt* places beyond
> the reach of section 1983 any loss that 'is not a
> result of some established state procedure,' 451
> U.S. at 541, ... even if the loss might have been
> averted by a predeprivation hearing." *Tavarez*,
> 826 F.2d at 677. In such a case the state cannot
> predict when a loss will occur. *Wilson*, 839 F.2d
> at 380.
>
> Under the narrow reading the Board's action is
> not random and unauthorized. The Board is the
> body that is authorized to grant hearings, and
> thus it cannot be unaware that a hearing was not
> provided. Likewise under the broad reading the
> Board's action was not random and unauthor-
> ized. It is true that the Board's alleged action
> was not pursuant to the School Code, but in

contravention of it, and thus would seem not to be pursuant to established state procedure. However, the single act of a sufficiently high-ranking policymaker may equate with or be deemed established state procedure; therefore, here *Parratt* is inapposite even under the broad reading. *Tavarez*, 826 F.2d at 677; *Wilson*, 839 F.2d at 381 (defining "official policy" for the purpose of finding *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), satisfied and *Parratt* necessarily inapplicable). The Board's *Parratt* argument fails.

857 F.2d at 407 n.3.

In *Tavarez*, we rejected a similar *Parratt* defense to a *Monell* claim. The plaintiffs owned a store where a gas heater malfunctioned, causing injuries to several people. 826 F.2d at 673. Local officials evacuated and sealed the store. They kept it sealed for a month during winter. Because repairs could not be made, pipes burst and damaged the store and its inventory. *Id.* at 673–74. We recognized that officials could of course take emergency action to evacuate and seal the store. No pre-deprivation hearing was required for that step, and no one suggested otherwise. *Id.* at 674. The problem was the defendants' bureaucratic refusal to let the plaintiffs return after the emergency had passed and the officials' failure to provide plaintiffs with any opportunity to be heard as they were denied continuing access to the premises. The district court dismissed the plaintiffs' due process claim on the theory that *Parratt* rendered the deprivation "unauthorized," leaving plaintiffs to their tort remedies under state law. *Id.* at 674–75.

We reversed on the claim against defendants who were assumed to have municipal policymaking authority in the matter. 826 F.2d at 677–78. We explained that *Parratt* "does not place all *ultra vires* conduct beyond the reach of section 1983, but only conduct that occurs at such a low level of state or local government that it would be infeasible for the state to provide an opportunity for a hearing before the conduct occurred." *Id*. at 677. Even under a broader reading of *Parratt*, we explained, those defendants "cannot escape liability under section 1983 simply by exceeding the scope of their authority." *Id*. We reasoned that although *Monell* prohibits municipal liability "based on the doctrine of respondeat superior," if the municipal defendant (as head of the relevant agency) possessed "final authority to establish municipal policy," then "he *was* [the] County, in which event the county was a proper defendant, too." *Id*. at 677–78, citing *Pembaur*, 475 U.S. 469.

We offered a different basis for importing language from *Parratt* into the municipal context in *Michalowicz v. Village of Bedford Park*, 528 F.3d 530 (7th Cir. 2008), but that basis is similarly inadequate to support the village's argument here. In *Michalowicz* a village fire inspector was fired for conflicts of interest. Before he was fired, he was given written notice that he was in danger of being fired, along with a statement of the reasons. He was interviewed twice by village officials and then received an additional letter regarding the possible firing, along with a notice of hearing and a document listing the charges and statutes he allegedly violated. *Id.* at 533. At the hearing he was accompanied by his attorney, who made a statement on his behalf. The plaintiff was also given notice of post-termination process, including a hearing at which he presented evidence and witnesses, as well as cross-examined the witnesses against him. *Id.*

In *Michalowicz*, the village easily cleared the constitutional hurdle for predeprivation due process. The plaintiff's complaint that a local ordinance entitled him to a more thorough explanation of the incriminating evidence is not cognizable as a constitutional violation. 528 F.3d at 537–38. The crux of the case was that the plaintiff was trying to enforce under the United States Constitution a particular detail of state or local procedural law. That simply does not work, for reasons we have explained in *Schultz v. Baumgart*, *Wallace v. Tilley*, *Osteen v. Henley*, *Archie v. City of Racine*, and many other cases. See cases discussed above at 11–12 & n.3. Our decision in *Michalowicz* regarding plaintiff's pretermination process was fully in accord with this analysis, and we did not cite or refer to *Parratt*. *Id.* at 536–38.

With respect to his post-termination hearing, the plaintiff in *Michalowicz* similarly tried to enforce under the federal Constitution a specific provision of a local ordinance limiting who could serve as a decision-maker—another procedural detail not mandated by the federal Constitution. 528 F.3d at 534–35. We cited the *Parratt* doctrine in that portion of *Michalowicz*, but we did not cite it on the theory that top-level municipal officials are excused from liability when they violate both state law and federal due process rights, which is the village's position here. Instead, we cited *Parratt* because of the "inherently unpredictable" nature of the specific kind of procedural missteps in *Michalowicz*—assigning a post-termination hearing to the wrong municipal body. *Id*.

The dissent asserts: "The substance of Bradley's claim"—i.e., a constitutional violation—compared to Michalowicz's claim—i.e., failure to follow state procedures—"is simply irrelevant under the *Parratt* doctrine." Post at 72. To the

contrary, the substance of that claim is decisive. To reiterate, *Michalowicz* involved the sorts of "procedural details" of state and local law which, even if violated, do not violate the federal constitutional standards for due process that are enforceable via § 1983—notice and an opportunity to be heard before firing. State and local laws often provide very detailed procedures for terminating public officials and employees. As we have noted so often, those procedural details of those state and local laws simply are not matters of federal due process. Where the plaintiff received the constitutionally required notice and opportunity to be heard before termination, and a more extensive hearing afterward, the "remedies guaranteed by state law" in state court were enough to protect against the kind of state-law mistakes that happened in *Michalowicz*. 528 F.3d at 535, quoting *Doherty*, 75 F.3d at 323; see also *Cannici v. Village of Melrose Park*, 885 F.3d 476, 479–80 (7th Cir. 2018) (affirming decision applying *Michalowicz* where plaintiff complained that hearing was not fair).

The village's argument here, however, asks us to stretch well beyond that limited point about the differences between detailed state-law procedural requirements and the minimum federal constitutional requirements in *Michalowicz* and *Schultz*. The village would have us hold that *Parratt* excuses a municipality from liability when its top officials decide as a matter of village policy to ignore an employee's due process rights completely. This unnecessary and expansive reading of *Parratt*—as we discuss next—runs contrary to the core procedural due process cases for public employees like *Roth* and *Loudermill* and their progeny, as well as other lines of Supreme Court precedent.

C. *Parratt and the Supreme Court's Other § 1983 Precedents*

Recall that *Zinermon* explicitly rejected the argument the village makes here for applying *Parratt* and highlighted the rule's lineage as consistent with, not contrary to, existing § 1983 precedent:

> Contrary to the dissent's view of *Parratt* and *Hudson*, those cases do not stand for the proposition that in every case where a deprivation is caused by an "unauthorized … departure from established practices," *post*, at 146, state officials can escape § 1983 liability simply because the State provides tort remedies. This reading of *Parratt* and *Hudson* detaches those cases from their proper role as special applications of the settled principles expressed in *Monroe* and *Mathews*.

