# EXHIBIT A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EDDIE RAY BRADLEY,                              )
                                                )
                  Plaintiff,                    )
                                                )
v.                                              )
                                                )    Court No. 15 cv 08489
VILLAGE OF UNIVERSITY PARK,                     )
ILLINOIS, an Illinois Home Rule municipality,   )    Honorable Judge Charles R, Norgle, Sr.
and VIVIAN COVINGTON, Mayor of                  )
UNIVERSITY PARK, ILLINOIS, both                 )
Individually and her official capacity as mayor, )
                                                )
                  Defendants.                   )

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO
## PLAINTIFF'S COMPLAINT

### NATURE OF THE CASE

1.      Plaintiff brings this action for violation of his civil rights, and of Illinois law and statutes regarding termination of village police chiefs, and of the Illinois Wage Payment and Collection act and the Illinois Whistleblower act.

**ANSWER:**    **Defendants admit that the Plaintiff has brought this action for alleged violations of the above stated statutes and acts, however Defendants deny any wrongdoing or liability in connection thereto.**

### JURISDICTION AND VENUE

2.      This action arises under the United States Constitution, amendment XIV, and federal statutes, 42 U.S.C. §§ 1983 and 1988. Jurisdiction over such claims arises under 28 U.S.C. § 1331, and 28 U.S.C. § 1343. The Court has supplemental jurisdiction over Plaintiff's remaining state court claims pursuant to 28 U.S.C. § 1367(a).

**ANSWER:**    **Defendants admit the allegations contained in paragraph 2.**

3.      Venue is proper in this judicial district in accord with 28 U.S.C. § 1391 (b) and (c), as Plaintiff and Defendants reside in this district or have their principal place of business in this district, and all events giving rise to Plaintiff's claims occurred within this district.

**ANSWER:      Defendants admit the allegations contained in paragraph 3.**

## JURY DEMAND

4.      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff requests a trial by jury.

**ANSWER:      Defendants also request a trial by a 12 person jury.**

## PARTIES

5.      Plaintiff EDDIE TAY BRADLEY (hereinafter "Plaintiff" or "BRADLEY"), at all times relevant to this complaint, is a citizen of the United States and has resided in the Village of University Park, Illinois 60484. His place of employment as Chief of Police was the Village of University Park, Police Station, 650 Burnham Drive, the vast majority of which is located in Will County, Illinois.

**ANSWER:      Defendants admit that Plaintiff resided in the Village of University Park and that Plaintiff was employed as Chief of Police of the Village of University Park.**

6.      Plaintiff has an extensive and exemplary law enforcement background and was Chief of Police of the Village of University Park, Illinois from October of 2013 until his purported termination, first revealed to his in a letter to Plaintiff signed by defendant Mayor Covington dated May 29, 2015. A copy of this letter is attached hereto and made part hereof as **Exhibit A** to this Complaint.

**ANSWER:** **Defendant admits that Plaintiff was Chief of Police and that the termination letter has been attached to the Complaint as Exhibit A and deny the remainder of the allegations contained in paragraph 6.**

7.     The VILLAGE's Chief of Police immediately prior to Plaintiff was Mel Davis who did not have a written agreement with the VILLAGE. He was paid a $25,000.00 severance.

**ANSWER:** **Defendants admit that Mel Davis was the Chief of Police for the Village of University Park and was paid a severance but deny the relevance said allegations contained in paragraph 7.**

8.     Defendant VILLAGE OF UNIVERSITY PARK, ILLINOIS (hereinafter the "VILLAGE") is a home rule unit of Illinois and an Illinois municipal corporation.

**ANSWER:** **Defendants admit the allegations contained in paragraph 8.**

9.     Defendant Vivian Covington (hereinafter the "MAYOR") is the present Mayor of the VILLAGE and was its Mayor at all times relevant to this Complaint and is sued in both her official capacity and individually.

**ANSWER:** **Defendants admit that the Mayor is being sued in both her official and individual capacity, but deny any liability in connection thereto.**

10.     The May 29, 2015 letter from the MAYOR acknowledges Plaintiff's contract of employment but claims, *inter alia*, that Plaintiff's contarct was the Village is "ultra vires" and "void ab initio" and therefore, the letter claims, "the contract conferred no rights, imposed no duties and afforded no protection." The letter purports to rely on an 1892 Illinois court decision and 65 ILCS 5/3.1-30-5(c), a statute concerning the replacement of a removed or dismissal municipal officer.

3

**ANSWER:** Defendants admit that Plaintiff has stated what was written in said letter, but deny the remainder of the allegations contained in paragraph 10.

11.     Prior to the May 29th letter, the MAYOR informed Plaintiff by letter dated May 16, 2015, that he had been placed on "administrative leave" with pay. A copy of this letter is attached to this Complaint as **Exhibit B** and made part hereof.

**ANSWER:** Defendants admit that Exhibit B speaks for itself and deny the remainder of the allegations contained in paragraph 11.

12.     Plaintiff commenced work as Chief of Police of the Village pursuant to a written contract. After one year, he was offered and he accepted a new written employment contract paying him a salary of $100,000.00 a year, plus the following enumerated benefits: full medical benefits; three weeks vacation in 2015 for January 1 to December 31; four weeks vacation in 2016 for January to December 31; any vacation for the year that is not used by December 1 shall be paid at that time; sick time, 10 hours per month (bringing forward 120 hours for fiscal year 2014), two weeks annual Police Chief training mandatory with expenses paid by the Village. Department take home car, all village recognized holidays off.

**ANSWER:** Defendants admit the allegations contained in paragraph 12.

13.     Plaintiff's written contract provides for removal for cause, only after service of written notice of the for-cause charges at least seven (7) days before any date for a hearing with such hearing to be before the Village Board at which time Plaintiff "shall be allowed to explain his position," and the Village Manager may suspend Plaintiff with or without pay from the period prior to the hearing and any period, not in excess of two (2) weeks during which time the Village Board will consider termination of the contract.

**ANSWER:** **Defendants admit that the contract states as such, but assert that other reasons existed for the Plaintiff's dismissal and therefore deny the remainder of the allegations contained in paragraph 13.**

14.     Plaintiff's written contract provides for termination without cause but requires that the Village Board notify Plaintiff in writing of that decision and pay a termination fee equal to four (4) months salary to Bradley, "as Bradley may have lost other employment opportunities." A copy of the contract is attached here as **<u>Exhibit C</u>** and made part hereof.

**ANSWER:** **Defendants admit that Exhibit C is attached and this document speaks for itself and deny the remainder of the allegations contained in paragraph 14.**

## FACTS COMMON TO ALL CLAIMS

15.     At all times material to this complaint, Plaintiff was employed by the defendant VILLAGE as its Chief of Police for one year and eight months under his written employment contracts.

**ANSWER:** **Defendants deny that Plaintiff was employed as the Chief of Police for the Village for twenty months, but admit that he held the position from October of 2013 till May 29, 2015.**

16.     Both because of his written contract of employment and by virtue of Illinois law, Plaintiff has a protectable property interest in his position.

**ANSWER:** **Objection, paragraph 16 of Plaintiff's Complaint calls for a legal conclusion.**

17.     Plaintiff performed all of the duties of his position satisfactorily.

**ANSWER:** **Defendants deny the allegation contained in paragraph 17.**

18.     Illinois law expressly sets forth a process for the removal of police chiefs in home rule units. See 65 ILCS 5/10-2.1-4 and 5/10-2.1-17.

**ANSWER:**     **Objection, paragraph 18 of Plaintiff's Complaint calls for a legal conclusion.**

19.      65 ILCS 5/10-2.1-4 requires that the mayor of a municipality file with the municipality's board "the reasons for such removal or discharge, which removal or discharge shall not become effective unless confirmed by a majority vote of the corporate authorities."

**ANSWER:**     **Objection, paragraph 19 of Plaintiff's Complaint calls for a legal conclusion.**

20.      This has not been done in the instant case.

**ANSWER:**     **Defendants admit the allegations contained in paragraph 20.**

21.      On May 12, 2015, a "regular Meeting" of the VILLAGE Board of Trustees was held.

**ANSWER:**     **Defendants admit the allegations contained in paragraph 21.**

22.      Though required by law and his contract, Plaintiff has never received any required notifications or statement of reasons for dismissal or termination.

**ANSWER:**     **Defendants admit that Plaintiff never received notification or statement of reasons for his termination, but deny that Plaintiff was owed same, and deny the remainder of the allegations contained in paragraph 22.**

23.      In addition, 65 ILCS 5/10-2.1-17 further requires that: "Except as hereinafter provided, no officer or member of the fire or police department of any municipality such to this Division 2..1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. ***" The hearing is to be commenced within 30 days of the filing of the reasons."

**ANSWER:**     **Objection, paragraph 23 of Plaintiff's Complaint calls for a legal conclusion.**

24.      No hearing as required by 65 ILCS 5/10-2.1-17 has ever been conducted.

**ANSWER:** **Objection, paragraph 24 of Plaintiff's Complaint calls for a legal conclusion.**

25.     65 ILCS 5/10-2.1-17 further provides that if a police chief is "appointed in the manner provided by ordinance," while they may be removed or discharges "by the appointing authority" the appointing authority is required to "file with the corporate authorities the reasons for such removal or discharge, which removal or discharge *shall not* become effective unless confirmed by a majority vote of the corporate authorities." (Emphasis added.) In addition, the municipality's board of fire and police commissioners are to conduct a "fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof…."

**ANSWER:** **Objection, paragraph 25 of Plaintiff's Complaint calls for a legal conclusion.**

26.     Plaintiff is unaware of the filing of any reasons for his dismissal or termination pursuant to 65 ILCS 5/10-2.1-17 by the VILLAGE nor has the board of fire and police commissioners conducted any hearing to permit Plaintiff to respond, nor has his contractual right to notice been complied with.

**ANSWER:** **Defendants are without knowledge to either admit or deny the allegations contained in paragraph 26.**

27.     Plaintiff has never been accorded a name-clearing hearing by the VILLAGE or its Board of Fire and Police Commissioners.

**ANSWER:** **Defendants deny that Plaintiff is entitled to a "name-clearing" hearing and therefore deny paragraph 27.**

28.     Plaintiff pointed out the blatant violation of his statutory and due process rights in his purported termination and that under Illinois law, he was still Chief of Police, by certified latter to Mayor Covington dated July 14, 2015 and received on July 17, 2015. (A copy is attached to this Complaint as **<u>Exhibit D</u>** and made part hereof.)

**ANSWER:** Defendants admit that Exhibit D was sent by Plaintiff's counsel and that the document speaks for itself.

29. To date there has been no response to that letter.

**ANSWER:** Defendants admit the allegations contained in paragraph 29.

30. Except for termination for cause, Plaintiff is entitled under his contract to severance pay amounting to four months pay at his regular salary after termination, No legally appropriate termination pursuant to the agreement and state law has yet to occur here and therefore his right to salary and benefits has never abated.

**ANSWER:** Defendants admits that the contract discusses pay, but deny the remainder of the allegations contained in paragraph 30.

31. Plaintiff has never been convicted of any offenses which could result in termination nor cause nor has the MAYOR or the VILLAGE so claimed.

**ANSWER:** Defendants are without knowledge to either admit or deny the allegations contained in paragraph 31.

32. No reason has ever been given for the claimed termination of Plaintiff's contract.

**ANSWER:** Objection, paragraph 32 is duplicative and therefore no answer is required.

33. No notice was ever given to Plaintiff enumerating any charges for termination or suspension, nor to the best of Plaintiff's knowledge, has any hearing been held at which a majority vote was taken to terminate him.

**ANSWER:** Defendants deny the allegations contained in paragraph 33.

34. Plaintiff has been afforded no opportunity to be heard regarding any decision to terminate his contract.

ANSWER:    Defendants deny that any opportunity was required and therefore deny the allegations contained in paragraph 34.

35.    Defendants' publicized Plaintiff's illegal and improper "termination".

ANSWER:    Defendants deny the allegations contained in paragraph 35.

36.    To date, there has been no response from either the VILLAGE or the Mayor and Plaintiff has received no wage payments since on or about May 15, 2015.

ANSWER:    Defendants admit that they have not responded or made wage payments to the Plaintiff, but deny that any were required.

## COUNT I
### (Violation of Civil Rights)

37.    Plaintiff reincorporates paragraphs 1-36 above as if set out in this Count I in full.

ANSWER:    Defendants reincorporate and reallege their answers to paragraphs 1-36 as if fully restated herein.

38.    Plaintiff has at all times possessed a present entitlement to the benefits of his contract which constitutes a protected property interest under by the Due Process Clause of the Fourteenth Amendment to the Unites States Constitution and the Illinois Constitution of 1970, art. 1, section 2.

ANSWER:    Paragraph 38 is an allegation of law to which no answer is required.

39.    Defendants have failed to accord Plaintiff due process of law in that they have failed to provide a fair and prompt pre-termination hearing, including but not limited to the notice required by law as well as contract of the hearing date, place and time, and notice of the charge or charges being leveled against Plaintiff, and in other way providing Plaintiff with an

9

opportunity to be heard, in violation of the due process clause of the United States Constitution, amendment XIV, and the Illinois Constitution of 1970, article 1, section 2.

**ANSWER:      Paragraph 39 is an allegation of law to which no answer is required.  Defendants deny due process was required.**

40.     Defendants have further failed to provide any fair and prompt post-termination hearing, in violation of the due process clause of the United States Constitution, amendment XIV, and the Illinois

Constitution of 1970, article 1, section 2.

**ANSWER:      Paragraph 40 is an allegation of law to which no answer is required.   Defendants deny due process was required.**

WHEREFORE Defendants, MAYOR VIVIAN COVINGTON and the VILLAGE OF UNIVERSITY PARK, pray that this honorable court find in their favor and against the Plaintiff and for all other relief deemed necessary and just under the circumstances.

### COUNT II
### (Breach of Contract – Failure to Give Notice and
### To Provide an Opportunity to be Heard)

41.     Plaintiff reincorporates paragraphs 1 – 40 of Count I as of set out in this Count II in full.

**ANSWER:      Defendants reincorporate and reallege their answers to paragraphs 1-40 as if fully restated herein.**

42.     Plaintiff's employment agreement expressly provides that it can be terminated only following proper "written notice setting forth the charges against his at least seven (7) days prior to such hearing." (See **Exhibit C** to this Complaint).

10

**ANSWER:** **Objection, paragraph 42 is duplicative to paragraph 14, further answering, Exhibit C speaks for itself.**

43. Plaintiff's contract requires that defendant VILLAGE to provide Plaintiff was a hearing where he would have an opportunity to be heard on the charges leveled against him.

**ANSWER:** **Defendants admit that the contract requires a hearing but denies same was required and therefore deny the remainder of paragraph 43.**

44. Plaintiff has received no notice, no hearing nor opportunity to be heard by the VILLAGE in breach of his written employment agreement.

**ANSWER:** **Defendants admit the allegations contained in paragraph 44, but deny same was required and further deny contract was breached.**

45. In addition, Plaintiff's contract states that except for his conviction of a felony or of a crime involving moral turpitude of "for cause," he is entitled to severance pay equal to four (4) months of his regular salary.

**ANSWER:** **Defendants admit that the contract requires a hearing but denies same was required and therefore deny the remainder of paragraph 45.**

46. The claimed termination here was neither pursuant to proper or any notice nor was it based on any allegation of cause or criminal conduct, nor was Plaintiff provided a hearing, all in breach of the contract.

**ANSWER:** **Defendants deny that the contract was breached and that the termination was improper and therefore deny the allegations contained in paragraph 46.**

WHEREFORE Defendants, MAYOR VIVIAN COVINGTON and the VILLAGE OF UNIVERSITY PARK, pray that this honorable court find in their favor and against the Plaintiff and for all other relief deemed necessary and just under the circumstances.

11

## COUNT III
## (DEFAMATION)

47.     Plaintiff reincorporates paragraphs 1-46 of Count II as if set out in this Count III in full.

**ANSWER:     Defendants reincorporate and reallege their answers to paragraphs 1-46 as if fully restated herein.**

48.     The actions of the defendants in publicizing their illegal purported termination of Plaintiff constituted defamation *per se*, injuring him in his professional and held him out to public opprobrium, impeached his integrity, and his reputation and lowered him in the eyes of the community.

**ANSWER:     Objection, calls for legal conclusion and therefore defendants deny the allegations contained in paragraph 48.**

49.     Illinois recognizes five categories of statements that defamatory per se: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those that prejudice a party or impute lack of ability in the party's trade, profession or business; and (5) those imputing adultery or fornication.