494 U.S. at 138 n.20. Here, too, the defense theory overlooks the limits of the narrow and pragmatic rationales of *Parratt* and *Hudson* and seeks to extend them in ways that would undermine other principles and precedents governing § 1983 cases.

Defendants' broad reading of *Parratt* would also undermine the bedrock of § 1983 jurisprudence, *Monroe v. Pape*, 365 U.S. 167, 172, 187 (1961), which held that the statute offers a remedy for actions "under color of" state law even if the actions violate state law. As we explained in *Wilson*, "virtually no interference with property would be actionable in federal court under § 1983" if *Parratt* were extended to cover every *ultra vires* tort of a public official or agency because "ordinary state judicial remedies for torts" exist for many kinds of

property deprivation. 839 F.2d at 379. "The Supreme Court could not have meant to deny every § 1983 plaintiff his or her day in federal court, no matter how egregious the constitutional violation, simply because of the availability of a similar state tort action." *Id.* Such an approach would mistakenly read the first requirement of *Parratt*—"impracticability"—out of the opinion. See 451 U.S. at 540–41.

Defendants' theory also runs into the line of § 1983 precedent capped by *Patsy v. Board of Regents*, 457 U.S. 496 (1982). Patsy was a state employee, at a state university. She alleged that her employer had violated her constitutional rights by discriminating on the basis of race and sex, and she sued under § 1983. The district court had dismissed her claims because she had failed to exhaust available state administrative remedies. The Fifth Circuit had affirmed. The Supreme Court reversed, holding that a § 1983 claim should not be dismissed for failure to exhaust available state administrative or judicial remedies. *Id*. at 500–01 (collecting the "numerous" cases in which the Court had already "rejected th[is] argument"). The broad reading of *Parratt* urged by defendants here seeks to impose, in effect, the kind of exhaustion requirement rejected in *Patsy*.[7]

---

[7] The Supreme Court had recognized one exception to *Patsy*, when a plaintiff claims that her property has been taken for a public purpose but without just compensation. See *Williamson Cty. Reg'l Planning Com'n v. Hamilton Bank*, 473 U.S. 172, 192–93 (1985). The Supreme Court recently overruled that holding in an opinion that noted again in passing the narrow, pragmatic view of *Parratt*. See *Knick v. Township of Scott*, 139 S. Ct. 2162, 2174 (2019).

No. 16-3456                                                        43

*Conclusion*

Bradley has alleged a due process claim that follows the mainstream of due process law for public employees with for-cause protection: he was summarily fired, without notice or an opportunity to be heard before he was fired (or even after he was fired). The village does not dispute these points. The village's *Parratt* defense fails because it reads *Parratt* far too broadly, in a way that would conflict with *Monroe*, *Zinermon*, *Monell*, *Patsy*, and substantial precedent of this court. The judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.

MANION, *Circuit Judge*, dissenting. Eddie Bradley alleges he was summarily fired from his position as Chief of Police of the Village of University Park, Illinois. He says the mayor and the Village Board disregarded procedural protections enshrined in state law. If this is true, the conduct of the Village officials is quite troubling. Nevertheless, under prevailing Supreme Court and Seventh Circuit precedent, he has not pleaded a cognizable federal procedural due process claim. Therefore, the district court correctly dismissed his case.

This case should be governed by the principle first set forth in *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), that "random and unauthorized" acts by a state actor resulting in the deprivation of property without adequate pre-deprivation process do not state a federal claim if the state provides an adequate post-deprivation remedy. Under Seventh Circuit precedent interpreting *Parratt* and its progeny, the actions of the mayor and the Village Board in Bradley's case were "random and unauthorized." Since Illinois provides a post-deprivation remedy through the State's Administrative Review Act, Bradley must pursue that relief rather than an action in federal court.

The court today concludes otherwise. Because of its misapplication of Supreme Court precedent and divergence from our own, today's decision will create confusion for litigants and the district courts of our circuit, not to mention future panels of this court. In my view, we would do well to remain on the course we have been plotting for the past three decades. I respectfully dissent.

## I. Background

Illinois law provides that, with some exceptions not relevant here, "no officer or member of the fire or police department of any municipality … shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense." 65 ILCS 5/10-2.1-17. Bradley alleges the mayor and Village Board disregarded this requirement and summarily fired him. The district court held Bradley's federal procedural due process claim was barred by *Parratt* and he appealed.

## II. Discussion

This case raises the question whether a claim may lie in federal court for the Village's violation of state procedural law. The court answers in the affirmative, holding that "[i]n cases alleging due process violations by municipal policymakers, there is no need to inquire separately into whether an employee's actions were 'random and unauthorized.'" Maj. Op. at 3–4. Such a conclusion is contrary to our precedent and results from a misapplication of Supreme Court case law.

### A.  Supreme Court Decisions

In general terms, the *Parratt* doctrine bars procedural due process claims resulting from random and unauthorized acts of state actors for which the State provides an adequate post-deprivation remedy. In *Parratt*, the plaintiff was an inmate who alleged he was deprived of his property without due process when prison employees lost $23.50 worth of hobby materials he had ordered. 451 U.S. at 529. The Supreme Court began its analysis of his claim by acknowledging:

> [I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a

§ 1983 action are present: (1) whether the con-
duct complained of was committed by a person
acting under color of state law; and (2) whether
this conduct deprived a person of rights, privi-
leges, or immunities secured by the Constitu-
tion or laws of the United States.

*Id.* at 535. Since the defendants in *Parratt* were state employees
acting through their position of authority, the first question
was clearly answered affirmatively: "the alleged conduct by
the petitioners in this case satisfies the 'under color of state
law' requirement." *Id.* Accordingly, the Court focused the re-
mainder of its discussion almost entirely in terms of state em-
ployees as actors under color of state law.

Regarding whether the plaintiff was denied due process,
the Court reasoned it would be impracticable (and really, im-
possible) to guarantee a pre-deprivation hearing to everyone,
as the State could hardly predict when such random incidents
might occur. *Id.* at 540–41. Thus, no pre-deprivation process is
required in cases "involving a tortious loss of a prisoner's
property as a result of a random and unauthorized act by a
state employee." *Id.* at 541. In such situations, post-depriva-
tion process in state court is generally sufficient. The Court
later clarified no federal due process action will lie for the in-
tentional, random, and unauthorized deprivation of property
by a state official unless the post-deprivation remedy is inad-
equate. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

The Court subsequently limited *Parratt*'s scope in *Ziner-
mon v. Burch,* 494 U.S. 113 (1990). The plaintiff there alleged
several doctors and administrators at a state hospital de-
prived him of liberty without due process when they admit-

ted him as a voluntary mental patient even though he was in-
capable of consent. Rejecting the defendants' argument that
*Parratt* barred the suit, the Court held the plaintiff had not al-
leged "unauthorized" conduct because "[t]he State delegated
to [the defendants] the power and authority to effect the very
deprivation complained of here … and also delegated to them
the concomitant duty to initiate the procedural safeguards set
up by state law to guard against unlawful confinement." *Id.*
at 138. *Parratt*, in the Court's view, involved an employee with
"no similar broad authority to deprive prisoners of their per-
sonal property, and no similar duty to initiate (for persons un-
able to protect their own interests) the procedural safeguards
required before deprivations occur." *Id.* So the deprivation
was "'unauthorized' only in the sense that it was not an act
sanctioned by state law, but, instead, was a 'depriv[ation] of
constitutional rights … by an official's abuse of his position.'"
*Id.* (quoting *Monroe v. Pape*, 365 U.S. 167, 172 (1961)).