**ANSWER:     Objection, calls for legal conclusion and therefore defendants deny the allegations contained in paragraph 49.**

50.     Defendants' actions in publicizing Plaintiff's termination without providing him with a name-clearing hearing, implied that he was unable to perform his profession, was guilty of criminality, or imputed a lack of ability in his trade, profession or business, and seriously prejudiced him in the law enforcement community and therefore, constitute defamation *per se*.

**ANSWER:** **Objection, paragraph 50 of Plaintiff's Complaint calls for a legal conclusion and therefore defendants deny the allegations contained in paragraph 50.**

51.     The publication of the illegal termination without any name-clearing hearing was intended to hold Plaintiff up to scorn, ridicule and public opprobrium and suggest that he was guilty of some criminal act and to impeach his reputation.

**ANSWER:** **Defendants deny the allegations contained in paragraph 51.**

52.     The defendants published the illegal termination Plaintiff knowing that it was false and with reckless disregard for the truth or falsity.

**ANSWER:** **Defendants deny the allegations contained in paragraph 52.**

53.     The defendants' actions were intentionally malicious, seeking to not only injure Plaintiff but to permanently damage Plaintiff's reputation within the law enforcement community in the United States to destroy Plaintiff's ability to obtain similar future employment.

**ANSWER:** **Defendants deny the allegations contained in paragraph 53.**

54.     The publications were defamatory *per se* and are not capable of an innocent construction.

**ANSWER:** **Objection, calls for legal conclusions. Without waiving said objections, Defendants deny the allegations contained in paragraph 54.**

55.     The publications were for the sole purpose of revenge and vindictiveness for Plaintiff's investigation into various activities of members of the VILLAGE BOARD and individuals on the police force.

**ANSWER:** **Defendants deny the allegations contained in paragraph 55.**

13

56.     The actions of the defendants and each of them were the direct and proximate cause of damage to Plaintiff.

**ANSWER:      Defendants deny the allegations contained in paragraph 56.**

WHEREFORE Defendants, MAYOR VIVIAN COVINGTON and the VILLAGE OF UNIVERSITY PARK, pray that this honorable court find in their favor and against the Plaintiff and for all other relief deemed necessary and just under the circumstances.

## COUNT IV
## (FALSE LIGHT)

57.     Plaintiff reincorporates paragraphs 1-56 of Count III as if set out in this Court IV in full.

**ANSWER:      Defendants reincorporate and reallege their answers to paragraphs 1-56 as if fully restated herein.**

58.     The defendants' actions in publicizing Plaintiff's illegal termination placed Plaintiff in a false light before the public and their actions extended far beyond any privileged scope.

**ANSWER:      Defendants deny the legal allegations contained in paragraph 58.**

59.     The false light in which Plaintiff was paced, that he had failed to perform the duties of his office appropriately or was removed for failure to perform or for a want of integrity or for criminality, is highly offensive to a reasonable person.

**ANSWER:      Defendants deny the legal allegations contained in paragraph 59.**

60.     The defendants acted with actual malice, that is with the knowledge that the termination was illegal and placed Plaintiff in a false light or with reckless disregard for whether the public assumed the basis for the termination was true or false.

**ANSWER:**     Defendants deny the legal allegations contained in paragraph 60.

WHEREFORE Defendants, MAYOR VIVIAN COVINGTON and the VILLAGE OF UNIVERSITY PARK, pray that this honorable court find in their favor and against the Plaintiff and for all other relief deemed necessary and just under the circumstances.

## COUNT V
### (Illinois Whistleblower Act Violation)

61.     Plaintiff reincorporates paragraphs 1 – 60 of Count IV as of set out in this Count V in full.

**ANSWER:**     Defendants reincorporate and reallege their answers to paragraphs 1-60 as if fully restated herein.

62.     Plaintiff disclosed to the Village Manager the details of an investigation he was conducting into an account discovered at Seaway Bank. After disclosing the investigation, the person on the account resigned from VILLAGE employment in or about June, 2015.

**ANSWER:**     Defendants are without knowledge to either admit or deny the allegations contained in paragraph 62.

63.     This information was conveyed to the defendant MAYOR and to the VILLAGE.

**ANSWER:**     Defendants deny the allegations contained in paragraph 63.

64.     Plaintiff was conducting an investigation into the handling of stolen vehicles placed into storage by the VILLAGE. This investigation was reported to the defendant MAYOR.

**ANSWER:**     Defendants deny the allegations contained in paragraph 64.

65.     Plaintiff was conducting an investigation into a VILLAGE Trustee who was accused of pistol whipping his son, breaking his son's jaw. Plaintiff received a communication

from the Village Clerk asking why the records were at the station. He was advised that they should not be there due to their age. The Clerk had received an FOIA request for the records. Plaintiff was told to forget about the incident because the trustee was a friend of the MAYOR.

**ANSWER:** **Defendants are without knowledge to either admit or deny the allegations contained in paragraph 65.**

66. On complaining to the Village Manager and to the MAYOR, Plaintiff stated his concerns and what Plaintiff believed to be violation of federal and state law as well as Village policy.

**ANSWER:** **Defendants deny the allegations contained in paragraph 66.**

67. Defendant MAYOR retaliated against the Plaintiff for conducting and reporting his investigations and continuing them after being warned to cease, by illegally termination Plaintiff's employment as Chief of Police.

**ANSWER:** **Defendants deny the allegations contained in paragraph 67.**

**COUNT VI**
**(Violations of the Illinois Wage Payment and Collection Act)**

68. Plaintiff reincorporates paragraphs 1 – 67 of Count V as if set out in this Count VI in full.

**ANSWER:** **Defendants reincorporate and reallege their answers to paragraphs 1-67 as if fully restated herein.**

69. Plaintiff brings Count VI pursuant to 820 ILCS 115/11 (c) and this Court's supplemental jurisdiction under 28 U.S.C. § 1367 (a) to hear and adjudicate violations of this Act.

**ANSWER:** **Defendants admit that the Plaintiff has brought this action for alleged violations of the above stated statute, however Defendants deny any wrongdoing or liability in connection thereto.**

70.     Plaintiff's contract, unless properly terminated, runs through 2016.

**ANSWER:** **Defendants admit that Plaintiff's contract ran through 2016, but deny the remainder of the allegations contained in paragraph 70.**

71.     To date, Defendants have made no payment of wages to Plaintiff since the purported termination though the contract of employment has never been legally terminated.

**ANSWER:** **Defendants admit that they have made no wage payments, but deny that Plaintiff was improperly terminated.**

72.     Plaintiff has made timely and appropriate demands on Defendants for payment of wages. Defendants have refused to make any payments for wages.

**ANSWER:** **Defendants deny the allegations contained in paragraph 72.**

WHEREFORE Defendants, MAYOR VIVIAN COVINGTON and the VILLAGE OF UNIVERSITY PARK, pray that this honorable court find in their favor and against the Plaintiff and for all other relief deemed necessary and just under the circumstances.

## **AFFIRMATIVE DEFENSES**

### **Affirmative Defense I – Failure to Exhaust Administrative Remedies**

Plaintiff has failed to exhaust his administrative remedies.

### **Affirmative Defense II – Qualified Immunity**

At all relevant times Defendant, VIVIAN COVINGTON, was employed by the Village of University Park and a reasonable person, objectively viewing the facts and circumstances that

confronted the Defendant, VIVIAN COVINGTON, would have believed her actions to be lawful in light of clearly established law and the information they possessed at the time, as such this Defendant is entitled to qualified immunity. Further, to the extent that this Court finds the Defendants to be acting within the scope of their employment with the City of Chicago Heights, then the Defendants are entitled to qualified immunity for their actions, as they were not acting in the individual capacity.

### Affirmative Defense III – Tort Immunity

To the extent that Defendant, VIVIAN COVINGTON, was acting within the scope of her employment as Mayor of the Village of University Park, Illinois, the public employee or public agent is not liable for her acts or omissions in the execution of her job duties, unless such conduct constitutes "willful and wanton" conduct. 745 ILCS 10/2-202 (2004). Accordingly the Plaintiff's state law claims against Mayor, VIVIAN COVINGTON, are barred, in whole or in part, by Tort Immunity.

Under the Tort Immunity Act, Mayor, VIVIAN COVINGTON exercised discretionary on a non-ministerial matter and is not liable for any resulting injuries. 745 ILCS 10/2-201. Accordingly, the Plaintiff's state law claims against Mayor, VIVIAN COVINGTON, are barred, in whole or in part, by the Tort Immunity Act.

Under the Illinois Tort Immunity Act, Defendants are not liable under state law for any injury caused by the act or omission of another person. 745 ILCS 10/2-204.

Under the Illinois Tort Immunity Act, a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208.

18

To the extent that this Court finds the defendants to be acting within the scope of their employment with the Village of University Park, then the defendants are entitled to the statute known as the Local Government and Government Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILCS 10/1-101, et seq.

### Affirmative Defense IV – Failure to State a Valid Claim

The allegations and counts contained in Plaintiff's Complaint fail to state a cause of action, upon which relief can be granted.

### Affirmative Defense V –Failure to Mitigate

To the extent that the Plaintiff is entitled to any damages, which the Defendants expressly deny, the Plaintiff failed to use reasonable efforts to mitigate his damages, and Plaintiff's damages, if proven, should be eliminated or reduced accordingly.

To the extent any injuries or damages claimed by the Plaintiff were proximately caused, in whole or in part, by negligent, willful, wanton, and/or other wrongful conduct on the part of the Plaintiff, any verdict or judgment obtained by the Plaintiff must be reduced by application of the principles of comparative fault, by an amount commensurate with the degree of fault attributed to the Plaintiff by the jury in this case. If the Plaintiff's fault is determined to exceed fifty percent (50%) of the total cause, then the Plaintiff must be barred from recovery herein.

### Affirmative Defense VI – Truth

Defendants assert truth as an Affirmative Defense to Plaintiff's defamation claims.

### Affirmative Defense VII – Tort Immunity

Under 745 ILCS 10/2-107, a public entity is not liable for Plaintiff's state law claims.

### Affirmative Defense VIII – Qualified Privilege

Qualified Privilege provides complete immunity to any and all of Plaintiff's claims.

**Affirmative Defense IX – Plaintiff's Claim are not *"per se"* Actionable**

Plaintiff is not entitled to recovery as defendant's statements, in and of themselves, are not so obviously and naturally harmful to make proof of special damages unnecessary, especially since defendant's statements do no (1) impute the commission of a criminal offense, (2) impute infection with a loathsome communicable disease; (3) impute an inability to perform or want of integrity in the discharge of duties of office or employment; or (4) prejudice plaintiff, or impute lack of ability, in his or her trade, profession or business.

**Affirmative Defense X – Defamation Privilege**

Plaintiff is not entitled to the relief sought a non-actionable opinion of the complaint as defendants statements are true, substantially true and/or protected opinion.

**Affirmative Defense XI – 1st Amendment**

Plaintiff is not entitled to recovery because defendants' statements are protected under the First Amendment to the United States Constitution, and Article 1, Section 4 of the Illinois Constitution of 1970.

**Affirmative Defense XII – Innocent Construction**

Plaintiff is not entitled to recovery because defendants' statements are reasonably capable of an innocent construction.

**Affirmative Defense XIII – No Actual Malice**

Plaintiff is not entitled to recovery as plaintiff cannot establish that defendants' statements were made with actual malice, as defendants statements were not false or made in reckless disregard of the truth.

**Affirmative Defense IXV – No Damages**

Plaintiff is not entitled to recovery as it cannot establish any economic loss or special damages.

## Affirmative Defense XV – Fair Reporting Privilege

Plaintiff is not entitled to recovery as defendants' statements relate to matters of governmental affairs and proceedings and are protected by the fair reporting privilege, as well as being a fair comment on a matter of public interest.

## Affirmative Defense XVI – No Injury

Plaintiff is not entitled to recovery as it has not sustained an actual injury.

## Affirmative Defense XVII – Unclean Hands

Plaintiff is not entitled to recovery as he has unclean hands.

WHEREFORE, Defendants, VILLAGE OF UNIVERSITY PARK and VIVIAN COVINGTON, respectfully request judgment in their favor and against the Plaintiff. Defendants request that plaintiff take nothing by way of this Complaint and that they be awarded all fees and costs incurred in defending this claim so wrongfully brought, or for all such other relief this court deems just.

Respectfully submitted,


By:     /s/ Patrick S. Wall_____
        One of the Attorneys for Defendants

Paul A. O'Grady
Patrick S. Wall
Kevin M. Casey
Peterson, Johnson & Murray Chicago
200 West Adams, Suite 2125
Chicago, IL. 60606
pwall@pjmlaw.com

# EXHIBIT B

10-7-14

## EMPLOYMENT CONTRACT BETWEEN
## CHIEF EDDIE R. BRADLEY AND
## THE VILLAGE OF UNIVERSITY PARK

WHEREAS, the management and operation of a Police Department is one of the most important functions which a municipality can perform for its citizens; and

WHEREAS, in recent years, the Village of University Park has had a number of Police Chiefs and the Corporate Authorities of the Village wish to assure that the municipality will have a Police Chief in place for an extended period of time; and

WHEREAS, the Corporate Authorities believe that Chief Eddie R. Bradley, based upon training experience and temperament, has the right combination of abilities to improve the performance of the Village's Police Department; and

WHEREAS, the statutes of the State of Illinois allow a municipality to enter into a contract with a Police Chief for an extended period of time; and

WHEREAS, the Corporate Authorities of the Village of University Park believe that, under its home rule powers, it can employ a Police Chief to serve for a period of time which extends beyond the term of a Mayor or even that of Village Manager; and

1



EXHIBIT

C 1-2

WHEREAS, Chief Bradley is prepared to commit to serve as the Police Chief of the Village during 2015 and 2016;

NOW, THEREFORE, in accordance with the promises of the party herein, which constitute adequate consideration, the Village of University Park ("Village") and Eddie R. Bradley ("Bradley") do hereby agree to enter into an employment contract with the following terms:

1.      Bradley, except under the circumstances provided in Section 3, shall serve as the Chief of Police of the Village of University Park during 2015 and 2016.  He shall receive a salary for that position in 2015 of One hundred thousand ($100,000 dollars), and in 2016 One hundred thousand dollars, ($100,000 dollars).  In addition to his base salary, Bradley shall be entitled to the following additional payments and benefits:

Full medical benefits

Three  weeks vacation in 2015 for January1 to December 31.

Four  weeks vacation in 2016 for January 1 to December 31.

Any vacation for the year that is not used by December 1 shall be paid at that time.

Sick time: 10 hrs per month  (forward 120hrs for fiscal year 2014)

Two week annual Police Chief training mandatory : expenses shall be paid by village

Departmental take home car

All village recognized holidays off

2

# EXHIBIT C



Village of

# University Park

**Vivian E. Covington**
**MAYOR**

Dorothy R. Jones
**VILLAGE CLERK**

**BOARD OF TRUSTEES**
Larry B. Brown
Joseph E. Roudez III
Oscar H. Brown, Jr.
Keith J. Griffin
Milton C. Payton
Paula C. Wilson

Devon Dilworth
**VILLAGE TREASURER**

Lafayette Linear
**VILLAGE MANAGER**

May 16, 2015

Eddie Bradley
622 Hickok Lane
University Park Il 60484

This letter is to notify you that you have been place on administrative leave with pay pending further review by the board.

Be advised that you are not to conduct any official business until notified otherwise.

Sincerely

Mayor Vivian Covington

Cc: file



EXHIBIT
B

Village Hall • 698 Burnham Drive • University Park, Illinois 60484-2708
(708) 534-6451 • Fax (708) 534-3430 • Website: www.university-park-il.com

# EXHIBIT D

Village of

# University Park



Vivian E. Covington
**MAYOR**

Dorothy R. Jones
**VILLAGE CLERK**

**BOARD OF TRUSTEES**
Larry B. Brown
Joseph E. Roudez III
Oscar H. Brown, Jr.
Keith J. Griffin
Milton C. Payton
Paula C. Wilson

Devon Dilworth
**VILLAGE TREASURER**

Bola Delano
**VILLAGE MANAGER**

May 29, 2015

Mr. Ed Bradley
622 Hickok
University Park, IL  60484

Dear Mr. Bradley:

Please be advised that your appointment to the office of Chief of Police of the Village of University Park terminated as of May 15, 2015 by operation of 65 ILCS 5/3.1-30-5(c) and/or 65 ILCS 5/8-1-7(b), and Commander Darryl Stroud has subsequently been appointed as Acting Chief of Police, effective May 22, 2015.

Further, please be advised that the purported contract between you and the Village was *void ab initio* and *ultra vires* as it violated the above cited Illinois statutes as well as Illinois common law -- See *Millikin v. Edgar County*, 142 Ill. 528 (1892). In effect, the contract conferred no rights, imposed no duties and afforded no protection.