   *Parratt* and *Hudson* make it plain that the intentional dep-
rivation of property resulting from the random and unauthor-
ized act of a state actor will not create a federal cause of action
unless the State does not provide an adequate post-depriva-
tion remedy. *Easter House v. Felder*, 910 F.2d 1387, 1396 (7th
Cir. 1990) (en banc), *cert. denied*, 498 U.S. 1067 (1991). But
*Zinermon* muddied the waters when it comes to the task of
determining which acts are random and unauthorized. *See id.*
at 1408 (Easterbrook, J., concurring) (arguing that *Zinermon* is
fundamentally inconsistent with *Parratt* and *Hudson*). It was
left to this court to provide clarity.

## B. Seventh Circuit Decisions

Just months after *Zinermon*, this court sitting *en banc* in *Easter House* did just that.[1] Easter House was an adoption agency that alleged employees of the Illinois Department of Children and Family Services conspired to deprive it of property without due process by, among other things, withholding the renewal of its license. We accepted the defendants' argument that *Parratt* barred Easter House's suit and rejected Easter House's three main arguments: (1) that *Parratt* applies only to minor deprivations; (2) that a conspiracy can never be a "random and unauthorized" act; and (3) that the actions of high-level policymaking employees are *per se* "authorized" because they amount to the policy or established procedure of the State. *See id.* at 1398 (majority opinion).

The last of these is particularly relevant here. In rejecting that argument, we distinguished *Zinermon* on the grounds that the statute delegating authority in that case did not include procedural safeguards, meaning the state officials had "broadly delegated authority." *Id.* at 1401. In effect, we limited *Zinermon*'s qualification of *Parratt* to situations where the state official in question had unfettered discretion to act. That

---

[1] In *Easter House*, the panel, over a dissent from Judge Kanne, originally held *Parratt* inapplicable. *Easter House v. Felder*, 852 F.2d 901 (7th Cir. 1988). We then granted rehearing *en banc* and went the other way, holding over a dissent from Judge Cudahy that Easter House's claim was barred by *Parratt*. 879 F.2d 1458 (7th Cir. 1989) (en banc). The Supreme Court granted Easter House's petition for certiorari, vacated our judgment, and remanded the case back to the *en banc* court in light of *Zinermon*. 494 U.S. 1014 (1990) (mem.). On remand, we came out the same way, with only Judge Posner switching his vote from the majority to the dissent. 910 F.2d 1387 (7th Cir. 1990) (en banc). It is the *en banc* opinion on remand that is controlling today.

much is clear from our statement that "we can envision a sce-nario where a high-ranking state official does exercise the au-thority and discretion to effect a deprivation, yet that discre-tion is 'circumscribed' by statutory or other predeprivation procedural safeguards." *Id.* at 1400. In such a case, we said, "an abuse of that discretion … would not necessarily be 'pre-dictable' from the point of view of the state and, according to *Parratt* and *Zinermon*, not compensable under § 1983." *Id.* In-deed, we went as far as to call the failure to cabin the officials' discretion in *Zinermon* a "statutory oversight." *Id.* at 1401. In short, Easter House's claim was barred because it alleged that state officials simply failed to heed the procedural safeguards contained in state law. The "licensing conspiracy was not one that the state could have predicted or, more importantly, pre-vented through the implementation of additional predepriva-tion procedural safeguards." *Id.*

Further still, the *en banc* court rejected Easter House's re-lated argument that the acts of certain high-ranking officials may be considered "established state procedure" and thus avoid the application of *Parratt*. Writing for the court, Judge Kanne framed the issue as "whether a single act of employee misconduct, which clearly contravenes established state pol-icy and procedure as contained within formal rules, regula-tions, and statutes, automatically becomes the state's new po-sition in all similar matters or whether the act, when viewed from the state's perspective, is merely a 'random and unau-thorized' deviation." *Id.* at 1402. We chose the latter: Where there is a formal pronouncement of state policy (like a state statute) rather than case-by-case adjudication, even if a poli-cymaker himself "deviates in a single instance from the more formal pronouncement, it is less likely to reflect a new trend in state policy and procedure." *Id.* at 1403.

Thus, *Easter House* established that (1) *Zinermon*'s limitation of the *Parratt* doctrine does not apply when state employees ignore procedural safeguards guaranteed under state law; and (2) when they violate state procedural statutes, even high-ranking officials can commit random and unauthorized acts from the perspective of the State. To put it differently, a wrongful decision may be predictable and authorized from the State's perspective only when state law does not cabin an official's discretion to grant pre-deprivation process.

We have subsequently applied this rule to bar cases where the plaintiff alleges a violation of state procedural rules. In *Clifton v. Schafer*, 969 F.2d 278 (7th Cir. 1992), the plaintiff alleged the director of the Lafayette County, Wisconsin, Department of Human Services intentionally deprived him of welfare benefits without a hearing even though the state Department ordered him not to do so. We held *Easter House* controlled: "Where established state policy would provide adequate predeprivation process, and that policy circumscribes the discretion of state officials to act, a single act of a state official—even a high-ranking state official—that violates that established policy is random and unauthorized from the state's perspective." *Id.* at 281–82 (citing *Easter House*, 910 F.2d at 1400–03). It did not matter that the director in some sense had the power to take the action he took. What mattered was that "Wisconsin law circumscribed any discretion [the director] might have had over the decision to reduce Clifton's benefits." *Id.* at 282.

In *Germano v. Winnebago County*, 403 F.3d 926 (7th Cir. 2005), retirees from the County Sheriff's Department alleged that, contrary to Illinois law, the County through its board required them—without a pre-deprivation hearing—to pay

higher health care premiums than current employees. We held *Parratt* and *Easter House* barred their federal procedural due process claim, writing that "the actions of Winnebago County were not authorized by the state; indeed, the actions were in direct violation of state law and should not be considered a basis for a due process claim." *Id.* at 929. "The county's decision to act contrary to this state law was not authorized and could not have been predicted or prevented by the state through any sort of predeprivation hearing." *Id.* The plaintiffs instead would have to seek a remedy in state court.

*Michalowicz v. Village of Bedford Park*, 528 F.3d 530 (7th Cir. 2008), reached the same result. There, a Village fire inspector alleged he was terminated without a proper pre- or post-deprivation hearing. He claimed his pre-deprivation hearing amounted to a summary termination and his post-deprivation hearing violated established law because it was conducted by the same board that had summarily terminated him. *Id.* at 533. Again, we held that because "state law afforded him the constitutional protection he alleges he was denied, any violation of that law by the Village must be considered random and unauthorized." *Id.* at 538. "Because such misconduct is inherently unpredictable, the state's obligation under the Due Process Clause is to provide sufficient remedies after its occurrence, rather than to prevent it from happening." *Id.* at 535. Michalowicz thus had to seek his remedy under the Illinois Administrative Review Act rather than in federal court.