You are required by law to immediately return all Village records and property in your possession, including all keys and identification badges.

Please contact the Director of Human Resources at 708-235-0182 to make arrangements to return said items to the Village. Failure to return the Village property shall subject you to liability, pursuant to 65 ILCS 5/3.1-10-35, for all damages incurred by the Village as a result of said failure. The Human Resources Department will also be sending you information regarding COBRA benefits and, if applicable, will contact you with regard to any monies due to you.

Thank you for your service to the community.

Sincerely

Vivian Covington
Mayor

**EXHIBIT**

_A_

Village Hall • 698 Burnham Drive • University Park, Illinois 60484-2708
(708) 534-6451 • Fax (708) 534-3430 • Website: www.university-park-il.com

# EXHIBIT E

# THE MORAN LAW GROUP

309 West Washington Street, Suite 900
Chicago, Illinois 60606-3209
Tel: 312.630.0200   Fax: 312.630.0203
Email j.t.moran@moranlawgroup.com

Admitted in Illinois, Colorado
6th, 7th, 8th, 9th Circuits
Trial Bar: N.D. Illinois
C.D. Illinois
Supreme Court of the United
States, 1973

From the Desk of John Thomas Moran, Jr.

### *VIA REGULAR AND CERTIFIED MAIL*
#7008 1830 0000 9997 4795

July 14, 2015

Mayor Vivian Covington
Village of University Park
Village Hall
698 Burnham Drive
University Park, Illinois 60484-2708

Re:   Chief Ed Bradley
        Purported Termination

Dear Mayor Covington:

My law firm has been engaged to handle Chief Ed Bradley's response to your letter dated May 29, 2015.  There are matters requiring your prompt attention.

The Illinois Municipal Code applicable to "home rule" units of local government sets out specific provisions for removal of a police chief, specifically sections 10-2.1-4 and 10-2.1-17 (65 ILCS 5/10-2.1-4 and 5/10-2.1-17).  However, your letter of May 29 relies solely on section 3.1-35-10 and an unidentified ordinance. In Illinois, specific provisions of a statute "control over more general provisions." *Szewczyk v. Bd. of Fire & Police Comm'rs*, 381 Ill.App.3d 159, 885 N.E.2d 1106 (2nd Dist. 2008).  Where, as here, you and the Village have attempted to terminate Chief Bradley, section 10-2.1-4 of the Municipal Code requires that the mayor file with the municipality's board "the reasons for such removal or discharge, which removal or discharge *shall not* become effective unless confirmed by a majority vote of the corporate authorities." *65 ILCS 5/10-2.1-4*.  This has not been done.  Section 10-2.1-17 further requires in relevant part that:

> "Except as hereinafter provided, no officer or member of the fire or police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. The hearing shall be as



EXHIBIT
D(1-3)

hereinafter provided, unless the employer and the labor organization representing the person have negotiated an alternative or supplemental form of due process based upon impartial arbitration as a term of a collective bargaining agreement. Such bargaining shall be mandatory unless the parties mutually agree otherwise. Any such alternative agreement shall be permissive. If the chief of the fire department or the chief of the police department or both of them are appointed in the manner provided by ordinance, they may be removed or discharged by the appointing authority. In such case the appointing authority shall file with the corporate authorities the reasons for such removal or discharge, which removal or discharge shall not become effective unless confirmed by a majority vote of the corporate authorities. The board of fire and police commissioners shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof, which hearing may be continued from time to time. In case an officer or member is found guilty, the board may discharge him, or may suspend him not exceeding 30 days without pay. The board may suspend any officer or member pending the hearing with or without pay, but not to exceed 30 days. If the Board of Fire and Police Commissioners determines that the charges are not sustained, the officer or member shall be reimbursed for all wages withheld, if any. In the conduct of this hearing, each member of the board shall have power to administer oaths and affirmations, and the board shall have power to secure by its subpoena both the attendance and testimony of witnesses and the production of books and papers relevant to the hearing."

So there is no evidence to suggest that either you or the Village have complied with the foregoing in any manner, including but not limited to, filing a statement of reasons for discharge. Certainly, Chief Bradley has never received any such report. Thus, as a matter of state law, Chief Bradley remains in his position and the village is liable for his salary and benefits.

Indeed, even if notice of the reasons for discharge were given to the village board for a majority vote to discharge, such discharge would become effective only after the Board of Fire and Police Commissioners conducts a hearing, pursuant to proper notice, which meets due process standards (subpoena power of witnesses, books and records), and then the Board makes a finding of "guilty" of the charge(s). Chief Bradley has never received notice, due process or a hearing.

As observed by the court in *Szewczyk v. Bd. of Fire & Police Comm'rs*, 381 Ill.App.3d 159, 885 N.E.2d 1106 (2nd Dist. 2008), the section your May 29 letter purports to rely on, 65 ILCS 5/3.1-30-5, is a general section of the statute and therefore does not control where, as here, there is a more specific section that applies. Moreover, 5/3.1-30-5 is concerned only with the *replacement* of an officer after he or she has resigned or been dismissed from office. Chief Bradley has not resigned nor has he been properly dismissed.

2

In addition, even under your "alternate" statutory basis, Chief Bradley remains legitimately employed and is entitled to both his benefits and agreed upon salary until further notice. 65 ILCS 5/3.1-30-5 sets out a procedure to be followed for removing a municipal officer generally. But it too requires a hearing at which the mayor "reports the reasons for the removal" to the village board at a meeting held "not less than 5 nor more than 10 days after the removal." Chief Bradley has not been given any such report nor attended such a meeting. If, as here, there is no report, "the officer thereupon shall be restored to the office from which the officer was removed." 65 ILCS 5/3.1-30-10 (West 2006). Illinois law mandates that the Village of University Park follow statutory procedures to terminate Chief Bradley and it has not. And because it has been held that the Village must follow the procedures set out in 65 ILCS 5/10-2.1-4 and 10-2.1-17, the Village owes Chief Bradley his agreed pay and benefits from the last date of such payments to the present and continuing.

In sum, Chief Bradley has been denied his right to a hearing before the Board of Fire and Police Commissioners who is required to conduct a "fair and impartial hearing of the charges" for which termination is sought. *Mandamus* is available to enforce my client's rights. So, even assuming there was a basis to seek to discharge Chief Bradley in your capacity as Mayor, under the Illinois Municipal Code, your decision must be ratified by the Village Board by a majority vote on your "report" to it. No evidence of such a report or of any vote has been forthcoming from you or the Village. And obviously, the Board of Fire and Police Commissioners have never held the required hearing.

My client hopes to resolve this matter expeditiously and without filing suit, but he has incurred additional legal and related expenses. Therefore, I expect a prompt response to this letter by July 20, 2015.

Sincerely,

John Thomas Moran, Jr.
JTM/nm

cc: E. Bradley

3

# EXHIBIT F

cmsreporters@comcast.net

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

EDDIE RAY BRADLEY                )
                                 )
          Plaintiff,             )
                                 )
 vs.                             )   No.15-cv-08489
                                 )
VILLAGE OF UNIVERSITY PARK,      )
et al.,                          )
                                 )
          Defendants.

          The deposition of

JOSEPH E. ROUDEZ, III taken under oath VIA ZOOM

at 10:34 A.M. on Wednesday, July 29, 2020

pursuant to the Rules of the United States

District Court, Northern District of Illinois,

before Carol M. Siebert-LaMonica, C.S.R. No.

084.001355 in and for the County of Cook and

State of Illinois, pursuant to notice.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

```
                                                    Page 2
 1   APPEARANCES:

 2        THE MORAN LAW GROUP, by

 3        MR. JOHN T. MORAN

 4        566 West Lake Street, Suite 101

 5        Chicago, IL  60661

 6        (J.t.m.moran@gmail.com)

 7                  And

 8        THE KELEHER APPELLATE LAW GROUP, LLC.

 9         MR. CHRISTOPHER KELEHER

10         190 South LaSalle Street, Suite 2100

11         Chicago, IL 60603

12         (Ckeleher@appellatelawgroup.com)

13              Appeared on behalf of the plaintiff;

14

15

16

17

18

19

20

21

22

23

24
```

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 3

1        PETERSON, JOHNSON & MURRAY CHICAGO

2        MR. DOMINICK LANZITO

3        200 West Adams, Suite 2125

4        Chicago, IL  60606

5        (Danzito@pjmchicago.com)

6             Appeared on behalf of the defendants.

7

8

9                - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 4

```
 1                 JOSEPH E. ROUDEZ, III,
 2    called as a witness herein, having been first
 3    duly sworn, was examined and testified as
 4    follows:
 5                 E X A M I N A T I O N
 6    BY MR. MORAN:
 7         Q.   Okay.  Good morning, Mayor Roudez, how
 8    are you?
 9         A.   I'm fantastic.  How are you?  Thank
10    you for asking.
11              MR. MORAN:  You are welcome, and I'm
12    fine, too.
13         Q.   Today we are here on an Amended Notice
14    of Deposition to take your deposition today in
15    a case of Eddie Ray Bradley versus Village of
16    University Park, et al, 15 CV 08489, a case
17    that's in front of Judge Norgle.
18              The -- apart from the correction
19    of my address, by agreement of the parties we
20    are taking your deposition remotely.  Your
21    attorney had no objection to this, I take it
22    you don't have any objection to this?
23         A.   No.  None.
24         Q.   Okay.  I believe your attorney also
```

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 5

1   mentioned that the only document you reviewed

2   so far was the complaint itself and the

3   attachments to it?

4        A.   Okay.

5        Q.   Is that yes or no or --

6        A.   Yes.

7             MR. MORAN:   Okay.

8                  All right.  This is going to be

9   the deposition of Mayor Joseph Roudez,

10  R O U D E Z, correct me if I spelled it wrong,

11  pursuant to the Federal Rules of Civil

12  Procedure.

13       Q.   Mayor Roudez, what did you do to

14  prepare for the deposition today?

15       A.   I prayed before I left out the house

16  and had a good hearty breakfast after

17  exercising.

18       Q.   Okay.  Did you -- and you reviewed the

19  complaint and attachments to it, is that right?

20       A.   Yes.

21       Q.   Have you discussed the case with

22  anyone besides your lawyer, Mr. Lanzito?

23       A.   No.

24       Q.   Now, is this the first time you have

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 6

1    been Mayor of University Park?

2         A.   Yes.

3         Q.   And when did you begin?

4         A.   I was sworn in May 15, 2019.

5         Q.   And when does your term end, sir?

6         A.   Oh, boy, let's see, '23.  It is a

7    four-year term.

8         Q.   Okay.  So it would be 5/14/23?

9         A.   Somewhere in that area.

10        Q.   Okay.  Is it correct that prior to

11   being Mayor you were a trustee of University

12   Park?

13        A.   Yes.

14        Q.   And how long were you a trustee?

15        A.   2005 to 2017.

16        Q.   So you were a trustee when Eddie

17   Bradley was the Police Chief, is that correct?

18        A.   Yes.

19        Q.   How would you describe your

20   relationship with Mr. Bradley when he was

21   Police Chief?

22        A.   Professional.

23        Q.   Did you interact with him often or on

24   a regular basis?

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 7

1      A.    At council meetings.

2      Q.    How often does the council meet, at

3    least when you were trustee?

4      A.    Twice a month, the 2nd and 4th

5    Tuesday.

6      Q.    Did you ever have occasion to see

7    Ms. Covington, when she was the Mayor, interact

8    with Mr. Bradley?

9      A.    Yes.

10     Q.    And how would you describe their

11   interaction?

12     A.    Let me find the correct words.

13     Q.    Okay.

14     A.    It was contentious.  It was --

15     Q.    Contentious, is that what you said?

16     A.    Yes.

17     Q.    Do you recall was there ever a vote on

18   terminating Mr. Bradley as Police Chief?

19     A.    Was there a vote terminating

20   Mr. Bradley?

21     A.    Yes, there was.

22     Q.    Do you recall who presented the motion

23   to terminate Mr. Bradley?

24     A.    I was out of town.  I was not in

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 8

1    attendance.

2         Q.   So you don't know?

3         A.   Correct.  I was not in town.  I was

4    not at that meeting.

5         Q.   Were you at a meeting in Las Vegas for

6    the Village?

7         A.   It was the end recon conference.

8    R E C O N.

9         Q.   You were there with another trustee?

10        A.   Yes.

11        Q.   And who was that?

12        A.   Keith J. Griffin.

13        Q.   When Mr. Bradley was -- did Lafayette

14   Linear, do you know who he is?

15        A.   He was the Village Manager.

16        Q.   And at the time that this motion for

17   Bradley's termination came up did Mr. Linear

18   have any involvement in that?

19        A.   I was out of town.

20        Q.   Now Mr. Linear was replaced as Village

21   Manager while you were on the Board of

22   Trustees, is that correct?

23        A.   Yes.

24        Q.   And do you know -- do you recall who

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 9

1    replaced him?

2        A.   Bola Delano, B O L A, D E L A N O.

3        Q.   Do you recall who presented Bola

4    Delano as Village Manager?

5        A.   No, I was out of town.

6        Q.   That happened while you were out of

7    town as well?

8        A.   Yes.

9        Q.   The same weekend, the same period of

10   time?

11       A.   Yes.

12       Q.   I see.  Do you know if the Village

13   provided Eddie Bradley with a pre-termination

14   hearing?

15       A.   I don't know.

16       Q.   Do you know if the Village ever gave

17   Mr. Bradley any reasons for his termination in

18   writing?

19       A.   I don't know.

20       Q.   Are you aware of any?

21       A.   No.

22       Q.   After he was terminated did

23   Mr. Bradley receive any kind of a hearing from

24   the Village?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 10

1       A.   No.

2       Q.   Did the Village ever give Mr. Bradley

3   an opportunity to comment or be heard after he

4   was -- before he was fired?

5       A.   Not that I am aware of.

6       Q.   Do you know if Mr. Bradley ever

7   received severance pay?

8       A.   I don't know.

9       Q.   Who would know that issue?

10      A.   Finance Department.

11      Q.   Do you know whether or not Mr. Bradley

12  was fired for criminal conduct?

13      A.   I don't know.

14      Q.   Are you aware if Mr. Bradley committed

15  any criminal offenses while you were trustee?

16      A.   Please restate that question.

17      Q.   Are you aware of Mr. Bradley

18  committing any criminal offenses while you were

19  trustee?

20      A.   No.

21      Q.   Do you know why Mr. Bradley was fired?

22      A.   No.

23      Q.   Do you know how his termination was

24  communicated to him?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 11

1      A.   No.

2      Q.   Do you know how his termination was

3  communicated to Village employees?

4      A.   No.

5      Q.   Do you know how it was communicated to

6  the Village and the public at large?

7      A.   No.

8      Q.   Was Eddie Bradley unable to perform

9  his duties as Police Chief at the time of his

10  termination?

11      A.   Was he unable to perform?

12      Q.   Yes.

13           MR. LANZITO:   Object to the form.

14  You can answer.

15           THE WITNESS:  No.

16  BY MR. MORAN:

17      Q.   Did Eddie Bradley lack integrity in

18  the performance of his duties as Police Chief?

19      A.   No.

20      Q.   Do you know -- are you aware of who

21  announced that Mr. Bradley had been fired?

22      A.   No.

23      Q.   So you don't know?

24      A.   No.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 12

1       Q.    Okay.  Did Eddie Bradley ever

2   investigate any members of the Village Board to

3   your knowledge?

4       A.    Not to my knowledge.

5       Q.    Did Mr. Bradley ever investigate any

6   members of the police department?

7       A.    Yes.

8       Q.    Do you recall who he investigated?

9       A.    I don't remember.

10      Q.    Do you remember why he investigated

11  them?

12      A.    No.

13      Q.    Is it offensive for someone to falsely

14  state someone failed to perform the duties of

15  his office?

16            MR. LANZITO:   Objection, form,

17  foundation.  You may answer.

18            THE WITNESS:  Repeat the question,

19  please.

20            MR. MORAN:  Can you repeat it,

21  Ms. Court Reporter?

22              (Question read.)

23            MR. LANZITO:   You may answer.

24            THE WITNESS:  In my opinion, yes.

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                          8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

```
                                          Page 13

 1

 2   BY MR. MORAN:

 3        Q.   Would you agree that falsely saying a

 4   person was fired because he lacked integrity

 5   was offensive?

 6             MR. LANZITO:   Same objections.  You

 7   may answer.

 8             THE WITNESS:  I want to make sure I

 9   hear the question right.

10             Mrs. Court Reporter, please give

11   me a rewind on that.

12             (Question read.)

13             THE WITNESS:  Yes.

14   BY MR. MORAN:

15        Q.   Mayor, would you agree that falsely

16   saying someone was fired because he was a

17   criminal is offensive?

18        A.   Yes.

19        Q.   Did you ever hear of Seaway Bank?

20        A.   Yes.

21        Q.   Do you know where it is located?

22        A.   There is a branch, if I'm not

23   mistaken, on 87th Street in Chicago still

24   existing.
```

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)          8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 14

1       Q.   Did they have more branches at one

2    time?