No. 16-3456

These cases and others[2] stand for the proposition that even high-ranking local and state officials like department directors and county and village boards commit random and unauthorized acts if they act contrary to established state law. That is precisely what happened in this case.

## C. Bradley's Case

Bradley alleges he was fired from his position as Chief of Police of the Village of University Park without any process. But like the plaintiffs in *Easter House*, *Clifton*, *Germano*, and *Michalowicz*, he has not alleged the mayor and Village Board had unfettered discretion to fire him without a hearing. Rather, his complaint acknowledges the mayor and Board's actions as alleged would violate Illinois law. Put another way, he alleges the mayor and the Village Board did something that, as far as the State is concerned, was random and unauthorized. Nothing the legislature in Springfield could dream up could have stopped this conduct. Illinois law already "circumscribed any discretion [the Village actors] might have had

---

[2] *See, e.g., Strasburger v. Bd. of Educ.*, 143 F.3d 351, 358 (7th Cir. 1998) ("[W]hat [the plaintiff] complains of is a conspiracy by state officials to deprive him of a state-created property interest. The State of Illinois should have the first chance to assess the alleged violations of its own laws."); *Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003) (actions of the Illinois Secretary of State and the Director of the Illinois Department of Central Management Services were random and unauthorized because "[o]nly by acting in a manner patently inconsistent with Illinois law, could the defendants deprive the plaintiffs of the [veterans] hiring preference"); *Leavell v. Ill. Dep't of Natural Resources*, 600 F.3d 798, 806 (7th Cir. 2010) ("[B]ecause Ms. Leavell simply alleges that the State had in place a procedure to provide notice and that the procedure was not followed with respect to the February 2008 hearing, she is complaining of a 'random and unauthorized' action by a state employee.").

over the decision" to fire Bradley without process. *Clifton*, 969 F.2d at 282. Therefore, Bradley's claim falls within the scope of *Parratt* and *Easter House*. So long as Illinois provides an adequate post-deprivation remedy, a § 1983 procedural due process claim will not lie.

As in *Michalowicz*, the Illinois Administrative Review Act provides an adequate remedy for Bradley. We said in that case "the relief Michalowicz seeks—an independent review of whether the evidence supports his termination and whether the Village Board was biased or failed to follow the prescribed procedure in connection with his termination—falls squarely within the ambit of the Act, both through the state court's own review of the administrative record and through its authority to remand for rehearing." 528 F.3d at 536. The fact that *no hearing* instead of a *defective hearing* occurred in this case does not change that outcome. If the state court believes more fact-finding is necessary, it can simply remand to the Village and order it to conduct a hearing. Therefore, I conclude the Administrative Review Act provides an adequate remedy. *Parratt* thus bars Bradley's federal procedural due process claim.

### D. The Court's Avoidance of *Parratt*

The court's primary argument for avoiding *Parratt* is that the actions of high-ranking municipal decisionmakers render the municipality liable under *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), and thus cannot be random and unauthorized under *Parratt*. Maj. Op. at 32. This conclusion, however, results from the conflation of two separate inquiries: (1) whether a municipality can be liable for a decision or action of a municipal employee, and (2) whether a deprivation effected by a person acting under color of state law was random and unauthorized by state law. *Monell* addressed the

first question, holding that a municipality or other local government unit qualifies as a "person" within the meaning of § 1983, 436 U.S. at 690, and can be liable when it acts either through its established policy or through the actions of high-ranking policymakers, *id.* at 694. *Parratt* and its progeny address the second question: whether a person acting under color of state law has acted in a way that was predictable and preventable by the State through additional pre-deprivation procedural safeguards, or whether, by contrast, the act was "random and unauthorized." *Parratt*, 451 U.S. at 541.

The court also contends that applying the *Parratt* exception to *Monell* claims would undermine public employees' constitutional due process protections, conflict with Supreme Court cases recognizing a state or local official may be liable under § 1983 for actions taken "under color of state law" even where the official's actions also violate state or local law, and conflict with *Patsy v. Board of Regents*, 457 U.S. 496 (1982), which held § 1983 plaintiffs need not exhaust state-law remedies before asserting their federal rights. Maj. Op. at 16. For the reasons explained below, none of these arguments avail.

### 1. Interaction between *Parratt* and *Monell*

Under *Monell*, the actions of a municipality's high-ranking decisionmakers can create official policy such that the municipality may be liable for § 1983 purposes. 436 U.S. at 694. According to the court's decision today, if a municipality is liable for its policymaker's actions under *Monell*, then *Parratt* by definition does not apply. This conclusion can only result, however, from an improper conflation of official municipal policy with established state procedures.

No. 16-3456                                                                55

In *Monell*, the Supreme Court overturned the portion of *Monroe v. Pape* that held Congress had not intended municipalities to qualify as "persons" under § 1983. Instead, the Court concluded "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id.* at 690. In reaching this conclusion, the Court was careful to note a municipality cannot be vicariously liable for the actions of its employees under a respondeat superior theory; instead, the municipality can only be liable for its established policy *or* an action of a high-level policymaker "whose edicts or acts may fairly be said to represent official policy." *Id.* at 692–94.

Importantly, this test for municipal liability only determines whether the action of a particular municipal employee can be attributed to the municipality as its official policy. *See Wilson v. Town of Clayton*, 839 F.2d 375, 381 (7th Cir. 1988) ("[O]nce the officials who have authority to make policy for the Town are identified, their actions pursuant to that policy are attributable to the Town."). As the Supreme Court explained in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), "*Monell* is a case about responsibility. … [It] make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Monell* did not otherwise change the basis for liability under § 1983, which is expressly predicated on an action taken *under color of state law*. *See* 42 U.S.C. § 1983. The statute provides a federal remedy only when there is a "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Monroe*, 365 U.S. at 184 (quoting *United States v. Classic*, 313 U.S. 299, 325–326 (1941)); *see also Screws v. United States*, 325 U.S. 91, 109–113

(1945) (reaffirming the *United States v. Classic* definition of "under color of state law").

Therefore, *Monell* takes us as far as the conclusion that the municipality is indeed a person acting under color of state law[3] when it acts through its high-ranking policymakers, and a municipal defendant may therefore be subject to liability under § 1983 for the actions of the municipality's high-ranking policymakers in the same way that a state employee or other actor under color of state law may be held liable under § 1983. However, reaching that conclusion does not mean there is no longer a need to examine whether the action taken under color of state law was random and unauthorized.