3       A.   At one time.

4       Q.   Do you know if the Village or the

5    Mayor at the time of Mr. Bradley's termination

6    retained accounts at Seaway Bank?

7            MR. LANZITO:   Objection, form,

8    relevance.  You may answer.

9            THE WITNESS:  What is the question

10   again?

11               (Question read.)

12           THE WITNESS:  I heard retained

13   accounts.  You kind of went in and out.  I

14   didn't hear the full question.

15   BY MR. MORAN:

16      Q.   Oh.  Did the Village or the Mayor,

17   when Chief Bradley was about to be terminated,

18   have accounts at Seaway Bank?

19      A.   I don't know.

20      Q.   Okay.  Who would know?

21      A.   The Mayor and the Finance Department.

22           MR. LANZITO:   The former Mayor, you

23   mean?

24           THE WITNESS:  Yes.  The former Mayor,

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 15

1    yes.

2    BY MR. MORAN:

3         Q.    That would be Mayor Covington?

4         A.    Correct.

5         Q.    And the Finance Department, who was

6    running Finance at the time, do you know?

7         A.    I don't remember but Jacelia Kelly was

8    there during that tenure and she is still

9    currently there.

10          MR. LANZITO:   Can you please spell

11   that name?

12          THE WITNESS:   I will do my best to

13   spell it correctly.  It is J A C L I A and the

14   last name is Kelly, K E L L Y.

15   BY MR. MORAN:

16        Q.    Do you know if Chief Bradley

17   investigated any Village accounts at Seaway

18   Bank?

19        A.    I'm not sure.

20        Q.    Okay.  You may have heard something to

21   that effect but you really don't remember?

22          MR. LANZITO:   Is that a yes?  I'm

23   sorry I didn't hear.

24          THE WITNESS:   I don't remember.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 16

```
 1
 2   BY MR. MORAN:
 3       Q.   Okay.  Are you aware of any stolen
 4   vehicles placed into storage by the Village?
 5       A.   Yes.
 6       Q.   Okay.  Was there an investigation of
 7   those vehicles?
 8       A.   I would believe so.
 9       Q.   Do you know who conducted that
10   investigation?
11       A.   I guess it would be the police
12   department.
13       Q.   So it could have been Mr. Bradley, is
14   that correct?
15       A.   Correct.
16       Q.   Okay.  Do you have any knowledge of
17   the results of that investigation?
18       A.   I don't know the results.
19       Q.   Do you recall the Village trustee
20   accused of pistol whipping his son?
21           MR. LANZITO:   Objection, form.  Who
22   is his son, who is his?
23   BY MR. MORAN:
24       Q.   The question is are you aware of a
```

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 17

1    Village trustee who was accused of pistol

2    whipping his son while Eddie Bradley was Police

3    Chief?

4         A.   I'm unaware.

5         Q.   You don't know anything about that any

6    investigation or any of the circumstances, is

7    that correct?

8         A.   Correct.

9         Q.   Okay.  Were you aware that Bradley was

10   asked to remove files concerning this incident?

11        A.   No.

12             MR. LANZITO:   Just objection, form,

13   vague as to that last question.  Answer can

14   stand.

15   BY MR. MORAN:

16        Q.   Did Chief Bradley ever express

17   concerns to you about what he believed to be

18   violations of federal and state law?

19        A.   Yes.

20        Q.   Do you recall what he was complaining

21   about?

22        A.   I don't remember the specifics.

23        Q.   Do you know if he expressed these

24   concerns to anyone else?

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 18

1       A.    Yes, Trustee Keith Griffin and myself.

2       Q.    Is that G R I F F I N?

3       A.    I want to say yes.

4       Q.    Mayor, do you have any recollection of

5    what federal or state law Mr. Bradley was

6    referring to?

7       A.    I don't recollect.

8       Q.    Did Chief Bradley also mention he

9    thought there might be violations of Village

10   policy?

11      A.    Yes.

12      Q.    Do you recall what policy violations

13   he was talking about?

14      A.    No, it has been awhile.  No, I don't.

15      Q.    Do you know if Chief Bradley was ever

16   told by then Mayor Covington to cease any of

17   his investigations?

18      A.    It is possible.

19      Q.    Do you have any recollection of the

20   circumstances?

21      A.    No.

22      Q.    No.  Okay.  Do you have any knowledge

23   as to whether any Village trustee or Village

24   employee told Eddie Bradley to cease any

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 19

1   investigations?

2        A.   I'm unaware.

3             MR. MORAN:  If I could have a moment

4   here.

5             (Recess.)

6   BY MR. MORAN:

7        Q.   Mayor, do you recall who, if anyone,

8   Eddie Bradley mentioned he thought was

9   violating Village policy or state or federal

10  laws?

11       A.   Yes.

12       Q.   And who was that?

13       A.   Current chief, our current Chief of

14  Police.

15       Q.   What is their name?

16       A.   Chief Wilson.

17       Q.   Do you have a first name?

18       A.   Deborah.

19       Q.   Did he mention anyone else?

20       A.   Potentially, yes.

21       Q.   What do you mean by potentially?

22       A.   I said yes.

23       Q.   Okay.  Who else did he mention?

24       A.   The Public Works Director that was the

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

Page 20

1    Director at that time.

2         Q.   Who was that?

3         A.   Jerry Townsend.

4         Q.   Okay.  Anybody else?

5         A.   There might have been one other

6    person.  I just can't remember who it was.

7    Wash those hands now.

8              MR. LANZITO:  Allergies aren't

9    contagious.

10   BY MR. MORAN:

11        Q.   After Mr. Bradley was fired do you

12   know if the Village refused to make any

13   payments to him for wages?

14        A.   I'm not sure, but I would believe so.

15        Q.   They refused to pay?

16        A.   Correct.

17        Q.   And is it correct the Village, to your

18   knowledge, has never paid Mr. Bradley any

19   severance?

20        A.   To my knowledge.

21             MR. LANZITO:   Foundation.  You can

22   answer.

23             THE WITNESS:  To my knowledge.

24   BY MR. MORAN:

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)          8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 21

1        Q.    That's correct?

2        A.    Yes.

3        Q.    Okay.   Have you spoken to Eddie Ray

4    Bradley since he was fired?

5        A.    He is my neighbor.   I see him in

6    passing.

7        Q.    Okay.   Has the Village ever formally

8    asked Eddie Ray Bradley to return as Police

9    Chief?

10       A.    Not to my knowledge.

11       Q.    Do you have any knowledge of any

12   trustee or Village employee asking Mr. Bradley

13   to come back as Police Chief?

14       A.    Yes.

15       Q.    And did a trustee ask him to come back

16   or a Village employee?

17       A.    A trustee.

18       Q.    And who was that?

19       A.    Trustee Keith Ray Griffin.

20       Q.    That is the gentleman you were in

21   Las Vegas with?

22       A.    Yes, trustee, correct.

23       Q.    Did anything come of that?

24       A.    No.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 22

1       Q.   Was that due to Bradley or the

2    Village?

3            MR. LANZITO:   Objection, form, calls

4    for speculation.  You may answer.

5            THE WITNESS:  It would definitely be

6    the Village.  It wouldn't be on Chief Bradley.

7    BY MR. MORAN:

8       Q.   To your knowledge has there been a

9    federal investigation of the Village in the

10   last ten years?

11      A.   Yes.

12      Q.   Who conducted such an investigation,

13   why and what were the results, if any?

14      A.   Yes.  It would be the Federal Bureau

15   of Investigation, and if I'm not mistaken it is

16   still an ongoing investigation.  And it was --

17   it was for $14.9 million missing from the TIFF

18   accounts.

19      Q.   From a TIFF account?

20      A.   Correct.

21      Q.   So that investigation has not

22   resolved, it is continuing to this day?

23      A.   As far as I know.

24           MR. MORAN:  Okay.  Let's take five

Siebert & Associates Court Reporters, Inc.

Page 23

```
 1   minutes.  I have to grab some other paperwork.

 2             THE WITNESS:  Okay.

 3             MR. MORAN:  Is it okay, Ms. Court

 4   Reporter?

 5             THE REPORTER:  Yes.

 6             MR. MORAN:  Dominick, any problem?

 7             MR. LANZITO:  No.  We will come back

 8   at 10:30.

 9             MR. MORAN:  Okay.  Thanks.

10                (Recess.)

11                      (Deposition Exhibit No. 1-10

12                       referred to.)

13             MR. LANZITO:  Mayor Roudez, I'm going

14   to blow it up a little, Mayor.  Let me know

15   when you are able to read it.

16             THE WITNESS:  Okay.  I'm able to read

17   it.

18             MR. LANZITO:   Everyone see the

19   contract.

20             MR. MORAN:   I see it now.

21             MR. LANZITO:   Tell me where you want

22   to go, John, and I will navigate.

23   BY MR. MORAN:

24        Q.  Mayor, have you ever seen this
```

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 24

1    document before, this contract with Eddie

2    Bradley?

3         A.   Yes.

4         Q.   And when did you first see it?

5         A.   When we voted on it to approve him as

6    chief.

7         Q.   Okay.  And is the language in this

8    contract similar to the language in the

9    contract with the present Chief of Police?

10            MR. LANZITO:   Objection, foundation.

11   You may answer.

12            THE WITNESS:  Yes.  It is different.

13            MR. MORAN:  Okay.

14            THE WITNESS:  She has a probationary

15   one-year contract, this is completely

16   different.

17   BY MR. MORAN:

18        Q.   I see.  Does the present chief have a

19   severance clause in their contract?

20        A.   I'm not sure.

21        Q.   Okay.  Do you know if the present

22   police chief has a termination without cause

23   clause as appears on page 4 of this contract

24   with Eddie Bradley?

Siebert & Associates Court Reporters, Inc.

Page 25

1      A.    I have not been able to see page 4

2   yet.

3      Q.    Okay.  There it is.

4      A.    What is the question?

5      Q.    Okay.  The question is, does the

6   present police chief have a similar clause?

7           MR. LANZITO:   Objection to confusion.

8   You may answer.

9           THE WITNESS:  I would believe so.

10  BY MR. MORAN:

11     Q.    This clause includes language that

12  says that he is to receive, if he is terminated

13  without cause, a fee equal to four months

14  salary, is that correct?

15          MR. LANZITO:   Objection, the document

16  speaks for itself.  You can answer.

17          THE WITNESS:  I mean that's what I am

18  reading.

19  BY MR. MORAN:

20     Q.    Okay.  Doesn't it -- it further says

21  that the fee shall be paid if the term of the

22  contract is declared to be unenforceable, is

23  that correct?

24          MR. LANZITO:   Objection.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 26

1           THE WITNESS:  That's what it reads.

2    BY MR. MORAN:

3       Q.   Now, I want to shift to Exhibit

4    Number 9, do you have that one?

5           MR. LANZITO:   This is the Oscar Brown

6    letter.

7           MR. MORAN:   Yes.

8           MR. LANZITO:   Let me find it.

9           MR. MORAN:   At the bottom it has

10   Exhibit 3 from 2016 on it.

11          MR. LANZITO:   I'm sharing it right

12   now number 9.  Can you read that, Mayor?

13          THE WITNESS:  Let's see.

14          MR. LANZITO:   I blew it up a little

15   bit, I enlarged it.

16          MR. MORAN:   Let me know when you have

17   completed reading it.

18          THE WITNESS:  What about the letter?

19   BY MR. MORAN:

20      Q.   Do you recognize the document, the

21   letter?

22      A.   Oh, yes.  Yes.

23      Q.   And you are listed as one of the

24   people who would have received it?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 27

1      A.   Yes.

2      Q.   And do you recall receiving it at that

3 time?

4      A.   Yes.

5      Q.   Okay.  Were you on the Board at

6 University Park, do you recall the Board asking

7 the mayor, Mayor Covington to resign?

8      A.   I did, yes.

9      Q.   And Mayor Roudez, why did you ask

10 Mayor Covington to resign?

11     A.   The inappropriate transferring of

12 TIFF funds into the general fund without Board

13 approval, without anyone knowing, besides a few

14 privileged people.  It was completely immoral,

15 illegal and should not have happened and it

16 causes great harm and danger.

17     Q.   And this was -- when did you introduce

18 your statement to the Board?

19     A.   I don't remember exactly.

20     Q.   Could it have been in 2017?

21     A.   It is hard to remember.

22     Q.   Okay.

23     A.   But it wasn't announced to the Board.

24 It was actually done during a press conference.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 28

```
 1       Q.   Okay.  And your concern was with the

 2   sudden loss of a significant amount of money in

 3   TIFF funds, is that right?

 4       A.   The manipulation of money and moving

 5   money without Board approval and without Board

 6   knowledge, absolutely.

 7       Q.   Mayor Roudez, when you reviewed the

 8   complaint for today, there were two -- there

 9   were several exhibits attached to the

10   complaint, Exhibits A and B are two letters to

11   Eddie Bradley signed by Mayor -- then Mayor

12   Covington, do you recall that?

13       A.   I would like to see the exhibit,

14   insure that is the same one I saw yesterday.

15           MR. MORAN:  Okay.  Dominick, do you

16   have those or Carol.

17           MR. LANZITO:   Grabbing them right

18   now.

19           MR. MORAN:  This is the complaint,

20   Exhibits A and B.

21           MR. LANZITO:   Do you want me to

22   scroll down to the exhibits?  Here is

23   Exhibit A.

24           THE WITNESS:  What's the question
```

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)          8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 29

1    regarding this?

2    BY MR. MORAN:

3         Q.   My question to you is, are you aware,

4    besides Exhibits A and B attached to the

5    complaint, are you aware of any other letters

6    that were sent to Eddie Ray Bradley from the

7    Village?

8         A.   No.

9         Q.   Do you know a woman named Maxine

10   Jackson?

11        A.   I know the name.  I don't know the

12   person.

13        Q.   Okay.  Do you recall a Maxine Jackson

14   being Director of Human Resources for the

15   Village back in May and June of 2015?

16        A.   Yes, she had some position with the

17   Village.

18        Q.   Do you have any recollection as to how

19   her name was put in as Director of Human

20   Resources?

21        A.   My predecessor.

22        Q.   Who was your predecessor?

23        A.   Mayor Covington.

24        Q.   Oh.  Okay.  Do you know who the

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 30

1    Village attorney was in May and June of 2015?

2         A.   Oh, my goodness you are really testing

3    my memory.

4         Q.   Yes.

5         A.   Yes. I really don't remember, at one

6    time it was Odelson & Sterk.

7         Q.   Do you remember a woman named Felicia

8    Frazier?

9         A.   Odelson & Sterk.

10        Q.   She is with them.  Okay.  Do you

11   recall any lawyers named Montana or Welch?

12        A.   Yes.

13        Q.   Would they have been Village attorneys

14   around the same time?

15        A.   I would say that Montana and Welch

16   came on under Bola Delano as Village Manager.

17        Q.   Oh, and when she left did they leave

18   with her?

19        A.   No.

20        Q.   Did they stay longer or shorter than

21   Delano?

22        A.   When you say "they" are you speaking

23   of the lawfirm?

24        Q.   Yes.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 31

1      A.   The lawfirm did not leave until I

2   became mayor.

3      Q.   Okay.  And you already told us when

4   you became mayor?

5      A.   Yes.

6      Q.   Who did you bring in?

7      A.   The new lawfirm is Ottosen Britz.

8      Q.   Could you spell that?

9      A.   I sure can.  O T T O S E N

10  B R I T Z.

11     Q.   Are they still lawyers for the Village

12  in the day-to-day activities?

13     A.   Yes.

14          MR. MORAN:  Why don't we take 10 more

15  minutes, and I will see if I have any more

16  questions, and then we will go back and wrap it

17  up.

18          MR. LANZITO:   Okay.

19             (Recess.)

20  BY MR. MORAN:

21     Q.   Okay.  Back on the record.

22             Okay.  Mayor Roudez, you continue

23  to be under oath, you are aware of that,

24  correct?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 32

1       A.    Correct.

2       Q.    Okay.  I would like to go back to that

3  employment contract for a minute.

4             Do you have that first page of

5  the contract we can show Mayor Roudez?

6             MR. LANZITO:   Yes, I will pull it up

7  right now.

8  BY MR. MORAN:

9       Q.    Okay.  Mayor, you see those "WHEREAS"

10  clauses on the first page?

11      A.    Yes.  "WHEREAS, the management and

12  operation of a Police..."