While it is true that the actions in cases like *Michalowicz* and this one would certainly rise to the level of a municipal policy under *Monell*, such a policy would still be random and unauthorized as far as the *State* is concerned. Even the official policy of a municipality established through acts of high-ranking officials is unpredictable from the State's perspective if such policy contravenes established state procedures. *See, e.g., Germano*, 403 F.3d at 929. As we said in *Clifton*, "a single act of a state official—even a high-ranking state official—that violates that established [state] policy is random and unauthorized from the state's perspective." 969 F.2d at 282 (citing

---

[3] Since "[m]unicipal corporations are mere creatures of the legislative will, and can exercise no powers except such as the State has conferred upon them," *Zanone v. Mound City*, 103 Ill. 552, 556 (1882), there is little question that execution of a municipality's official policy or the act of a sufficiently high-ranking policymaker is an act taken "under color of state law," in much the same way that a state employee acting within the scope of his employment is acting under color of state law, *see Parratt*, 451 U.S. at 535.

*Easter House*, 910 F.2d at 1400–03). This is especially true when the high-ranking official is a municipal official acting on behalf of the municipality as opposed to a high-ranking state official. We've applied this reasoning to a county board in *Germano* and a village board in *Michalowicz*. The decisionmakers in this case are not materially different from those.

From the State of Illinois' perspective, the actions of the mayor and board of University Park—even though they are attributable to the municipality as its official policy under *Monell*—are no different than those of the employees in *Easter House*. They are actions by a "person" vested with power by the State, but actions that nonetheless violate established state procedures. These are precisely the sort of claims barred by *Parratt* and *Easter House*. It makes no difference whether the defendant is a high-ranking municipal employee creating municipal policy through his action or a state official acting with the authority imbued in his office by state law. The actions may still be random and unauthorized from the State's perspective if the defendant's authority has been circumscribed and regulated by state law. *See Easter House*, 910 F.2d at 1402; *Clifton*, 969 F.2d at 281 ("In *Easter House*, we emphasized that whether an act is random and unauthorized depends on the state's point of view, not the actor's.").

The court dismisses this line of reasoning by asserting the State's perspective is irrelevant in cases where the State is not a defendant, and that "different rules of liability under § 1983 apply to municipalities making and carrying out their own policies." Maj. Op. at 28. This essentially construes *Monell* as creating a wholly new cause of action: one analogous to § 1983, but which holds municipal policymakers liable for actions taken under color of *municipal policy* in the same way

58                                No. 16-3456

that § 1983 holds actors liable for actions taken under color of *state law*. If that were the case, then it might be reasonable to look to the perspective of the municipality when determining if an action was random and unauthorized. This is not what *Monell* purported to accomplish, however, when it held that a municipality qualifies as a "person" under § 1983 and may be liable for the actions of high-level policymakers.[4]

Moreover, the court's interpretation of *Monell* and § 1983 misses the essential "under color of state law" linchpin of § 1983. Once again, § 1983 provides a federal remedy for constitutional deprivations effected by a misuse of authority vested in the actor by the *State*. *Monroe*, 365 U.S. at 171–72 ("Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity."). Even a *Monell* claim is presumptively predicated on the municipal defendant's misuse of the authority with which the *State* has clothed it. *See Monell*, 436 U.S. at 690 (holding "that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies," and reciting the "under color of state law" language of § 1983); *c.f. id.* at 682 (discussing the legislative history of § 1983 to support the conclusion that § 1983 was intended to include municipalities and noting "there was no distinction of

---

[4] The Sixth Circuit has rejected the argument that an established "policy or custom" under *Monell* automatically renders *Parratt* inapplicable, pointing out that this confuses the separate inquiries of *Monell* and *Parratt*. *Vinson v. Campbell Cty. Fiscal Court*, 820 F.2d 194, 199 (6th Cir. 1987). The Eleventh Circuit has likewise recognized a distinction between a "policy or custom" under *Monell* and "established state procedure" under *Parratt*. *Rittenhouse v. DeKalb County*, 764 F.2d 1451, 1456 n.5 (11th Cir. 1985).

constitutional magnitude between officers and agents—including corporate agents—of the State").

Thus, the State's perspective is preeminently relevant in determining whether that misuse of state-imbued authority was predictable and preventable through additional procedural safeguards. *See Easter House*, 910 F.2d at 1401 (finding that the alleged deprivation "was not one that the state could have predicted or, more importantly, prevented through the implementation of additional predeprivation procedural safeguards.").

In *Parratt* and *Easter House*, merely proving the prison officials and the state agency employees had caused deprivations without due process was not sufficient to impose liability where their actions were random and unauthorized. In the same way, proving via *Monell* that the Village policy created through the actions of the Mayor and the Board caused a deprivation without due process does not foreclose inquiry as to whether that municipal policy was random and unauthorized from the State's perspective.

Whoever the "person" acting under color of state law is—be it a municipality via its policymakers, a prison official, a state agency, or someone else entirely—it is still necessary to determine if the State could have predicted and prevented the deprivation. If not, and if the State has provided sufficient post-deprivation remedies, then there is no justification to supplant the State's authority and subvert federalism by allowing the plaintiff to pursue a federal due process claim instead of the State's provided remedies.

## 2. The applicability of *Parratt* to *Monell* claims in *Wilson*, *Breuder*, *Matthiessen*, and *Tavarez*

The majority cites a collection of Seventh Circuit cases to support its conclusion that the *Parratt* exception is inapplicable to *Monell* claims. If read as the majority suggests, each of these cases represents the same mistaken conflation of *Monell*'s municipal liability inquiry with *Parratt*'s random and unauthorized acts inquiry. Three of these cases, however, were decided prior to the *Easter House en banc* decision: *Tavarez v. O'Malley*, 826 F.2d 671 (7th Cir. 1987), *Wilson v. Town of Clayton*, 839 F.2d 375 (7th Cir. 1988), and *Matthiessen v. Board of Education*, 857 F.2d 404 (7th Cir. 1988). Thus, to the extent that those cases suggest a "narrower" construction of *Parratt* than that adopted by *Easter House*, their continuing status as good law is suspect. *See Easter House*, 910 F.2d at 1410–11 (Cudahy, J., dissenting) (observing that *Tavarez* construed *Parratt* narrowly while the *en banc* majority in *Easter House* adopted a broad interpretation).[5]

---

[5] The majority also cites *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011), averring we there "disparaged [a] similar attempt[] to evade municipal liability, dismissing as 'extravagant' a claim that the 'acts of [a] Mayor … are merely acts of an errant employee.'" Maj. Op. at 16. In actuality, however, *Vodak* rejected the "extravagant claim that the only officials whose tortious conduct can *ever* impose liability on it are the members of the City Council acting through their ordinances." *Vodak*, 639 F.3d at 747 (emphasis in original). Viewed in context, the issue was not whether a particular action was random and unauthorized (the opinion does not cite *Parratt* or *Hudson* at all); rather, it was whether any action by a policymaker could *ever* be attributed to the municipality. Obviously, under *Monell* and *Pembaur*, the answer is yes; but that still leaves unanswered the question of whether that municipal action was random and unauthorized by *state law*.

First, the majority cites *Wilson v. Town of Clayton*, 839 F.2d at 380–82, for the propositions that (1) a single decision by a municipality's highest decisionmakers is attributable to the municipality as "policy" under *Monell*, and (2) such a decision, by definition, cannot be random and unauthorized under *Parratt*. As explained above, I have no quarrel with the first of these statements; there is no doubt that an action of the Village Board or the mayor may be the policy of the Village under *Monell*. *Pembaur*, 475 U.S. at 479–81. But, as I have demonstrated, the second proposition is incorrect. While such a decision would not be random and unauthorized from the Village's perspective, it could be so with respect to the State if state law circumscribes the discretion of the Village actors. *Michalowicz*, 528 F.3d at 535, 538; *Germano*, 403 F.3d at 929; *Clifton*, 969 F.2d at 282.