13             Give me one second, please.  One

14  second.

15             MR. LANZITO:   I can scroll down.  I

16  think there might be one missing.

17             MR. MORAN:   Yes, there is.

18             THE WITNESS:  Yes. Okay.

19  BY MR. MORAN:

20      Q.    Mayor, there are five WHEREAS clauses

21  on the first page of the contract and there is

22  another one on the top of the second page.

23             When you finish reading those let

24  me know?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 33

1          MR. LANZITO:   The top of the second

2     page, Mayor, I will go to the first page, if

3     you have to.

4          THE WITNESS:  Okay.

5          MR. LANZITO:   That is the second,

6     this is the first page, if you can read that.

7          THE WITNESS:  Okay.  I'm ready to go

8     to the next page.

9          MR. MORAN:   Okay.

10          THE WITNESS:  Unless you have

11     questions on Page 1.

12          MR. MORAN:  I just have a couple of

13     general questions about the WHEREAS clauses.

14          THE WITNESS:  Okay.  Okay.

15          MR. LANZITO:   Okay.  John, go ahead

16     and ask your questions.

17     BY MR. MORAN:

18       Q.   Okay.  I wanted to clarify, what is

19     your understanding of these WHEREAS clauses?

20          MR. LANZITO:  Objection, calls for a

21     legal conclusion.  You may answer, Mayor.

22          THE WITNESS:  What is my understanding

23     of them?

24     BY MR. MORAN:

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 34

1      Q.   Yes.

2      A.   It is customary in a resolution of an

3  ordinance form.  They have meaning to them.

4  And the meaning follows behind WHEREAS.

5      Q.   Okay.  And what is the general meaning

6  of these WHEREAS clauses?

7           MR. LANZITO:   Same objection.  It

8  calls for a legal conclusion.  You may answer,

9  Mayor.

10          THE WITNESS:  What is the question?

11  What is the meaning of them?

12  BY MR. MORAN:

13     Q.   Yes.  What are we trying to say about

14  Eddie Bradley's contract?

15     A.   Oh, it says we have a good guy, a good

16  chief, and we don't plan on having a rotating

17  Chief of Police, so it speaks for itself.

18     Q.   Does it also indicate that under its

19  home rule powers, it can employ a Police Chief

20  which extends beyond the term of a Mayor or

21  Village Manager?

22     A.   That's just --

23     Q.   I'm asking, does it say that?

24     A.   Point to me and show me where.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 35

1      Q.   The last WHEREAS on the first page.

2      A.   What about this last page, Mr. Moran?

3      Q.   Oh, the WHEREAS clause states --

4      A.   "WHEREAS, the Corporate Authorities of

5   the Village of University Park believe that,

6   under its home rule powers, it can employ a

7   Police Chief to serve for a period of time

8   which extends beyond the term of a Mayor or

9   even that of a Village Manager."

10      Q.   Okay.  That's what it says.  Thank

11   you.

12            When you were Village trustee,

13   Mayor Roudez, did you have any seminars or

14   training for the position?

15      A.   Oh, yes, I stayed in training.  It is

16   on-the-job training.  It is all in the

17   conferences.  Absolutely.

18      Q.   So it was a constant training during

19   your period as trustee, is that what you mean?

20      A.   Yes.

21      Q.   Okay.  To your knowledge who does the

22   hiring and firing of Village employees?

23      A.   The Village Manager.

24      Q.   Do you know when Ms. Delano started on

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 36

1   as Village Manager?

2      A.   No, I was out of town during that

3   process.

4      Q.   Okay.  That was the same process that

5   terminated Lafayette Linear, to your knowledge?

6           MR. LANZITO:   Objection.  You may

7   answer.

8           THE WITNESS:  I would guess so.

9   BY MR. MORAN:

10      Q.   You were out of town for the whole

11   thing?

12      A.   Correct.

13      Q.   Okay.  What is a Village Trustee's

14   function?

15      A.   Legislative.

16      Q.   Did you ever have occasion to speak

17   with Lafayette Linear?

18      A.   Yes.

19      Q.   Do you recall him ever telling you

20   that Mayor, former Mayor Covington asked him to

21   fire Chief Bradley?

22      A.   Yes.

23      Q.   Was it a single conversation or was

24   there a series of conversations?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 37

1        A.   It was probably just once he mentioned

2   it.

3        Q.   Did he say why the Mayor wanted

4   Bradley fired?

5        A.   He didn't.

6        Q.   He did?

7        A.   He did not say.

8        Q.   Okay.  Were Linear and Bradley both

9   terminated within a week of each other or

10  simultaneously?

11       A.   I'm not sure.  Again this all happened

12  when I was out of town.  When we --

13       Q.   Were you aware of the fact that Mayor

14  Covington sent Bradley a letter placing him on

15  administrative leave?

16       A.   I found out, yes.

17       Q.   And the letter states that he is on

18  administrative leave pending further review by

19  the Board, do you recall that?

20       A.   Yes.

21       Q.   Okay.  As a city member of the Board

22  of Trustees was there a review by the Board of

23  that termination?

24       A.   No.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 38

1      Q.   Is it correct Chief Bradley was first

2    hired at an emergency meeting held on a

3    Saturday morning and a vote was taken and

4    passed?

5      A.   I don't remember exactly when.

6      Q.   Is there anything inaccurate though

7    about what I read, questioned you about, do you

8    recall did Mayor Covington show up for a vote

9    on Eddie Bradley?

10     A.   I don't know.  I was out of town

11   during that process.

12     Q.   No, I'm talking about the hiring

13   process.

14     A.   Restate the question.

15     Q.   When Eddie Bradley was first hired,

16   was he hired pursuant to an emergency Saturday

17   morning meeting?

18     A.   If that what the minutes reflect.  I

19   don't remember what the process was.

20     Q.   Do you recall Mayor Covington

21   attending the meeting, whatever the process

22   was?

23     A.   Oh, you are really testing my memory.

24   I don't remember.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 39

1      Q.   Would it be correct to say at the next

2   official Board meeting there was a vote taken

3   to make Bradley chief, which was sworn and

4   passed?

5      A.   What date was that?

6      Q.   That would be the Tuesday following

7   the Saturday morning when he was hired at this

8   emergency hearing, so it would be in 2013?

9      A.   Okay.  If that's what the records say.

10  They would know better than I.

11     Q.   Okay.  Do you recall Mayor Covington

12  voting no to Bradley being made Chief of

13  Police?

14     A.   I don't recall.

15     Q.   Is Village trustee training mandatory

16  by state law?

17     A.   No.

18     Q.   Do you know why Mayor Covington fired

19  or moved to fire Chief Bradley?

20     A.   No.

21     Q.   Did you receive any training or

22  seminars for the Office of Mayor?

23     A.   I go to the same seminars for mayor as

24  I did for trustee, yes.

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

Page 40

1      Q.   Is that training mandatory?

2      A.   No.

3      Q.   Okay.  What are your functions and

4   duties as mayor, you said legis --

5      A.   I'm the Chief Executive Officer of the

6   community.

7      Q.   And what does that mean?

8      A.   That means I am the official signor.

9   I am in charge of basically everything except

10  the day-to-day operations.

11     Q.   They are done by the Village Manager?

12     A.   Yes.

13     Q.   Do you know what the procedure is to

14  fire a police officer?

15     A.   To fire a police officer, if I am not

16  mistaken it goes through the Police & Fire

17  Commission.

18     Q.   And they have to deal with it?

19     A.   Yes.

20     Q.   When you and Linear talked about the

21  termination of Bradley, what did he tell you

22  besides that she wants to terminate him?

23     A.   I'm not doing that.

24     Q.   Linear said he is not going to fire

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)     8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 41

1    him?

2          A.    Correct.

3          Q.    Anything else said that you recall?

4          A.    No.

5          Q.    Okay.  Now the functions and duties of

6    the Fire & Police Board, they do the

7    procedures -- they create the procedures,

8    follow the process to terminate a police

9    officer under state law?

10         A.    Yes, and just for the record they only

11   do police officers.  The Chief of Police comes

12   under a different jurisdiction.  And that's

13   totally under the Village Manager.

14         Q.    Do you know a person named Irma

15   Holloway or know of?

16         A.    I know of Irma Holloway, correct.

17         Q.    Who is she?

18         A.    She is a principal of a firm that the

19   Village did business with when I was a trustee.

20         Q.    What kind of business?

21         A.    Financials, auditing.

22         Q.    Where is she now?

23         A.    Good question.

24         Q.    Don't know?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 42

1        A.    No.

2        Q.    Did Linear tell you why he would not

3    fire Bradley?

4        A.    Yes, he did.  Yes, he did.

5        Q.    What did he say, if you recall?

6        A.    He said:  There is absolutely no way

7    I'm going to fire him.  He is a fantastic

8    chief.  And he is doing a get job.  And I'm not

9    playing into the politics.

10       Q.    Do you know how much money was paid to

11   Irma Holloway's organization by the Village?

12       A.    I don't know.

13       Q.    Have you heard it could be more than

14   $300,000?

15       A.    Yes.

16             MR. LANZITO:  Objection, foundation.

17   BY MR. MORAN:

18       Q.    No one knows where Irma Holloway is

19   now, is that correct?

20       A.    I don't.

21       Q.    You don't know.  Okay.

22                Do you know if Mayor Covington's

23   laptop was taken by the FBI?

24       A.    Yes.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 43

1        Q.   Do you know if it is presently -- you

2   said is ongoing?

3        A.   Yes.

4        Q.   Is that investigation -- is that

5   investigation for corruption, gross

6   mismanagement?

7             MR. LANZITO:   Objection, foundation,

8   based on knowledge.  You may answer.

9             THE WITNESS:  There are probably a lot

10  of reasons, and I'm not sure exactly what the

11  main focus of the investigation is or was.

12  BY MR. MORAN:

13       Q.   Okay.  Did you and Trustee Griffin go

14  with Mr. Bradley to the Will County State's

15  Attorney's Office?

16       A.   Yes.

17       Q.   And did the subject of corruption and

18  gross mismanagement come up?

19       A.   Yes.

20       Q.   And did Chief Bradley indicate he was

21  investigating that?

22       A.   Yes.

23       Q.   It correct that Bradley was fired a

24  few months after that discussion?

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 44

1      A.   When was it that we went to the

2   State's Attorney's Office?

3      Q.   That's what I am asking you, I

4   can't --

5      A.   Oh, I'm not going to guess.  All

6   depends on when it was, when did we go to the

7   State's Attorney's Office, I don't remember the

8   dates or the time, but I would say it was

9   shortly thereafter, sometime down the line.

10      Q.   Okay.  Do you what a whistleblower is?

11      A.   Yes.

12      Q.   What is a whistleblower?

13           MR. LANZITO:   Objection, calls for a

14   legal conclusion.  You may answer.

15           THE WITNESS:  That is somebody who is

16   asking for protection for reporting criminal

17   activities.

18   BY MR. MORAN:

19      Q.   Okay.  Thank you.  Mayor Roudez, to

20   your knowledge how long has the Village been

21   millions in the red?

22           MR. LANZITO:   Objection, foundation,

23   form.  You may answer.

24           THE WITNESS:  I'm just trying to think

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)     8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 45

1    of -- it is hard to say because you get people

2    in there that play with the numbers.  So it is

3    actually hard to say what is solid and what's

4    fiction.

5              So they have been operating in

6    the red for a little while.  I'm working on

7    getting us out of the red.

8              We are working in the right

9    direction finally.

10   BY MR. MORAN:

11        Q.   Was the Village in the red when Vivian

12   Covington was Mayor?

13        A.   Yes.

14        Q.   And so you have been trying to

15   rehabilitate Village finances when you took

16   office, is that correct?

17             MR. LANZITO:   Objection to the form

18   of the question.  You may answer.

19             THE WITNESS:  Yes.

20   BY MR. MORAN:

21        Q.   When you became Mayor were there any

22   audits in existence that you reviewed?

23        A.   There were no audits up-to-date and

24   when I got in office I was told there were

Siebert & Associates Court Reporters, Inc.

Page 46

1    audits done, but after going a little further

2    and getting into the Village Manager we just

3    approved '14, '15 and '16 in anticipation of

4    passing '17 at the next council meetings and

5    all of the others will be up-to-date by October

6    of this year.  So nothing was done.  It was a

7    ragged house of finances.

8         Q.   Wow.  So you just approved in 2020,

9    '14, '15 and '16?

10        A.   That is correct.

11        Q.   Is it true or false that the Village

12   paid Irma Holloway about $600,000 for the

13   audits and the fiscal audits were never done?

14        MR. LANZITO:   Objection, asked and

15   answered.

16        THE WITNESS:  When I was on the Board

17   they didn't spend that much money, but my

18   understanding is after I lost my election in

19   2017 as trustee that they renewed the contract.

20   The numbers of that contract that was renewed

21   I'm unaware of, but I'm hearing that it was

22   over 600,000 bucks.

23   BY MR. MORAN:

24        Q.   Do you have a time period that she

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)        8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 47

1    would have been paid that amount of money or

2    was that just when you were out of office?

3             MR. LANZITO:   You can answer.

4             THE WITNESS:  I was out of office from

5    2017 until May of 2019.

6    BY MR. MORAN:

7        Q.   So she was paid somewhere in that

8    period of time, is that correct?

9        A.   Yes, I wasn't around, so I don't know

10   what happened, who got paid, I was on my time

11   out.

12       Q.   Any knowledge of the relationship

13   between Irma Holloway and Vivian Covington that

14   you personally observed?

15       A.   I was gone when all of the good stuff

16   went on.

17       Q.   Do you know anything about their

18   relationship through Village records?

19       A.   No.

20       Q.   Okay.  Is it correct that Eddie Ray

21   Bradley when he was chief gave a copy of his

22   investigation file to you and Keith?

23       A.   Yes.

24       Q.   Do you know an individual named Mel

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 48

1    Davis?

2        A.   Yes.

3        Q.   Who is he?

4        A.   I don't know who he is, but he was a

5    former Chief of Police here in University Park.

6        Q.   Was he the chief immediately before

7    Eddie Ray Bradley?

8        A.   I believe that was the one who Chief

9    Bradley came behind.

10       Q.   Do you have any knowledge as to

11   whether or not Mayor Covington gave Mel Davis a

12   $25,00 severance check?

13       A.   I believe so.

14       Q.   You believe she did?

15       A.   Yes.

16       Q.   Do you know why she gave it to him?

17       A.   No.

18       Q.   Was that check voted on by the Village

19   Board to your knowledge?

20       A.   I don't recall.

21       Q.   You don't recall it being called for a

22   vote, is that what you mean?

23       A.   I don't remember.

24       Q.   Okay.  Was Vivian Covington, was it

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 49

1    known that she was upset when Mel Davis was

2    fired?

3         A.   Yes.

4              MR. LANZITO:  Objection, speculation,

5    known by whom.  You may answer.

6    BY MR. MORAN:

7         Q.   Okay.  Did she indicate why she was

8    upset?

9         A.   No.

10        Q.   Do you recall what Mel Davis was fired

11   for?

12        A.   No.

13        Q.   You don't recall?

14        A.   I don't.

15        Q.   Okay.  Do you know if Mel Davis was

16   given the opportunity to come before the

17   Village Board at a regular Board meeting and

18   express his concerns about being terminated?

19        A.   For some reason I believe that

20   happened, it has been so long ago, charted to

21   my head and not my heart, it sounds vaguely

22   familiar, he did have the opportunity to

23   address the Board.

24        Q.   Okay.  That would be in Board minutes

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 50

1    or would that be in executive session?

2        A.   It would be in Board minutes, I would

3    assume.

4        Q.   Do you remember one of the reasons

5    Covington fired Chief Bradley was in

6    retaliation for the Board hiring Mel Davis?

7             MR. LANZITO:   Objection to form,

8    speculation.  You may answer.

9             THE WITNESS:  It is potentially

10   possible.

11   BY MR. MORAN:

12       Q.   That's why you said the politics of

13   the situation?

14       A.   Yes.

15            MR. MORAN:  Dominick, could you show

16   Mayor Roudez Exhibit B to the complaint, it is

17   the May 6th letter, 2015.

18            MR. LANZITO:   D.

19            MR. MORAN:   It is B.  "B" as in boy.

20       Q.   Okay.  Mayor Roudez, you see this

21   letter that was Exhibit B to the complaint?

22       A.   Yes.

23       Q.   This is, I think we talked about this

24   earlier, this is a letter notifying Eddie

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 51

1    Bradley he is on administrative leave with pay

2    pending further review by the Board, is that

3    correct?

4         A.   Yes.

5         Q.   Did you ever see this letter before?

6         A.   No.

7         Q.   Okay.  Do you recognize who signed the

8    letter?