Regardless, *Wilson* is distinct from both the present case and *Easter House*, because in *Wilson*, there was no state law to circumscribe the Town officials' discretion. The plaintiff complained Town officials conspired to destroy his business, but the *Wilson* court cited no state statute or procedural rule which had been violated. *Wilson*, then, appears to be one of the *Zinermon* species of cases, where the employees in question were acting with unfettered discretion and deprived the plaintiff of due process in a predictable way that could have been avoided through procedural protections. If it is not interpreted this way, then it conflicts with *Easter House*.

The court next cites *Breuder v. Board of Trustees of Community College District No. 502*, 888 F.3d 266, 271 (7th Cir. 2018), for the proposition that a decision made by a body's governing board cannot be random and unauthorized. The court goes so far as to say *Breuder* "squarely rejected a reading of

*Parratt* identical to the village's argument here." Maj. Op. at 35. However, in *Breuder*, we expressly acknowledged that the defendants "ha[d] not contended that the process due for a summary termination is the opportunity to sue in state court." 888 F.3d at 270–71. Thus, a *Parratt* argument was not properly before the court in *Breuder* because the defendants did not argue it.

Even though the argument was not presented or developed by the defendants, we suggested that "[w]hen the decision is made by a body's governing board, *it would be hard to contend* that the action is random and unauthorized for the purpose of *Parratt* … and its successors." *Id.* at 271 (emphasis added). This statement may indeed be understood to suggest the relevant inquiry is whether an action is random and unauthorized from the perspective of the actor (e.g., a body's governing board) rather than the State. However, given that the defendants did not present or develop a *Parratt* argument in *Breuder*, it was unnecessary for the court to address this issue, and thus this statement is a mere dictum. *See United States v. Crawley*, 837 F.2d 291, 292–93 (7th Cir. 1988) (describing as dictum a passage that "was unnecessary to the outcome of the earlier case and therefore perhaps not as fully considered as it would have been if it were essential to the outcome," or where "the issue addressed … was not presented as an issue, hence was not refined by the fires of adversary presentation"). In any event, the non-absolute language used does not unequivocally create a *per se* rule that a decision by a body's governing board can *never* be random and unauthorized.

Even more fundamentally, as I have already described, if *Breuder* is read to mean that the actor's perspective is the rel-

evant perspective for determining whether an action is random and unauthorized, it would conflict with *Easter House, Germano,* and *Michalowicz.* It would also misunderstand the reasoning and undermine the purpose of the *Parratt* exception: that the State's role in providing due process should only be supplanted by federal courts when the deprivation caused by an actor clothed with state authority was predictable and preventable by the State, or where the State has not provided adequate post-deprivation remedies. *See Easter House v. Felder,* 879 F.2d 1458, 1470 (7th Cir. 1989) (en banc) (describing *Parratt*'s purpose as "discouraging the use of section 1983 as a supertort remedy to supplant existing state remedial procedures"), *vacated on other grounds,* 494 U.S. 1014 (1990) (mem.).

Furthermore, as with *Wilson,* the outcome of *Breuder* squares perfectly with *Easter House*'s explanation of *Parratt, Hudson,* and *Zinermon*: where an actor under color of state law is granted discretion to cause a deprivation and such discretion is not circumscribed or regulated by state law, then his actions are not random and unauthorized from the perspective of the State. The board in *Breuder* was not constrained by any procedural requirements that it provide the dismissed college president a pretermination hearing, but rather had unfettered discretion to act under state law. There is no doubt that a decision made by a governing board to terminate an employee without a hearing would not be "unauthorized" in the absence of any state law requiring such a hearing. Therefore, *Breuder* is not inconsistent with the general rule we established in *Easter House.* Where state law does not constrain an actor's discretion, a procedural due process claim in federal court may lie. That is not the case here, however.

Next, the majority cites *Matthiessen v. Board of Education*, 857 F.2d 404 (7th Cir. 1988). In *Matthiessen*, a teacher was terminated by a school board without being afforded the procedural protections to which she would have been entitled under state law if she were a tenured teacher. The school board raised *Parratt* before the district court and on appeal, prompting us to discuss the application of *Parratt* in a footnote of that opinion. *Id.* at 407 n.3.[6] The court in *Matthiessen* held the school board's action was not random and unauthorized under either a "narrow" or "broad" reading of *Parratt*. In so doing, however, the court unjustifiably ignored the difference between official municipal policy (as enacted by a high-ranking policymaker) and established state procedure, asserting "the single act of a sufficiently high-ranking policymaker may equate with or be deemed established *state procedure*." *Id.* (emphasis added). The *Matthiessen* court cited *Wilson*'s definition of "official policy" under *Monell* for this proposition, even though *Wilson* does not claim that municipal policy and state procedure are one and the same, and in fact correctly summarizes the municipal liability holding of *Monell* and *Pembaur* by stating simply: "once the officials who have authority to make policy for the Town are identified, their actions pursuant to that policy *are attributable to the Town*." *Wilson*, 839 F.2d at 381 (emphasis added). As I have described, conflating *Monell*'s

---

[6] *Matthiessen*'s discussion of the applicability of the *Parratt* exception was confined entirely to a single (though lengthy) footnote. This is because the court's decision focused primarily on whether the plaintiff-teacher was tenured under Illinois law, which was necessary for her entitlement to procedural protections. The district court had dismissed the case based on its holding that she was not tenured, and therefore no due process violation had occurred. We reversed that holding. *Matthiessen*, 857 F.2d at 405.

No. 16-3456                                              65

test for municipal liability with *Parratt*'s test for random and unauthorized acts misconstrues both cases.

*Matthiessen*'s misapplication of *Monell* and *Parratt* should not be considered binding on this court for two reasons. First, the *Matthiessen* decision focused primarily on the alternative issue of whether Matthiessen was tenured, confining the entire discussion of *Parratt* to a single footnote. Even within that discussion, the conclusion that Matthiessen's claim would fail under a "broad" reading of *Parratt* was in the alternative to its initial conclusion embracing a "narrow" reading. *Matthiessen*, 857 F.2d at 407 n.3; *see also Crawley*, 837 F.2d at 292 (noting that a passage in a prior opinion may not be entitled to binding weight when it "was not an integral part of the earlier opinion").