9         A.   I see it.

10        Q.   Who signed the letter?

11        A.   It says sincerely, Mayor Vivian

12   Covington.

13        Q.   It has her signature above Mayor

14   Covington?

15        A.   In between sincerely and right above

16   her name, correct.

17        Q.   Right.  Okay.  Dominic, could you put

18   up Exhibit A?

19             MR. LANZITO:   You mean Exhibit A to

20   the complaint?

21   BY MR. MORAN:

22        Q.   Yes.  Do you see this letter?

23        A.   I see it.

24        Q.   Okay.  Did you ever see it before?  Or

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 52

1    do you recognize it, I should say?

2         A.    No, I haven't seen it.

3         Q.    Okay.  Does it seem to be a letter of

4    termination?

5              MR. LANZITO:   Objection, calls for a

6    legal conclusion.  You may answer.

7              THE WITNESS:  It says in the first

8    sentence:  "Please be advised that your

9    appointment to the office of the Chief of

10   Police of the Village of University Park

11   terminated as of May 15, 2015."

12   BY MR. MORAN:

13        Q.    So the answer to the question it is a

14   letter of termination.  Who signed this letter?

15        A.    As we all see sincerely, Vivian E.

16   Covington, Mayor.

17        Q.    Who is listed as Village Manager on

18   this letter?

19        A.    Bola Delano.  B O L A  D E L A N O.

20        Q.    On Exhibit B to the complaint, who is

21   listed as Village Manager, could you pull that

22   one back up, Dominick?

23        A.    Lafayette Linear.

24        Q.    What a difference two days makes?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 53

1         MR. LANZITO:   Exhibit B is dated

2    May 16, 2015 and Exhibit A was dated May 29,

3    2015.   Those are Exhibit A and B to the

4    complaint.

5         THE WITNESS:  Yes.  L A F A Y E T E

6    L I N E A R.

7    BY MR. MORAN:

8       Q.   It is between the 16th and the 29th,

9    is that correct, Mayor?

10      A.   Yes.

11      Q.   So one is the 16th and the other one

12   is May 29th, is that right?

13      A.   Yes.

14      Q.   Okay.  I wanted to go back for a

15   second.

16           When you had a conversation with

17   Lafayette Linear about terminating Eddie

18   Bradley?

19      A.   Okay.

20      Q.   Besides -- what did Linear say besides

21   singing Bradley praises as a police officer?

22      A.   I don't know.  It was just that -- it

23   wasn't much of a conversation, just he is not

24   doing it, he has no reason to, and we kept on

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 54

1    doing what we were doing.

2        Q.   What were you guys doing?

3        A.   Probably just talking about some other

4    issues in the community, I don't remember

5    that's been so long ago.

6        Q.   Okay.  Do you have any recollection of

7    whether Linear mentioned politics at all in

8    this conversation with you?

9        A.   I don't have any recollection.

10           MR. MORAN:  Okay.  Let me just take

11   two minutes and then I think we will be

12   wrapping it up.

13           THE WITNESS:  Okay.

14              (Recess.)

15   BY MR. MORAN:

16       Q.   Okay.  We are back on the record.  I

17   just wanted to follow up on one thing.

18              Mayor, when you and Lafayette

19   Linear were conversing about Eddie Bradley,

20   again do you recall why he would not fire Eddie

21   Bradley?

22       A.   No, there was no cause to.

23       Q.   That's what he said, no cause?

24       A.   Yes.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 55

1        Q.   Did he say anything about

2    investigations or anything of that nature?

3        A.   No, not that I can remember.

4             MR. MORAN:   Okay.  I have no further

5    questions.

6

7                      EXAMINATION

8    BY MR. LANZITO:

9        Q.   Mayor, I just have a couple.

10             You said at one point in time you

11   went to the Will County Sheriff's Office or

12   Will County State's Attorney's Office, Griffin

13   and the plaintiff and Chief Bradley, correct?

14       A.   Yes.

15       Q.   And you were also given an

16   investigative file or saw an investigative file

17   provided by Mr. Bradley?

18       A.   Yes.

19       Q.   Did you ever share the fact that you

20   received that investigative file with Vivian

21   Covington?

22       A.   No.

23       Q.   Did you ever share the fact that you

24   went to the Will County State's Attorney's

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)        8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

```
                                              Page 56

  1    Office with Mr. Bradley with anyone else other

  2    than talking about it today?

  3         A.    Trustee Griffin.

  4         Q.    Trustee Griffin was there, correct?

  5         A.    Correct.  I don't remember.

  6         Q.    I'm sorry.

  7         A.    I don't remember.

  8         Q.    Telling anyone else?

  9         A.    No, I don't remember telling anybody

 10    else.

 11         Q.    Do you remember telling Vivian

 12    Covington that you went to the Will County

 13    State's Attorney's Office?

 14         A.    Absolutely not.

 15         Q.    So you are saying you absolutely did

 16    not tell her?

 17         A.    No, I know I didn't.

 18         Q.    Okay.  Do you know if Trustee Griffin

 19    did?

 20         A.    I don't know.

 21         Q.    Do you know if Chief Bradley did?

 22         A.    I don't know.

 23              MR. LANZITO:   That's all I have.

 24    Thanks.
```

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 57

1           MR. MORAN:   I have one follow-up

2    question then.

3

4                EXAMINATION (CONT'D)

5    BY MR. MORAN:

6        Q.   Mayor, what were your reasons for not

7    telling Covington about going to the Will

8    County State's Attorney's Office?

9        A.   I'm not a law enforcement officer, but

10   you know, you don't give the other team your

11   playbook.

12       Q.   And was she mentioned in this

13   conversation with the Will County State's

14   Attorney's Office?

15       A.   I'm sure.

16       Q.   Okay.  And this trip to the Will

17   County State's Attorney's Office, was that

18   mentioned to Lafayette Linear?

19       A.   I don't recall.

20       Q.   And you do recall that Linear said he

21   was not going to fire Bradley because there was

22   no cause to fire him, did he say anything else

23   as to -- for those reasons -- as to reasons for

24   terminating Bradley?

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 58

1      A.    I don't recall.

2            MR. MORAN:   Okay.  I don't have any

3   further questions.

4            MR. LANZITO:   That's all I have.  We

5   will reserve signature.  Thank you.

6            MR. MORAN:   Okay.  Have a good day

7   everybody.  Thank you, Mayor.

8            THE WITNESS:  All right.  Thank you.

9                  (Deposition was concluded at

10                  11:29 A.M.)

11                   -O-o-O-

12

13

14

15

16

17

18

19

20

21

22

23

24

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 59

1    STATE OF ILLINOIS  )

2                       )  SS:

3       COUNTY OF COOK  )

4              The within and foregoing deposition

5    of the aforementioned witness was taken before

6    Carol M. Siebert-LaMonica, C.S.R, at the place,

7    date and time aforementioned.

8              There were present during the taking

9    of the deposition the previously named counsel.

10             The said witness was first duly sworn

11   and was then examined upon oral interrogatories;

12   the questions and answers were reported in

13   shorthand by the undersigned and transcribed

14   via computer-aided transcription.

15             The within and foregoing is a true,

16   accurate and complete record of all of the

17   questions asked of and answers made by the

18   forementioned witness at the time and place

19   hereinabove referred to.

20                The signature of the witness was

21   not waived and the deposition was submitted

22   pursuant to Rules 207 and 211 (d) of the Rules

23   of the Supreme Court of Illinois to the

24   deponent per copy of the attached letter.

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 60

1            The undersigned is not interested in

2      the within case, nor of kin or counsel to any

3      of the parties.

4            Witness my official signature in and

5      for Cook County Illinois on March 8, 2021.

6

7

8                  Carol M. Siebert-LaMonica

9                  C.S.R. No. 084.001355

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 61

C O R R E C T I O N   P A G E

I made the following changes for the
following reasons:

PAGE LINE  CHANGE:

____ ____  _____

           REASON: _____

____ ____  _____

           REASON: _____

____ ____  _____

           REASON: _____

____ ____  _____

           REASON: _____

____ ____  _____

           REASON: _____

____ ____  _____

           REASON: _____

____ ____  _____

           REASON: _____

____ ____  _____

           REASON: _____

____ ____  _____

           REASON: _____

____ ____  _____

           REASON:

(Signed)_____

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 62

WITNESS CERTIFICATION


                    I hereby certify that I

have read the foregoing transcript of my

deposition consisting of Pages 1 through 66,

inclusive.  Subject to the changes set forth on

the preceding pages, the foregoing is a true

and correct transcript of my deposition taken

on July 29, 2020.



                    (Signed)  _____




SUBSCRIBED AND SWORN TO

Before me this __ day of

_____,2021.




_____


Notary Public

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

Page 63

SIEBERT & ASSOCIATES COURT REPORTERS, INC.

507 West 28th Place

Chicago, IL  60614


March 8, 2021


PETERSON, JOHNSON & MURRAY CHICAGO

MR. DOMINICK LANZITO

200 West Adams, Suite 2125

Chicago, IL  60606

(Danzito@pjmchicago.com)

Re:  BRADLEY V VILLAGE OF UNIVERSITY PARK

Dep:  JOSEPH E. ROUDEZ, III


Dear MR. LANZITO:

The deposition testimony given on

July 29, 2020 in the above captioned case has

been transcribed, and inasmuch as signature was

not waived, this is to advise that the

deposition will be available in our office for

30 days for reading and signing.

If you choose to read and sign the

deposition at our offices, please call the

undersigned for an appointment.  Our office

Siebert & Associates Court Reporters, Inc.

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 64

hours are from 9:00 a.m. to 4:00 p.m., Monday

thru Friday.

          If you choose to make other

arrangements for the reading and signing of the

deposition, please advise us of the

arrangements you have made in writing with 30

days from the date of this letter.



                    Sincerely yours,




                    Carol M. Siebert-LaMonica

Electronically signed by Carol Siebert-LaMonica (001-088-343-0918)                    8cd8cb6c-d049-4f98-b4e3-1377fd0d1360

cmsreporters@comcast.net

Page 65

I N D E X

Witness:

Examination

JOSEPH E. ROUDEZ, III

Mr. Moran                                4

Mr. Lanzito                             55

Mr. Moran                               57

E X H I B I T S

Number                                Page



No. 1-10

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

## A

**a.m** 1:13 58:10
  64:3
**able** 23:15,16
  25:1
**absolutely** 28:6
  35:17 42:6
  56:14,15
**account** 22:19
**accounts** 14:6
  14:13,18 15:17
  22:18
**accurate** 59:16
**accused** 16:20
  17:1
**activities** 31:12
  44:17
**Adams** 3:3 63:9
**address** 4:19
  49:23
**administrative**
  37:15,18 51:1
**advise** 63:19
  64:11
**advised** 52:8
**aforementioned**
  59:5,7
**ago** 49:20 54:5
**agree** 13:3,15
**agreement** 4:19
**ahead** 33:15
**al** 1:8 4:16
**Allergies** 20:8
**Amended** 4:13
**amount** 28:2
  47:1
**announced**
  11:21 27:23
**answer** 11:14
  12:17,23 13:7
  14:8 17:13
  20:22 22:4
  24:11 25:8,16
  33:21 34:8
  36:7 43:8
  44:14,23 45:18

47:3 49:5 50:8
  52:6,13
**answered** 46:15
**answers** 59:12
  59:17
**anticipation**
  46:3
**anybody** 20:4
  56:9
**apart** 4:18
**APPEARAN...**
  2:1
**Appeared** 2:13
  3:6
**appears** 24:23
**APPELLATE**
  2:8
**appointment**
  52:9 63:24
**approval** 27:13
  28:5
**approve** 24:5
**approved** 46:3,8
**area** 6:9
**arrangements**
  64:9,13
**asked** 17:10 21:8
  36:20 46:14
  59:17
**asking** 4:10
  21:12 27:6
  34:23 44:3,16
**ASSOCIATES**
  63:1
**assume** 50:3
**attached** 28:9
  29:4 59:24
**attachments** 5:3
  5:19
**attendance** 8:1
**attending** 38:21
**attorney** 4:21,24
  30:1
**Attorney's**
  43:15 44:2,7
  55:12,24 56:13

57:8,14,17
**attorneys** 30:13
**auditing** 41:21
**audits** 45:22,23
  46:1,13,13
**Authorities** 35:4
**available** 63:20
**aware** 9:20 10:5
  10:14,17 11:20
  16:3,24 17:9
  29:3,5 31:23
  37:13
**awhile** 18:14

## B

**B** 9:2 28:10,20
  29:4 31:10
  50:16,19,19,21
  52:19,20 53:1
  53:3 65:19
**back** 21:13,15
  23:7 29:15
  31:16,21 32:2
  52:22 53:14
  54:16
**Bank** 13:19 14:6
  14:18 15:18
**based** 43:8
**basically** 40:9
**basis** 6:24
**behalf** 2:13 3:6
**believe** 4:24 16:8
  20:14 25:9
  35:5 48:8,13
  48:14 49:19
**believed** 17:17
**best** 15:12
**better** 39:10
**beyond** 34:20
  35:8
**bit** 26:15
**blew** 26:14
**blow** 23:14
**Board** 8:21 12:2
  27:5,6,12,18
  27:23 28:5,5

37:19,21,22
  39:2 41:6
  46:16 48:19
  49:17,17,23,24
  50:2,6 51:2
**Bola** 9:2,3 30:16
  52:19
**bottom** 26:9
**boy** 6:6 50:19
**Bradley** 1:4 4:15
  6:17,20 7:8,18
  7:20,23 8:13
  9:13,17,23
  10:2,6,11,14
  10:17,21 11:8
  11:17,21 12:1
  12:5 14:17
  15:16 16:13
  17:2,9,16 18:5
  18:8,15,24
  19:8 20:11,18
  21:4,8,12 22:1
  22:6 24:2,24
  28:11 29:6
  36:21 37:4,8
  37:14 38:1,9
  38:15 39:3,12
  39:19 40:21
  42:3 43:14,20
  43:23 47:21
  48:7,9 50:5
  51:1 53:18,21
  54:19,21 55:13
  55:17 56:1,21
  57:21,24 63:12
**Bradley's** 8:17
  14:5 34:14
**branch** 13:22
**branches** 14:1
**breakfast** 5:16
**bring** 31:6
**Britz** 31:7
**Brown** 26:5
**bucks** 46:22
**Bureau** 22:14
**business** 41:19

41:20

## C

**C** 8:8 15:13 61:1
  61:1
**C.S.R** 1:16 59:6
  60:9
**call** 63:23
**called** 4:2 48:21
**calls** 22:3 33:20
  34:8 44:13
  52:5
**captioned** 63:17
**Carol** 1:16 28:16
  59:6 60:8
  64:24
**case** 4:15,16
  5:21 60:2
  63:17
**cause** 24:22
  25:13 54:22,23
  57:22
**causes** 27:16
**cease** 18:16,24
**CERTIFICA...**
  62:1
**certify** 62:4
**CHANGE** 61:4
**changes** 61:2
  62:7
**charge** 40:9
**charted** 49:20
**check** 48:12,18
**Chicago** 2:5,11
  3:1,4 13:23
  63:3,7,10
**chief** 6:17,21
  7:18 11:9,18
  14:17 15:16
  17:3,16 18:8
  18:15 19:13,13
  19:16 21:9,13
  22:6 24:6,9,18
  24:22 25:6
  34:16,17,19
  35:7 36:21

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

38:1 39:3,12
39:19 40:5
41:11 42:8
43:20 47:21
48:5,6,8 50:5
52:9 55:13
56:21
**choose** 63:22
64:7
**CHRISTOPH...**
2:9
**circumstances**
17:6 18:20
**city** 37:21
**Civil** 5:11
**Ckeleher@ap...**
2:12
**clarify** 33:18
**clause** 24:19,23
25:6,11 35:3
**clauses** 32:10,20
33:13,19 34:6
**come** 21:13,15
21:23 23:7
43:18 49:16
**comes** 41:11
**comment** 10:3
**Commission**
40:17
**committed**
10:14
**committing**
10:18
**communicated**
10:24 11:3,5
**community** 40:6
54:4
**complaining**
17:20
**complaint** 5:2
5:19 28:8,10
28:19 29:5
50:16,21 51:20
52:20 53:4
**complete** 59:16
**completed** 26:17