Second, and more importantly, this court sitting *en banc* in *Easter House* called into question *Matthiessen*'s conclusion that the plaintiff's claim would fail "even under the broad reading" of *Parratt*. *Easter House* directly quoted *Matthiessen*'s problematic assertion that "a single act of a sufficiently high-ranking policymaker may equate with or be deemed established state procedure," and then pointed out that "in the *Parratt* analysis, this means nothing more than an employee acts under color of state law during the performance of his job-related duties." *Easter House*, 910 F.2d at 1402. Thus, *Easter House* implicitly recognized that *Matthiessen*'s holding could

only have been based on a reading of *Parratt* which the *en banc* majority chose not to follow.[7]

Finally, the majority cites *Tavarez v. O'Malley*, 826 F.2d 671 (7th Cir. 1987), for the same proposition that the highest decisionmakers of a municipality cannot avoid liability for their decisions under *Parratt*.[8] The *Tavarez* opinion also seems to improperly conflate official municipal policy with established state procedure, stating "we cannot say" the deprivation was not the result of "an established state procedure" because the defendants "appear to be the senior county and town officials

---

[7] Even if *Matthiessen*'s conflation of official municipal policy with established state procedure is considered binding post-*Easter House*, however, it represents an aberration that misapplies Supreme Court precedent and creates an intracircuit conflict with more recent decisions of this court. *See infra* Section II.D.3. The court should repair our precedent by denouncing that incorrect reasoning, rather than embracing it. *See U.S. v. Welton*, 583 F.3d 494, 499 (7th Cir. 2009) (proclaiming a prior decision was not binding where that decision "relied on a misunderstanding of our prior precedent" and a mistake in reasoning), *vacating on other grounds*, 559 U.S. 1034 (2010); *United States v. Humphrey*, 34 F.3d 551, 560 (7th Cir. 1994) (Posner, J., concurring) ("[W]e should be quick to terminate gratuitous intracircuit conflicts."). If circulation to the entire court under Circuit Rule 40(e) is necessary, then that is the proper course of action rather than perpetuating a conflict and faulty reasoning. *See Shropshear v. Corporation Counsel of Chicago*, 275 F.3d 593, 597 (7th Cir. 2001).

[8] As explained above, it is highly questionable whether this case, like *Matthiessen*, remains good law after *Easter House*. In his *Easter House* dissent, Judge Cudahy observed that *Tavarez* construed *Parratt* narrowly, while the *en banc* majority in *Easter House* adopted a broad interpretation (and a correspondingly narrow interpretation of *Zinermon*). 910 F.2d at 1410–11 (Cudahy, J., dissenting). It seems Judge Cudahy was correct that *Easter House* implicitly rejected the interpretation of *Parratt* set forth in *Tavarez*.

(respectively) who have the practical if not the legal authority to establish procedures for dealing with hazardous premises." *Id.* at 677. But the fact that the defendants were able to establish official policy for the *county* and *town* (respectively) does not mean they had the power to establish *state* procedure. Nor does it follow that their acts attributable to the county and town as official policy were not random and unauthorized by the State which clothed the county and town with authority.

Even so, as with *Wilson* and *Breuder*, the outcome of *Tavarez* is consistent with the rule espoused by *Easter House*: that a federal due process claim may be brought where the State confers broad, unfettered discretion to the actor. There were two municipal officials responsible for the deprivation in *Tavarez*: a county official and a town official. The district court had concluded the actions of the officials were unauthorized not because they contravened a state law limiting their authority, but simply because the county and town did not have express policies causing the kind of deprivation at issue.[9] As in *Wilson*, the court in *Tavarez* cited no state statute or procedural rule that had been violated. Indeed, the court referred to the officials' acts as "*ultra vires* conduct," *id.* at 677, only because "no state or local law authorized" the deprivation, *id.* at

---

[9] This determination by the district court that there was no official policy simply because the county and town did not have rules requiring the deprivation was clearly wrong under *Monell* and *Pembaur*, since the actions of high-ranking policymakers can represent official policy. However, looking to the county and town policies to determine if the act was unauthorized was the wrong question to be asking to begin with. On appeal, we continued the district court's error by focusing on the town and county's perspective rather than the State that clothed the town and county with authority to act.

674–75. There is no indication in *Tavarez* that the discretionary authority granted to the county and town by the State was circumscribed or regulated by the State at all.

In sum, *Monell*'s test for determining whether a high-ranking official's actions amount to official policy such that they are attributable to the municipality is and should be maintained as a separate inquiry from *Parratt*'s question of random and unauthorized acts. The former focuses on the relationship between a municipality and its high-ranking official and answers whether the municipality may be liable for an act. *See Pembaur*, 475 U.S. at 479–80 (explaining that *Monell*'s holding is "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality" and limits liability to "action[s] for which the municipality is actually responsible"). The latter focuses on the relationship between the State and a person clothed with state authority and answers whether the State could have predicted or prevented a deprivation caused by such a person. *See Easter House*, 910 F.2d at 1399.

Even if some of this circuit's pre-*Easter House* cases and those of other circuits seemingly confuse these two inquiries (in contrast to our more recent cases properly separating the inquiries and focusing on the State's perspective instead of the actor's, such as *Germano* and *Michalowicz*), we should not completely eradicate that distinction as the court does today by proclaiming indelibly that *Parratt* is simply irrelevant to all *Monell*-type claims.

The fact that the mayor and Village Board's actions may represent the Village's official policy under *Monell* does not mean those actions were not random and unauthorized from the State of Illinois' perspective.

No. 16-3456                                                                69

### 3. Relevance of *Germano* and *Michalowicz*

I must also address the court's attempt to distinguish two cases which stand in the way of its claim that *Parratt* is wholly inapplicable to *Monell* claims. Both cases follow logically from the holding of *Easter House* and a proper understanding of the inquiries in *Monell* and *Parratt*, and both are much more recent than *Tavarez*, *Wilson*, and *Matthiessen*.

The court attempts to distinguish the 2005 decision in *Germano* primarily because the decision did not cite *Monell* or any of the pre-*Easter House* cases that seem to mistakenly conflate the *Monell* and *Parratt* inquiries. Maj. Op. at 33 n.6. But the lack of citation to *Monell* does not change the fact that the municipality's liability was expressly predicated on the understanding that the actions of its county board were attributable to the county itself. *Germano*, 403 F.3d at 928. *Monell* was not cited in *Germano* because we assumed the county was responsible for the actions of its board without needing to engage in an in-depth analysis of the question. Indeed, the county even conceded the alleged deprivation occurred because of "the action taken by [the county] … under the color of state law." *Id.* at 927.

Furthermore, the obviousness of the county's responsibility for the acts of its board only strengthens the argument that it is the *state's perspective* that is relevant in determining whether the municipality's act was random and unauthorized, not the municipality's own perspective. The court in *Germano* rejected the plaintiff's attempt to focus on the county's perspective and instead focused properly on the State's perspective. *Id.* at 928. Immediately assuming the county was responsible for its board's actions, the court stated "even if the

No. 16-3456

county is permitted to exercise some discretion …, the discretion is not unregulated. A county only has discretion to act in a way that is consistent with state law." *Id.* (internal citation omitted).

The court then invoked the reasoning of *Easter House*: "Germano, like the plaintiff in *Easter House*, 'points to nothing which would indicate that *the state* knew or should have known that the appellants … had disregarded, or were likely to disregard *the state's established procedure*.'" *Id.* (emphasis added). Thus, even attributing the acts of the county board directly to the county itself, the court concluded:

> [T]he actions of Winnebago County were not authorized by the state; indeed, the actions were in direct violation of state law and should not be considered a basis for a due process claim. … The county's decision to act contrary to … state law was not authorized and could not have been predicted or prevented by the state through any sort of predeprivation hearing.