**completely**
24:15 27:14
**computer-aided**
59:14
**concern** 28:1
**concerning**
17:10
**concerns** 17:17
17:24 49:18
**concluded** 58:9
**conclusion**
33:21 34:8
44:14 52:6
**conduct** 10:12
**conducted** 16:9
22:12
**conference** 8:7
27:24
**conferences**
35:17
**confusion** 25:7
**consisting** 62:6
**constant** 35:18
**CONT'D** 57:4
**contagious** 20:9
**contentious** 7:14
7:15
**continue** 31:22
**continuing**
22:22
**contract** 23:19
24:1,8,9,15,19
24:23 25:22
32:3,5,21
34:14 46:19,20
**conversation**
36:23 53:16,23
54:8 57:13
**conversations**
36:24
**conversing**
54:19
**Cook** 1:17 59:3
60:5
**copy** 47:21
59:24

**Corporate** 35:4
**correct** 5:10
6:10,17 7:12
8:3,22 15:4
16:14,15 17:7
17:8 20:16,17
21:1,22 22:20
25:14,23 31:24
32:1 36:12
38:1 39:1 41:2
41:16 42:19
43:23 45:16
46:10 47:8,20
51:3,16 53:9
55:13 56:4,5
62:9
**correction** 4:18
**correctly** 15:13
**corruption** 43:5
43:17
**council** 7:1,2
46:4
**counsel** 59:9
60:2
**County** 1:17
43:14 55:11,12
55:24 56:12
57:8,13,17
59:3 60:5
**couple** 33:12
55:9
**Court** 1:1,15
12:21 13:10
23:3 59:23
63:1
**Covington** 7:7
15:3 18:16
27:7,10 28:12
29:23 36:20
37:14 38:8,20
39:11,18 45:12
47:13 48:11,24
50:5 51:12,14
52:16 55:21
56:12 57:7
**Covington's**

42:22
**create** 41:7
**criminal** 10:12
10:15,18 13:17
44:16
**current** 19:13,13
**currently** 15:9
**customary** 34:2
**CV** 4:16

**D**

**d** 5:10 9:2 50:18
52:19 59:22
65:4
**danger** 27:16
**Danzito@pjm...**
3:5 63:11
**date** 39:5 59:7
64:15
**dated** 53:1,2
**dates** 44:8
**Davis** 48:1,11
49:1,10,15
50:6
**day** 22:22 58:6
62:18
**day-to-day**
31:12 40:10
**days** 52:24
63:21 64:15
**deal** 40:18
**Dear** 63:15
**Deborah** 19:18
**declared** 25:22
**defendants** 1:9
3:6
**definitely** 22:5
**Delano** 9:2,4
30:16,21 35:24
52:19
**Dep** 63:13
**department**
10:10 12:6
14:21 15:5
16:12
**depends** 44:6

**deponent** 59:24
**deposition** 1:11
4:14,14,20 5:9
5:14 23:11
58:9 59:4,9,21
62:6,9 63:16
63:20,23 64:11
**describe** 6:19
7:10
**difference** 52:24
**different** 24:12
24:16 41:12
**direction** 45:9
**Director** 19:24
20:1 29:14,19
**discussed** 5:21
**discussion** 43:24
**District** 1:1,2,15
1:15
**DIVISION** 1:3
**document** 5:1
24:1 25:15
26:20
**doing** 40:23 42:8
53:24 54:1,1,2
**Dominic** 51:17
**Dominick** 3:2
23:6 28:15
50:15 52:22
63:8
**due** 22:1
**duly** 4:3 59:10
**duties** 11:9,18
12:14 40:4
41:5

**E**

**E** 1:12 4:1,5
5:10 8:8 9:2
15:14 31:9
52:15,19 53:5
53:5,6 61:1,1
63:13 65:4,9
65:19
**earlier** 50:24
**EASTERN** 1:3

**Eddie** 1:4 4:15
6:16 9:13 11:8
11:17 12:1
17:2 18:24
19:8 21:3,8
24:1,24 28:11
29:6 34:14
38:9,15 47:20
48:7 50:24
53:17 54:19,20
**effect** 15:21
**election** 46:18
**emergency** 38:2
38:16 39:8
**employ** 34:19
35:6
**employee** 18:24
21:12,16
**employees** 11:3
35:22
**employment**
32:3
**enforcement**
57:9
**enlarged** 26:15
**equal** 25:13
**et** 1:8 4:16
**everybody** 58:7
**exactly** 27:19
38:5 43:10
**Examination**
55:7 57:4 65:7
**examined** 4:3
59:11
**executive** 40:5
50:1
**exercising** 5:17
**exhibit** 23:11
26:3,10 28:13
28:23 50:16,21
51:18,19 52:20
53:1,2,3
**exhibits** 28:9,10
28:20,22 29:4
**existence** 45:22
**existing** 13:24

**express** 17:16
49:18
**expressed** 17:23
**extends** 34:20
35:8

**F**

**F** 18:2,2 53:5
**fact** 37:13 55:19
55:23
**failed** 12:14
**false** 46:11
**falsely** 12:13
13:3,15
**familiar** 49:22
**fantastic** 4:9
42:7
**far** 5:2 22:23
**FBI** 42:23
**federal** 5:11
17:18 18:5
19:9 22:9,14
**fee** 25:13,21
**Felicia** 30:7
**fiction** 45:4
**file** 47:22 55:16
55:16,20
**files** 17:10
**finally** 45:9
**Finance** 10:10
14:21 15:5,6
**finances** 45:15
46:7
**Financials** 41:21
**find** 7:12 26:8
**fine** 4:12
**finish** 32:23
**fire** 36:21 39:19
40:14,15,16,24
41:6 42:3,7
54:20 57:21,22
**fired** 10:4,12,21
11:21 13:4,16
20:11 21:4
37:4 39:18
43:23 49:2,10

50:5
**firing** 35:22
**firm** 41:18
**first** 4:2 5:24
19:17 24:4
32:4,10,21
33:2,6 35:1
38:1,15 52:7
59:10
**fiscal** 46:13
**five** 22:24 32:20
**focus** 43:11
**follow** 41:8
54:17
**follow-up** 57:1
**following** 39:6
61:2,3
**follows** 4:4 34:4
**foregoing** 59:4
59:15 62:5,8
**forementioned**
59:18
**form** 11:13
12:16 14:7
16:21 17:12
22:3 34:3
44:23 45:17
50:7
**formally** 21:7
**former** 14:22,24
36:20 48:5
**forth** 62:7
**found** 37:16
**foundation**
12:17 20:21
24:10 42:16
43:7 44:22
**four** 25:13
**four-year** 6:7
**Frazier** 30:8
**Friday** 64:5
**front** 4:17
**full** 14:14
**function** 36:14
**functions** 40:3
41:5

**fund** 27:12
**funds** 27:12 28:3
**further** 25:20
37:18 46:1
51:2 55:4 58:3

**G**

**G** 18:2 61:1
**general** 27:12
33:13 34:5
**gentleman** 21:20
**getting** 45:7
46:2
**give** 10:2 13:10
32:13 57:10
**given** 49:16
55:15 63:16
**go** 23:22 31:16
32:2 33:2,7,15
39:23 43:13
44:6 53:14
**goes** 40:16
**going** 5:8 23:13
40:24 42:7
44:5 46:1 57:7
57:21
**good** 4:7 5:16
34:15,15 41:23
47:15 58:6
**goodness** 30:2
**grab** 23:1
**Grabbing** 28:17
**great** 27:16
**Griffin** 8:12
18:1 21:19
43:13 55:12
56:3,4,18
**gross** 43:5,18
**GROUP** 2:2,8
**guess** 16:11 36:8
44:5
**guy** 34:15
**guys** 54:2

**H**

**H** 65:19

**hands** 20:7
**happened** 9:6
27:15 37:11
47:10 49:20
**hard** 27:21 45:1
45:3
**harm** 27:16
**head** 49:21
**hear** 13:9,19
14:14 15:23
**heard** 10:3
14:12 15:20
42:13
**hearing** 9:14,23
39:8 46:21
**heart** 49:21
**hearty** 5:16
**held** 38:2
**hereinabove**
59:19
**hired** 38:2,15,16
39:7
**hiring** 35:22
38:12 50:6
**Holloway** 41:15
41:16 42:18
46:12 47:13
**Holloway's**
42:11
**home** 34:19 35:6
**hours** 64:3
**house** 5:15 46:7
**Human** 29:14
29:19

**I**

**III** 1:12 4:1
63:13 65:9
**IL** 2:5,11 3:4
63:3,10
**illegal** 27:15
**Illinois** 1:2,15,18
59:1,23 60:5
**immediately**
48:6
**immoral** 27:14

**inaccurate** 38:6
**inappropriate** 27:11
**inasmuch** 63:18
**incident** 17:10
**includes** 25:11
**inclusive** 62:7
**indicate** 34:18 43:20 49:7
**individual** 47:24
**insure** 28:14
**integrity** 11:17 13:4
**interact** 6:23 7:7
**interaction** 7:11
**interested** 60:1
**interrogatories** 59:11
**introduce** 27:17
**investigate** 12:2 12:5
**investigated** 12:8,10 15:17
**investigating** 43:21
**investigation** 16:6,10,17 17:6 22:9,12 22:15,16,21 43:4,5,11 47:22
**investigations** 18:17 19:1 55:2
**investigative** 55:16,16,20
**involvement** 8:18
**Irma** 41:14,16 42:11,18 46:12 47:13
**issue** 10:9
**issues** 54:4

**J**

**J** 8:12 15:13

**J.t.m.moran...** 2:6
**Jacelia** 15:7
**Jackson** 29:10 29:13
**Jerry** 20:3
**job** 42:8
**John** 2:3 23:22 33:15
**JOHNSON** 3:1 63:7
**Joseph** 1:12 4:1 5:9 63:13 65:9
**Judge** 4:17
**July** 1:13 62:10 63:17
**June** 29:15 30:1
**jurisdiction** 41:12

**K**

**K** 15:14
**Keith** 8:12 18:1 21:19 47:22
**KELEHER** 2:8 2:9
**Kelly** 15:7,14
**kept** 53:24
**kin** 60:2
**kind** 9:23 14:13 41:20
**know** 8:2,14,24 9:12,15,16,19 10:6,8,9,11,13 10:21,23 11:2 11:5,20,23 13:21 14:4,19 14:20 15:6,16 16:9,18 17:5 17:23 18:15 20:12 22:23 23:14 24:21 26:16 29:9,11 29:11,24 32:24 35:24 38:10 39:10,18 40:13

41:14,15,16,24 42:10,12,21,22 43:1 47:9,17 47:24 48:4,16 49:15 53:22 56:17,18,20,21 56:22 57:10
**knowing** 27:13
**knowledge** 12:3 12:4 16:16 18:22 20:18,20 20:23 21:10,11 22:8 28:6 35:21 36:5 43:8 44:20 47:12 48:10,19
**known** 49:1,5
**knows** 42:18

**L**

**L** 9:2,2 15:13,14 15:14 52:19,19 53:5,6
**lack** 11:17
**lacked** 13:4
**Lafayette** 8:13 36:5,17 52:23 53:17 54:18 57:18
**Lake** 2:4
**language** 24:7,8 25:11
**Lanzito** 3:2 5:22 11:13 12:16,23 13:6 14:7,22 15:10,22 16:21 17:12 20:8,21 22:3 23:7,13 23:18,21 24:10 25:7,15,24 26:5,8,11,14 28:17,21 31:18 32:6,15 33:1,5 33:15,20 34:7 36:6 42:16 43:7 44:13,22

45:17 46:14 47:3 49:4 50:7 50:18 51:19 52:5 53:1 55:8 56:23 58:4 63:8,15 65:14
**laptop** 42:23
**large** 11:6
**Las** 8:5 21:21
**LaSalle** 2:10
**law** 2:2,8 17:18 18:5 39:16 41:9 57:9
**lawfirm** 30:23 31:1,7
**laws** 19:10
**lawyer** 5:22
**lawyers** 30:11 31:11
**leave** 30:17 31:1 37:15,18 51:1
**left** 5:15 30:17
**legal** 33:21 34:8 44:14 52:6
**legis** 40:4
**Legislative** 36:15
**let's** 6:6 22:24 26:13
**letter** 26:6,18,21 37:14,17 50:17 50:21,24 51:5 51:8,10,22 52:3,14,14,18 59:24 64:15
**letters** 28:10 29:5
**line** 44:9 61:4
**Linear** 8:14,17 8:20 36:5,17 37:8 40:20,24 42:2 52:23 53:17,20 54:7 54:19 57:18,20
**listed** 26:23 52:17,21

**little** 23:14 26:14 45:6 46:1
**LLC** 2:8
**located** 13:21
**long** 6:14 44:20 49:20 54:5
**longer** 30:20
**loss** 28:2
**lost** 46:18
**lot** 43:9

**M**

**M** 1:16 4:5 59:6 60:8 64:24
**main** 43:11
**management** 32:11
**Manager** 8:15 8:21 9:4 30:16 34:21 35:9,23 36:1 40:11 41:13 46:2 52:17,21
**mandatory** 39:15 40:1
**manipulation** 28:4
**March** 60:5 63:5
**Maxine** 29:9,13
**mayor** 4:7 5:9 5:13 6:1,11 7:7 13:15 14:5,16 14:21,22,24 15:3 18:4,16 19:7 23:13,14 23:24 26:12 27:7,7,9,10 28:7,11,11 29:23 31:2,4 31:22 32:5,9 32:20 33:2,21 34:9,20 35:8 35:13 36:20,20 37:3,13 38:8 38:20 39:11,18 39:22,23 40:4

cmsreporters@comcast.net

42:22 44:19
45:12,21 48:11
50:16,20 51:11
51:13 52:16
53:9 54:18
55:9 57:6 58:7
**mean** 14:23
19:21 25:17
35:19 40:7
48:22 51:19
**meaning** 34:3,4
34:5,11
**means** 40:8
**meet** 7:2
**meeting** 8:4,5
38:2,17,21
39:2 49:17
**meetings** 7:1
46:4
**Mel** 47:24 48:11
49:1,10,15
50:6
**member** 37:21
**members** 12:2,6
**memory** 30:3
38:23
**mention** 18:8
19:19,23
**mentioned** 5:1
19:8 37:1 54:7
57:12,18
**million** 22:17
**millions** 44:21
**minute** 32:3
**minutes** 23:1
31:15 38:18
49:24 50:2
54:11
**mismanageme...**
43:6,18
**missing** 22:17
32:16
**mistaken** 13:23
22:15 40:16
**moment** 19:3
**Monday** 64:3

**money** 28:2,4,5
42:10 46:17
47:1
**Montana** 30:11
30:15
**month** 7:4
**months** 25:13
43:24
**Moran** 2:2,3 4:6
4:11 5:7 11:16
12:20 13:2,14
14:15 15:2,15
16:2,23 17:15
19:3,6 20:10
20:24 22:7,24
23:3,6,9,20,23
24:13,17 25:10
25:19 26:2,7,9
26:16,19 28:15
28:19 29:2
31:14,20 32:8
32:17,19 33:9
33:12,17,24
34:12 35:2
36:9 42:17
43:12 44:18
45:10,20 46:23
47:6 49:6
50:11,15,19
51:21 52:12
53:7 54:10,15
55:4 57:1,5
58:2,6 65:13
65:15
**morning** 4:7
38:3,17 39:7
**motion** 7:22
8:16
**moved** 39:19
**moving** 28:4
**MURRAY** 3:1
63:7

**N**

**N** 4:5,5 8:8 9:2
18:2 31:9

52:19 53:6
61:1 65:4
**name** 15:11,14
19:15,17 29:11
29:19 51:16
**named** 29:9 30:7
30:11 41:14
47:24 59:9
**nature** 55:2
**navigate** 23:22
**neighbor** 21:5
**never** 20:18
46:13
**new** 31:7
**No.15-cv-08489**
1:6
**Norgle** 4:17
**Northern** 1:2,15
**Notary** 62:24
**notice** 1:18 4:13
**notifying** 50:24
**number** 26:4,12
65:21
**numbers** 45:2
46:20

**O**

**O** 4:5 5:10 8:8
9:2,2 31:9,9
52:19,19 61:1
61:1
**O-o-O-** 58:11
**oath** 1:12 31:23
**Object** 11:13
**objection** 4:21
4:22 12:16
14:7 16:21
17:12 22:3
24:10 25:7,15
25:24 33:20
34:7 36:6
42:16 43:7
44:13,22 45:17
46:14 49:4
50:7 52:5
**objections** 13:6

**observed** 47:14
**occasion** 7:6
36:16
**October** 46:5
**Odelson** 30:6,9
**offenses** 10:15
10:18
**offensive** 12:13
13:5,17
**office** 12:15
39:22 43:15
44:2,7 45:16
45:24 47:2,4
52:9 55:11,12
56:1,13 57:8
57:14,17 63:20
63:24
**officer** 40:5,14
40:15 41:9
53:21 57:9
**officers** 41:11
**offices** 63:23
**official** 39:2 40:8
60:4
**Oh** 6:6 14:16
26:22 29:24
30:2,17 34:15
35:3,15 38:23
44:5
**okay** 4:7,24 5:4
5:7,18 6:8,10
7:13 12:1
14:20 15:20
16:3,6,16 17:9
18:22 19:23
20:4 21:3,7
22:24 23:2,3,9
23:16 24:7,13
24:21 25:3,5
25:20 27:5,22
28:1,15 29:13
29:24 30:10
31:3,18,21,22
32:2,9,18 33:4
33:7,9,14,14
33:15,18 34:5