*Id.* at 929. *Germano* is therefore directly on point and thoroughly refutes the majority's contention that *Parratt* is inapplicable in *Monell*-type cases.

The majority attempts to distinguish *Michalowicz* by asserting "[t]he crux of the case was that the plaintiff was trying to enforce under the United States Constitution a particular detail of state or local procedural law." Maj. Op. at 39. The majority asserts it was only the "specific kind of procedural missteps" at issue in Michalowicz's case that were "inherently unpredictable," as opposed to constitutional violations of due process that are also violations of state law. *Id.* The analysis in

No. 16-3456                                              71

*Michalowicz*, however, which directly applied *Parratt* to the acts of the municipality, reveals no such limitation:

> "Michalowicz … claims he was denied due process [by the Village's allowance of a biased post-termination hearing]. This species of due-process claim is a challenge to the "random and unauthorized" actions of the state officials in question, i.e., to their unforeseeable misconduct in failing to follow the requirements of existing law. Because such misconduct is inherently unpredictable, the state's obligation under the Due Process Clause is to provide sufficient remedies after its occurrence, rather than to prevent it from happening."

*Michalowicz*, 528 F.3d at 534–35 (internal citations omitted).

Amid this analysis, *Michalowicz* quoted *Doherty v. City of Chicago*, 75 F.3d 318 (7th Cir. 1996), a case that also applied the *Parratt-Hudson* "random and unauthorized act" exception to the acts of municipal employees, and which did not hinge on a mere violation of local procedural law that was not a constitutional violation. *Michalowicz* also cited *Easter House*'s discussion of *Parratt*, *Hudson*, and *Zinermon* when discussing the "species of due-process claim" at issue. Identifying the claim in *Michalowicz* as being of the same "species" as the claims in those cases—which each involved violations of constitutional magnitude and not mere "procedural missteps"—would make no sense if the *Michalowicz* court intended to limit the opinion's reach to violations of state procedure which were not also constitutional violations. Nothing in *Michalowicz* suggests the kind of narrow, close-cut ruling the majority ascribes to it.

Case: 1:15-cv-08489 Document #: 45 Filed: 09/23/19 Page 72 of 75 PageID #:323
Case: 16-3456      Document: 00713489477      Filed: 09/23/2019      Pages: 75

The *Michalowicz* court did not base its decision on any conclusion that Michalowicz had not alleged a substantial deprivation of due process that rose to the level of a federal claim.[10] Indeed, the court did not pass on the merits of his claim at all. It said only that the actions he complained of were random and unauthorized and that his remedy lies in state, not federal, court. *Id.* at 538. The substance of Bradley's claim compared to Michalowicz's is simply irrelevant under the *Parratt* doctrine.

### 4. Alleged conflict with Supreme Court precedent

Lastly, the court presents a parade of horribles that would result from applying *Parratt* in this case. It suggests such a holding would undermine public employees' constitutional due process protections and conflict with longstanding Supreme Court precedent allowing municipal officials to be held liable under § 1983 for acts representing official municipal policy. Maj. Op. at 41–42. The thrust of these arguments is that applying the *Parratt* exception to actions of municipal officials as representatives of the municipality would eliminate municipal liability under § 1983 and would eviscerate public employees' due process protections.

As I have already explained in detail, however, a proper understanding of the *Monell* municipal-liability inquiry and the *Parratt* random-and-unauthorized-acts inquiry demonstrates that the one does not foreclose the other. Rather than

---

[10] Had that been the basis for the court's decision in *Michalowicz*, that case would have conflicted with *Easter House*, where we held "Easter House's attempt to limit the application of *Parratt* according to the magnitude of the deprivation at issue is directly refuted by the Supreme Court in *Zinermon*." 910 F.2d at 1398.

engage in further refutation of these contentions, I will simply point to *Easter House*'s binding interpretation of *Parratt* and *Zinermon* as the answer to the court's concerns. Applying *Parratt* to *Monell*-type claims would no more eliminate public employees' procedural protections or municipal liability under § 1983 than *Easter House*'s rule eliminates due process claims against all state agency employees. Instead, where the State has conferred broad, unfettered discretion on an actor (whether that actor is a state employee, municipality, or other person), a deprivation committed by that actor cannot be said to be random and unauthorized. In such a case, the State could predict the deprivation would occur and could have prevented it through additional procedural safeguards. That was the case in *Zinermon* and, as I have pointed out, in *Tavarez*, *Wilson*, and *Breuder*. That was not the case, however, in *Easter House*, *Germano*, or *Michalowicz*; nor is it Bradley's case.

The court's additional concern that applying *Parratt* to this case would conflict with *Patsy v. Board of Regents*' holding that a § 1983 plaintiff need not exhaust her state administrative remedies before bringing a federal claim, 457 U.S. at 516, is similarly unfounded. *Patsy* was not a *Parratt*-type case: *Parratt* dealt with and created an exception applying only to certain kinds of procedural due process claims, while *Patsy* was concerned more generally with constitutional deprivations under § 1983 (the specific claim at issue in *Patsy* was sex discrimination). *Id.* at 498. Applying *Parratt* in this case would be no

No. 16-3456

more inconsistent with *Patsy* than *Parratt* itself is—or *Easter House*, for that matter.[11]

In short, a consistent application of *Parratt* regardless of who the actor under color of state law is would harmonize, not disrupt, Supreme Court precedent.

### III. Conclusion

Since our *en banc* decision in *Easter House*, the law of this circuit has been clear: an individual deprived of property without pre-deprivation process by the random and unauthorized act of a state actor may not maintain a due process action in federal court so long as the State provides an adequate post-deprivation remedy. Whether that state actor is a municipality or some other person clothed with authority by the State does not change the essential inquiry of whether the act was predictable and preventable by the State. We had a chance 28 years ago to adopt the broader reading of *Zinermon* that Judge Cudahy and others[12] advocated, but we rejected it. Today, the court seeks to change direction. Yet we are now bound by *Easter House*. Under that decision—and with a proper understanding of municipal liability under *Monell* and the relevance of the State's perspective under *Parratt*—the outcome of this case is clear: Bradley cannot maintain a due process claim in federal court.

---

[11] As explained in *Kauth v. Hartford Ins. Co. of Illinois*, 852 F.2d 951, 955 n.8 (7th Cir. 1988), where *Parratt* applies, there is no due process violation and thus no grounds for a § 1983 action; therefore, *Patsy* is not implicated.

[12] See, e.g., *Caine v. Hardy*, 943 F.2d 1406, 1418–19 (5th Cir. 1991) (en banc) (Williams, J., dissenting).

No. 16-3456                                                    75

Contrary to the court's concerns, the failure of Bradley's federal claim does not mean he has no opportunity for redress. If Bradley's allegations are true, he will have a remedy under the Illinois Administrative Review Act. We presume that "state courts are fully competent to adjudicate constitutional claims," *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930 (1975), so we should trust them to enforce state procedural law.

Today's decision undermines federalism, embraces a misunderstanding of the separate inquiries established by *Monell* and *Parratt*, and will sow confusion among the lower courts by muddying the clear waters of *Easter House* and its progeny. I would instead affirm the judgment below.

I respectfully dissent.