35:10,21 36:4
36:13 37:8,21
39:9,11 40:3
41:5 42:21
43:13 44:10,19
47:20 48:24
49:7,15,24
50:20 51:7,17
51:24 52:3
53:14,19 54:6
54:10,13,16
55:4 56:18
57:16 58:2,6
**on-the-job**
35:16
**once** 37:1
**one-year** 24:15
**ongoing** 22:16
43:2
**operating** 45:5
**operation** 32:12
**operations**
40:10
**opinion** 12:24
**opportunity**
10:3 49:16,22
**oral** 59:11
**ordinance** 34:3
**organization**
42:11
**Oscar** 26:5
**Ottosen** 31:7

**P**

**P** 61:1
**p.m** 64:3
**page** 24:23 25:1
32:4,10,21,22
33:2,2,6,8,11
35:1,2 61:4
65:21
**pages** 62:6,8
**paid** 20:18 25:21
42:10 46:12
47:1,7,10
**paperwork** 23:1

Siebert & Associates Court Reporters, Inc.

cmsreporters@comcast.net

**Park** 1:7 4:16
6:1,12 27:6
35:5 48:5
52:10 63:12
**parties** 4:19 60:3
**passed** 38:4 39:4
**passing** 21:6
46:4
**pay** 10:7 20:15
51:1
**payments** 20:13
**pending** 37:18
51:2
**people** 26:24
27:14 45:1
**perform** 11:8,11
12:14
**performance**
11:18
**period** 9:9 35:7
35:19 46:24
47:8
**person** 13:4 20:6
29:12 41:14
**personally** 47:14
**PETERSON** 3:1
63:7
**pistol** 16:20 17:1
**place** 59:6,18
63:2
**placed** 16:4
**placing** 37:14
**plaintiff** 1:5 2:13
55:13
**plan** 34:16
**play** 45:2
**playbook** 57:11
**playing** 42:9
**please** 10:16
12:19 13:10
15:10 32:13
52:8 63:23
64:11
**point** 34:24
55:10
**police** 6:17,21

7:18 11:9,18
12:6 16:11
17:2 19:14
21:8,13 24:9
24:22 25:6
32:12 34:17,19
35:7 39:13
40:14,15,16
41:6,8,11,11
48:5 52:10
53:21
**policy** 18:10,12
19:9
**politics** 42:9
50:12 54:7
**position** 29:16
35:14
**possible** 18:18
50:10
**potentially**
19:20,21 50:9
**powers** 34:19
35:6
**praises** 53:21
**prayed** 5:15
**pre-termination**
9:13
**preceding** 62:8
**predecessor**
29:21,22
**prepare** 5:14
**present** 24:9,18
24:21 25:6
59:8
**presented** 7:22
9:3
**presently** 43:1
**press** 27:24
**previously** 59:9
**principal** 41:18
**prior** 6:10
**privileged** 27:14
**probably** 37:1
43:9 54:3
**probationary**
24:14

**problem** 23:6
**procedure** 5:12
40:13
**procedures** 41:7
41:7
**process** 36:3,4
38:11,13,19,21
41:8
**Professional**
6:22
**protection** 44:16
**provided** 9:13
55:17
**public** 11:6
19:24 62:24
**pull** 32:6 52:21
**pursuant** 1:14
1:18 5:11
38:16 59:22
**put** 29:19 51:17

---

**Q**

**question** 10:16
12:18,22 13:9
13:12 14:9,11
14:14 16:24
17:13 25:4,5
28:24 29:3
34:10 38:14
41:23 45:18
52:13 57:2
**questioned** 38:7
**questions** 31:16
33:11,13,16
55:5 58:3
59:12,17

---

**R**

**R** 5:10 8:8 18:2
31:10 53:6
61:1,1
**ragged** 46:7
**Ray** 1:4 4:15
21:3,8,19 29:6
47:20 48:7
**read** 12:22 13:12

14:11 23:15,16
26:12 33:6
38:7 62:5
63:22
**reading** 25:18
26:17 32:23
63:21 64:9
**reads** 26:1
**ready** 33:7
**really** 15:21 30:2
30:5 38:23
**reason** 49:19
53:24 61:6,8
61:10,12,14,16
61:18,20,22
**reasons** 9:17
43:10 50:4
57:6,23,23
61:3
**recall** 7:17,22
8:24 9:3 12:8
16:19 17:20
18:12 19:7
27:2,6 28:12
29:13 30:11
36:19 37:19
38:8,20 39:11
39:14 41:3
42:5 48:20,21
49:10,13 54:20
57:19,20 58:1
**receive** 9:23
25:12 39:21
**received** 10:7
26:24 55:20
**receiving** 27:2
**Recess** 19:5
23:10 31:19
54:14
**recognize** 26:20
51:7 52:1
**recollect** 18:7
**recollection** 18:4
18:19 29:18
54:6,9
**recon** 8:7

**record** 31:21
41:10 54:16
59:16
**records** 39:9
47:18
**red** 44:21 45:6,7
45:11
**referred** 23:12
59:19
**referring** 18:6
**reflect** 38:18
**refused** 20:12,15
**regarding** 29:1
**regular** 6:24
49:17
**rehabilitate**
45:15
**relationship**
6:20 47:12,18
**relevance** 14:8
**remember** 12:9
12:10 15:7,21
15:24 17:22
20:6 27:19,21
30:5,7 38:5,19
38:24 44:7
48:23 50:4
54:4 55:3 56:5
56:7,9,11
**remotely** 4:20
**remove** 17:10
**renewed** 46:19
46:20
**repeat** 12:18,20
**replaced** 8:20
9:1
**reported** 59:12
**Reporter** 12:21
13:10 23:4,5
**REPORTERS**
63:1
**reporting** 44:16
**reserve** 58:5
**resign** 27:7,10
**resolution** 34:2
**resolved** 22:22

cmsreporters@comcast.net

**Resources** 29:14
29:20
**restate** 10:16
38:14
**results** 16:17,18
22:13
**retained** 14:6,12
**retaliation** 50:6
**return** 21:8
**review** 37:18,22
51:2
**reviewed** 5:1,18
28:7 45:22
**rewind** 13:11
**right** 5:8,19 13:9
26:11 28:3,17
32:7 45:8
51:15,17 53:12
58:8
**rotating** 34:16
**Roudez** 1:12 4:1
4:7 5:9,13
23:13 27:9
28:7 31:22
32:5 35:13
44:19 50:16,20
63:13 65:9
**rule** 34:19 35:6
**Rules** 1:14 5:11
59:22,22
**running** 15:6

**S**

**S** 31:9 65:19
**salary** 25:14
**Saturday** 38:3
38:16 39:7
**saw** 28:14 55:16
**saying** 13:3,16
56:15
**says** 25:12,20
34:15 35:10
51:11 52:7
**scroll** 28:22
32:15
**Seaway** 13:19

14:6,18 15:17
**second** 32:13,14
32:22 33:1,5
53:15
**see** 6:6 7:6 9:12
21:5 23:18,20
24:4,18 25:1
26:13 28:13
31:15 32:9
50:20 51:5,9
51:22,23,24
52:15
**seen** 23:24 52:2
**seminars** 35:13
39:22,23
**sent** 29:6 37:14
**sentence** 52:8
**series** 36:24
**serve** 35:7
**session** 50:1
**set** 62:7
**severance** 10:7
20:19 24:19
48:12
**share** 55:19,23
**sharing** 26:11
**Sheriff's** 55:11
**shift** 26:3
**shorter** 30:20
**shorthand** 59:13
**shortly** 44:9
**show** 32:5 34:24
38:8 50:15
**SIEBERT** 63:1
**Siebert-LaMo...**
1:16 59:6 60:8
64:24
**sign** 63:22
**signature** 51:13
58:5 59:20
60:4 63:18
**signed** 28:11
51:7,10 52:14
61:24 62:13
**significant** 28:2
**signing** 63:21

64:9
**signor** 40:8
**similar** 24:8
25:6
**simultaneously**
37:10
**sincerely** 51:11
51:15 52:15
64:19
**singing** 53:21
**single** 36:23
**sir** 6:5
**situation** 50:13
**solid** 45:3
**somebody** 44:15
**son** 16:20,22
17:2
**sorry** 15:23 56:6
**sounds** 49:21
**South** 2:10
**speak** 36:16
**speaking** 30:22
**speaks** 25:16
34:17
**specifics** 17:22
**speculation** 22:4
49:4 50:8
**spell** 15:10,13
31:8
**spelled** 5:10
**spend** 46:17
**spoken** 21:3
**SS** 59:2
**stand** 17:14
**started** 35:24
**state** 1:18 12:14
17:18 18:5
19:9 39:16
41:9 59:1
**State's** 43:14
44:2,7 55:12
55:24 56:13
57:8,13,17
**statement** 27:18
**states** 1:1,14
35:3 37:17

**stay** 30:20
**stayed** 35:15
**Sterk** 30:6,9
**stolen** 16:3
**storage** 16:4
**Street** 2:4,10
13:23
**stuff** 47:15
**subject** 43:17
62:7
**submitted** 59:21
**SUBSCRIBED**
62:17
**sudden** 28:2
**Suite** 2:4,10 3:3
63:9
**Supreme** 59:23
**sure** 13:8 15:19
20:14 24:20
31:9 37:11
43:10 57:15
**sworn** 4:3 6:4
39:3 59:10
62:17

**T**

**T** 2:3 4:5 31:9,9
31:10 53:5
61:1 65:19
**take** 4:14,21
22:24 31:14
54:10
**taken** 1:12 38:3
39:2 42:23
59:5 62:9
**talked** 40:20
50:23
**talking** 18:13
38:12 54:3
56:2
**team** 57:10
**tell** 23:21 40:21
42:2 56:16
**telling** 36:19
56:8,9,11 57:7
**ten** 22:10

**tenure** 15:8
**term** 6:5,7 25:21
34:20 35:8
**terminate** 7:23
40:22 41:8
**terminated** 9:22
14:17 25:12
36:5 37:9
49:18 52:11
**terminating**
7:18,19 53:17
57:24
**termination**
8:17 9:17
10:23 11:2,10
14:5 24:22
37:23 40:21
52:4,14
**testified** 4:3
**testimony** 63:16
**testing** 30:2
38:23
**Thank** 4:9 35:10
44:19 58:5,7,8
**Thanks** 23:9
56:24
**thing** 36:11
54:17
**think** 32:16
44:24 50:23
54:11
**thought** 18:9
19:8
**TIFF** 22:17,19
27:12 28:3
**time** 5:24 8:16
9:10 11:9 14:2
14:3,5 15:6
20:1 27:3 30:6
30:14 35:7
44:8 46:24
47:8,10 55:10
59:7,18
**today** 4:13,14
5:14 28:8 56:2
**told** 18:16,24

cmsreporters@comcast.net

31:3 45:24
**top** 32:22 33:1
**totally** 41:13
**town** 7:24 8:3,19
9:5,7 36:2,10
37:12 38:10
**Townsend** 20:3
**training** 35:14
35:15,16,18
39:15,21 40:1
**transcribed**
59:13 63:18
**transcript** 62:5
62:9
**transcription**
59:14
**transferring**
27:11
**trip** 57:16
**true** 46:11 59:15
62:8
**trustee** 6:11,14
6:16 7:3 8:9
10:15,19 16:19
17:1 18:1,23
21:12,15,17,19
21:22 35:12,19
39:15,24 41:19
43:13 46:19
56:3,4,18
**Trustee's** 36:13
**Trustees** 8:22
37:22
**trying** 34:13
44:24 45:14
**Tuesday** 7:5
39:6
**Twice** 7:4
**two** 28:8,10
52:24 54:11

**U**

**U** 5:10
**unable** 11:8,11
**unaware** 17:4
19:2 46:21

**undersigned**
59:13 60:1
63:24
**understanding**
33:19,22 46:18
**unenforceable**
25:22
**United** 1:1,14
**University** 1:7
4:16 6:1,11
27:6 35:5 48:5
52:10 63:12
**up-to-date**
45:23 46:5
**upset** 49:1,8

**V**

**V** 63:12
**vague** 17:13
**vaguely** 49:21
**Vegas** 8:5 21:21
**vehicles** 16:4,7
**versus** 4:15
**Village** 1:7 4:15
8:6,15,20 9:4
9:12,16,24
10:2 11:3,6
12:2 14:4,16
15:17 16:4,19
17:1 18:9,23
18:23 19:9
20:12,17 21:7
21:12,16 22:2
22:6,9 29:7,15
29:17 30:1,13
30:16 31:11
34:21 35:5,9
35:12,22,23
36:1,13 39:15
40:11 41:13,19
42:11 44:20
45:11,15 46:2
46:11 47:18
48:18 49:17
52:10,17,21
63:12

**violating** 19:9
**violations** 17:18
18:9,12
**Vivian** 45:11
47:13 48:24
51:11 52:15
55:20 56:11
**vote** 7:17,19
38:3,8 39:2
48:22
**voted** 24:5 48:18
**voting** 39:12
**vs** 1:6

**W**

**wages** 20:13
**waived** 59:21
63:19
**want** 13:8 18:3
23:21 26:3
28:21
**wanted** 33:18
37:3 53:14
54:17
**wants** 40:22
**Wash** 20:7
**wasn't** 27:23
47:9 53:23
**way** 42:6
**Wednesday** 1:13
**week** 37:9
**weekend** 9:9
**Welch** 30:11,15
**welcome** 4:11
**went** 14:13 44:1
47:16 55:11,24
56:12
**West** 2:4 3:3
63:2,9
**whipping** 16:20
17:2
**whistleblower**
44:10,12
**Wilson** 19:16
**witness** 4:2
11:15 12:18,24

13:8,13 14:9
14:12,24 15:12
15:24 20:23
22:5 23:2,16
24:12,14 25:9
25:17 26:1,13
26:18 28:24
32:18 33:4,7
33:10,14,22
34:10 36:8
43:9 44:15,24
45:19 46:16
47:4 50:9 52:7
53:5 54:13
58:8 59:5,10
59:18,20 60:4
62:1 65:6
**woman** 29:9
30:7
**words** 7:12
**working** 45:6,8
**Works** 19:24
**wouldn't** 22:6
**Wow** 46:8
**wrap** 31:16
**wrapping** 54:12
**writing** 9:18
64:13
**wrong** 5:10

**X**

**X** 4:5 65:4,19

**Y**

**Y** 15:14 53:5
**year** 46:6
**years** 22:10
**yesterday** 28:14

**Z**

**Z** 5:10 31:10
**ZOOM** 1:12

**0**

**084.001355** 1:17
60:9
**08489** 4:16

**1**

**1** 33:11 62:6
**1-10** 23:11 65:24
**10** 31:14
**10:30** 23:8
**10:34** 1:13
**101** 2:4
**11:29** 58:10
**14** 46:3,9
**14.9** 22:17
**15** 4:16 6:4 46:3
46:9 52:11
**16** 46:3,9 53:2
**16th** 53:8,11
**17** 46:4
**190** 2:10

**2**

**200** 3:3 63:9
**2005** 6:15
**2013** 39:8
**2015** 29:15 30:1
50:17 52:11
53:2,3
**2016** 26:10
**2017** 6:15 27:20
46:19 47:5
**2019** 6:4 47:5
**2020** 1:13 46:8
62:10 63:17
**2021** 60:5 62:19
63:5
**207** 59:22
**2100** 2:10
**211** 59:22
**2125** 3:3 63:9
**23** 6:6
**25,00** 48:12
**28th** 63:2
**29** 1:13 53:2
62:10 63:17
**29th** 53:8,12
**2nd** 7:4

**3**

**3** 26:10

cmsreporters@comcast.net

**30** 63:21 64:13
**300,000** 42:14

**4**

**4** 24:23 25:1
  65:13
**4:00** 64:3
**4th** 7:4

**5**

**5/14/23** 6:8
**507** 63:2
**55** 65:14
**566** 2:4
**57** 65:15

**6**

**600,000** 46:12
  46:22
**60603** 2:11
**60606** 3:4 63:10
**60614** 63:3
**60661** 2:5
**66** 62:6
**6th** 50:17

**7**

**8**

**8** 60:5 63:5
**87th** 13:23

**9**

**9** 26:4,12
**9:00** 64:3